UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
UNITED STATES OF AMERICA,

                                          **MEMORANDUM AND ORDER**

      -against-                           08-CR-906(KAM)


KEMO SYLLA, *et al.*,

                        Defendants.
------------------------------------
                                    X
**MATSUMOTO, United States District Judge:**

         Pending before the court is defendant Kemo Sylla's

("defendant" or "Sylla") motion to suppress physical evidence

seized during a search of his residence at the time of his

arrest on December 3, 2008.  Sylla is charged with one count of

smuggling African elephant ivory into the United States, in

violation of 18 U.S.C. § 545, and one count of conspiracy to do

the same, in violation of 18 U.S.C. § 373.

         On April 21, 2009, Sylla filed a motion requesting the

suppression of the physical evidence seized from his home at the

time of his arrest.[1]  (Doc. No. 126.)  Sylla argued, *inter alia*,

that this evidence should be suppressed because he signed the

---

[1] According to the government's 6/29/09 Memorandum in Opposition
to, *inter alia*, Sylla's 4/21/09 Motion to Suppress, the
following items were seized from Sylla's residence: five pieces
of ivory, a Samsung cellular phone, a Liberian passport,
miscellaneous documents, including African art catalogues, and a
wallet containing, among other things, raw diamonds.  (Doc. No.
143 at 21.)  The government did not present evidence regarding
the raw diamonds at the suppression hearing.

1

government's consent to search form *after* the search was conducted and that the warrantless search, therefore, was conducted without his consent.[2] (*Id.*)

On August 5, 2009, the court granted Sylla's motion for an evidentiary hearing on the issue of whether the seizure of evidence during the search of his residence occurred before or after he signed a consent to search form, and reserved decision on that issue pending an evidentiary hearing. (Doc. No. 149.)

The court held a suppression hearing on January 4, 2010, during which the government presented two witnesses, Philip Alegranti and Dorothy Manera, both Special Agents of the United States Department of the Interior, Fish and Wildlife Service. (*See generally* 1/4/10 Transcript of Suppression Hearing ("Tr.").) Defendant called two witnesses, Brian Ferrante, Special Agent for the United States Immigration and Customs Enforcement, and Watta Bamba, who resides with Sylla, along with their daughter. (*Id.*)

The court ordered post-hearing supplemental briefing, and submissions were completed by February 8, 2010. (1/4/10 Minute Entry; Doc. Nos. 171-173.) Upon consideration of the

---

[2] In his motion, Sylla also moved for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), and for severance of his trial from the trial of his co-defendants. (Doc. No. 126.) On August 5, 2009, the court denied Sylla's motions for a *Franks* hearing and for severance. (Doc. No. 149.)

parties' written submissions, including defendant's affidavit, dated April 9, 2009 (Doc. No. 126, Notice of Mot., Ex. A), and the testimony and evidence presented at the suppression hearing, and for the reasons stated below, the court denies defendant's motion to suppress.

## FACTUAL FINDINGS

### A. Credibility of the Witnesses

Special Agent Philip Alegranti ("Alegranti"), whose testimony the court finds credible, has been working for the United States Department of the Interior, Fish and Wildlife Service (the "USFWS") since 1999. (Tr. at 7.) He started as a Wildlife Biologist in the International Affairs Division and then worked as an Intelligence Research Specialist before becoming a Special Agent in 2004. (Tr. at 7.) Special Agent Manera ("Manera"), whose testimony the court also finds credible, has been a Special Agent of the USFWS for sixteen years. (Tr. at 81.) She has received training in the detection of ivory and has experience in elephant ivory investigations. (Tr. at 23-24, 81.) Special Agent Ferrante ("Ferrante"), whose testimony the court finds credible, has been a Special Agent of the United States Immigration and Customs Enforcement ("ICE") for two years. (Tr. at 131.)

Watta Bamba ("Bamba"), whose testimony the court finds credible, is the mother of Sylla's daughter, both of whom were

living with Sylla on December 3, 2008. (Tr. at 147-148, 153.)
Like Sylla, Bamba's first language is Mandingo and she testified
with the assistance of a Mandingo interpreter. (Tr. at 146-147;
Sylla Aff. at ¶ 20.)

**B. Entrance into Sylla's Residence and the Protective Sweep**

On the morning of December 3, 2008, two separate
arrest teams convened outside Sylla's residence at 222 Virginia
Avenue in Trenton, New Jersey to execute arrest warrants for
Sylla and Seidou Mfomboutmoun ("Mfomboutmoun").[3] (Tr. at 10.)
Mfomboutmoun's arrest team had surveilled Mfomboutmoun's car
around the vicinity of Sylla's house the previous evening,
December 2, 2008, and based on its proximity to Sylla's house as
well as subsequent surveillance of the car and residence,
determined that Mfomboutmoun was inside Sylla's house. (Tr. at
9, 27-28, 31-32.)

At approximately 6:10 a.m., between 10 to 12 ICE
agents, in addition to Alegranti and Manera, knocked on Sylla's
door. (Tr. at 10-11, 26, 33, 133.) Sylla answered the door,
appearing as if he had been awoken from sleep. (Tr. at 11, 34,
37.) The agents identified themselves as the police with arrest

---

[3] Alegranti was assigned to Seidou Mfomboutmoun's arrest team
(Tr. at 8-9), Manera was assigned to Sylla's arrest team (Tr. at
82), and Ferrante was the team lead for the Sylla arrest. (Tr.
at 132.) Arrest warrants were procured for both Sylla and
Mfomboutmoun. (Tr. at 8, 26.) The agents did not have a search
warrant for Sylla's residence. (Tr. at 133.)

warrants and asked if there were other people in the house.
(Tr. at 12, 35.) Sylla indicated that there were other adults
sleeping upstairs. (Tr. at 12, 35, 149.) Based on Sylla's
response that there were other people sleeping upstairs, and
based on the belief that a second defendant, Mfomboutmoun, was
in the house, the agents preformed a protective sweep of the
residence.[4] (Tr. at 12, 35, 133.) Sylla was handcuffed in the
living room and remained there during the course of the
protective sweep. (Tr. at 12.)

Meanwhile, Bamba was descending the stairs from the
second floor in a night dress. (Tr. at 83, 133.) Manera and a
female ICE agent searched and handcuffed Bamba, and also placed
her in the living room. (Tr. at 83.) Bamba indicated that
there were other adults present in the home, in addition to her
young daughter. (Tr. at 83, 133.) It was determined by the
agents and by Bamba that her daughter should remain upstairs so
she would not have to see the adults in handcuffs. (Tr. at 83-
84, 118-119.)

---

[4] Testimony established that the protective sweep included the
ground level and second floor of Sylla's residence. (Tr. at 13,
38-39, 134.) Although none of the agents testified that they
personally went into the basement as a part of the protective
sweep, Ferrante testified that it would have been normal
practice in the course of an arrest for agents to check the
basement as part of a protective sweep. (Tr. at 135.)

Between approximately 6:10 a.m. and 6:15 a.m., the agents conducted a protective sweep of the house.[5] (Tr. at 14, 133.) The agents divided up to perform the protective sweep; some began the protective sweep in the kitchen, while another group of agents, including Alegranti and Ferrante, began their portion of the protective sweep on the second floor. (Tr. at 38, 134.) During the protective sweep of the master bedroom on the second floor, Alegranti testified that he observed a young child sleeping under the covers in the bed. (Tr. at 40.) He testified that he also observed, in plain view, a large leopard figure on the floor between the bed and the dresser. (Tr. at 14, 40; Gov't Exs. 100-C, 101.) Alegranti testified that he readily recognized this figure as a "Benin Leopard"-style statue made of ivory. (Tr. at 48-49.) He testified that he did not remove the leopard or any other item during the protective sweep nor did he observe any of the other agents remove any items during the protective sweep. (Tr. at 14.)

---

[5] The layout of Sylla's house was described as follows: on the ground or first floor, the entrance to the house opens into the living room with a stairwell to the second floor. (Tr. at 12-13.) The living room is adjoined by the kitchen. (Tr. at 12-13.) Alegranti did not recall there being a door in between the living room and the kitchen. (Tr. at 12-13.) On the second floor, there are three bedrooms, and, on the third floor, there is a loft area/large bedroom. (Tr. at 12-13.) There is also a basement, the entrance of which cannot be seen from the living room. (Tr. at 164.)

Ferrante testified that when he was on the second floor during the protective sweep, he recognized one of the individuals as Mfomboutmoun, confirmed his identity, placed him in handcuffs and brought him downstairs to the living room. (Tr. at 134.)

Manera did not participate in the protective sweep. (Tr. at 84.)  Instead, she stayed in the living room with Bamba. (Tr. at 84.)

The agents placed all of the adults in handcuffs for security reasons and brought them downstairs to the living room at approximately 6:15 a.m. or 6:20 a.m.  (Tr. at 13-14, 39, 44, 58.)  In addition to Sylla and Bamba, there were three adults and one four year-old girl present in the residence.  (Tr. at 13-14, 56-57.)  The daughter was left upstairs in the master bedroom, and a female ICE agent went upstairs to watch after her.  (Tr. at 15, 51, 121.)

## C. Circumstances Surrounding Sylla's Signing of the Consent to Search Form

After the protective sweep was completed, Alegranti testified that he returned to the living room where all five handcuffed adults were assembled.  (Tr. at 15.)  The two arrest teams compared notes, and, at approximately 6:15 a.m., brought Mfomboutmoun into the kitchen, explained that they had an arrest warrant for him and that he was under arrest for smuggling.

(Tr. at 15-16, 60.)  After approximately 10 minutes, the agents
returned Mfomboutmoun back to the living room and brought Sylla
into the kitchen with his handcuffs on.  (Tr. at 18, 60.)
Alegranti, Ferrante and ICE Agent Bob Puglisi ("Puglisi") were
the only agents present in the kitchen at the time.  (Tr. at 16,
137.)

Alegranti testified that the agents confirmed that
Sylla spoke and understood English,[6] and explained to Sylla that
he was under arrest for smuggling and that he would be
transported back to the ICE office located at John F. Kennedy
International Airport ("JFK").  (Tr. at 16-17, 67.)  Alegranti
testified that the agents then confirmed that the residence was
Sylla's, that he lived there with Bamba and his daughter and
that Sylla's name was the only one on the lease.  (Tr. at 17.)
Alegranti and Ferrante both testified that Ferrante asked Sylla
if he would consent to a search of his home, and that Sylla
responded that he would.  (Tr. at 17, 69-70, 137-138.)
Alegranti and Ferrante testified that Ferrante read a standard
Consent To Search Form ("consent form") (Gov't Ex. 111) aloud
and verbatim to Sylla, which specifically informed Sylla of his

---

[6] Alegranti testified that the agents had no trouble
communicating with Sylla.  (Tr. at 17.)  Defense counsel
conceded at the hearing that Sylla understands and speaks
English, and stated that he only contests whether Sylla reads
and writes English.  (Tr. 155-156.)  Alegranti testified that he
did not recall confirming whether Sylla could read and write in
English.  (Tr. at 66.)

right to refuse to consent to the search of his home.[7] (Tr. at
17-18, 23, 69, 138-139.) Neither Ferrante nor Alegranti
recalled whether Ferrante informed Sylla of his right to refuse
consent separately from reading that aloud to him on the consent
form. (Tr. at 70, 138-139.) The consent form specifically
states:

> I, Kemo Sylla, have been informed by the U.S.
> Immigration and Customs Enforcement (ICE) Special
> Agent Brian Ferrante, *et al.* of my right to refuse
> consent to a search of my property described as:
> residence/home at 222 Virginia Ave., Trenton, NJ.
>
> I have also been advised by ICE Special Agent Brian
> Ferrante that, if I voluntarily consent to a search of
> this property, anything discovered during this search
> may be used against me in any criminal, civil, or
> administrative proceedings.
>
> I have decided to allow ICE Special Agent Brian
> Ferrante, *et al.* (ICE) and Phil Alegranti (FWS) to
> conduct a complete search of my residence located at
> 222 Virginia Avenue, Trenton, NJ. These ICE Special
> Agents are authorized by me to take any letters,
> papers, materials, or other property which they may
> desire to examine.
>
> I hereby voluntarily and intentionally consent to
> allow ICE to search my property. My consent is freely
> given and not the result of any promises, threats,
> coercion, or other intimidation. I have read the
> above statement and understand my rights.

(Gov't Ex. 111; Tr. at 21-23.)

---

[7] Sylla's affidavit confirms that the consent form was read out
loud to him before he signed it. (Sylla Aff. at ¶¶ 17-18 ("The
officer then asked me to sign a "CONSENT TO SEARCH" form. The
officer read the form to me and I signed it.").)

The consent form was signed by Sylla, dated December 3, 2008 at 6:30 a.m., and witnessed by Ferrante and Puglisi. (Gov't Ex. 111; Tr. at 22-23.) Although neither Alegranti nor Ferrante could definitively remember who wrote the time and date on the consent form, they each testified that it was not written in their respective handwriting. (Tr. at 75-76, 142, 145.) Based on a comparison of the handwritten date and time with Mr. Sylla's printed and signed name on the consent form, it appears to the court that the date and time are written in Sylla's handwriting. (Gov't Ex. 111.) For example, the printed name and signature indicate that Sylla writes in capital letters with the letters slanted to the right and the date and time are written in substantially similar form. (Gov't Ex. 111.)

Alegranti testified that Sylla was under arrest at the time he signed the consent form, and that his handcuffs were removed to allow him to sign the form. (Tr. at 18, 70-71.) Ferrante testified that at the time Sylla signed the form, he was "coherent" and understood what was going on. (Tr. at 139.) Alegranti and Ferrante both testified that Sylla never indicated that he did not understand English, did not understand the contents of the form he was signing, or request an interpreter.[8]

---

[8] Sylla himself confirms his ability to understand and attest to forms that have been read out loud to him in his affidavit, which states, "I do not know how to read English well enough to read this Affidavit . . . However, my attorney . . . read this

(Tr. at 18-19, 142.) Alegranti testified that at no time did he
or any of the other agents have their weapons drawn, speak in
raised voices or threaten Sylla. (Tr. at 19.) Bamba
corroborated that no one was yelling while Sylla was in the
kitchen (Tr. at 161), and testified that the agents were polite.
(Tr. at 161-162.) Alegranti further testified that Sylla did
not indicate there was a part of his home that he did not want
the agents to search. (Tr. at 18.) Although neither Alegranti
nor Ferrante could state with certainty whether Sylla's daughter
was brought downstairs before Sylla signed the consent form or
whether she observed her father in handcuffs (Tr. at 56-58,
136), Manera's testimony establishes that the daughter remained
upstairs before, during and after Sylla signed the consent form.
(Tr. at 87, 102, 110.) Bamba's testimony is consistent with
Manera's account. (Tr. at 150-151.)

A copy of Ferrante's report indicates Sylla was
advised of his *Miranda*[9] rights at the time he was arrested (Gov't
Ex. 3500-BF-2), although Ferrante testified that he did not
remember being present when Sylla was advised of his *Miranda*
rights. (Tr. at 139-140.) Alegranti testified that Sylla was
not questioned, and therefore did not receive *Miranda* warnings,

---

Affidavit to me word-for-word before I signed it. By signing
below, I am certifying that I understood everything he read and
swear that it is all true to the best of my knowledge. (Sylla
Aff. at ¶¶ 20-21.)

[9] *Miranda v. Arizona*, 384 U.S. 436 (1966).

until his arrival at the ICE office located in JFK.  (Tr. at
78.)  Sylla's affidavit indicates that he received *Miranda*
warnings at or near JFK.  (Sylla Aff. at ¶ 19.)

### D. Search After the Consent to Search Form was Signed

Alegranti testified that after Sylla signed the
consent form, he advised Manera that consent to search had been
given and asked her to accompany the ICE agents on the search of
the premises because of her background identifying elephant
ivory.  (Tr. at 23-24, 73-75.)  Alegranti testified at some
point at the beginning or during the search, he retrieved his
government-issued camera from his car and gave it to Manera.
(Tr. at 25.)  Although Alegranti testified that he did not
participate in the actual search of Sylla's residence[10] (Tr. at
24), Alegranti testified that he believed the search started in
the basement.  (Tr. at 72.)

Manera testified that she was in the living room with
Bamba at the time Alegranti told her that Sylla had provided
consent to search,[11] but that she did not immediately join the

---

[10] Alegranti testified that while the search was being conducted,
he was obtaining Mfomboutmoun's consent to search Mfomboutmoun's
vehicle and completing other paperwork.  (Tr. at 24.)
[11] Alegranti testified that he went to the second floor to advise
Agent Manera that consent to search had been given.  (Tr. at 23-
24, 73-75.)  However, this is not inconsistent with Manera's
account whereby she testified that she had two conversations
with Alegranti about Sylla's consent; once while she was in the
living room and a second time while she was on the second floor.
(Tr. at 87.)

search; she remained with Bamba until she was asked to go into the basement to see whether items found there were made of ivory. (Tr. at 85-86.) After an indeterminate amount of time in the basement, Manera returned to the living room. (Tr. at 86, 117.) At some point later, Manera was asked to go upstairs because agents believed there was an item containing ivory there. (Tr. at 87.) Manera testified she went upstairs, spoke with Alegranti, who handed her a digital camera, and was assigned to search the master bedroom. (Tr. at 87.) Manera testified that when she entered the master bedroom, she observed Sylla's daughter lying on the bed, the female ICE agent present in the room and an ivory statue of a leopard lying on the floor. (Tr. at 87-88; Gov't Exs. 100-C, 101.) Manera testified that Sylla's daughter remained in the bedroom as Manera began to document and search the bedroom. (Tr. at 102, 110.)

Manera testified that she took three sets of photos; photos of the bedroom before it was searched, during the search, and after the search was completed. (Tr. at 89.) The earliest time and date stamp on the CD of photos is December 3, 2008 at 6:53 a.m. and the last photo taken is stamped December 3, 2008 at 7:47 a.m. (Tr. at 91-92; Gov't Ex. 100.) Manera testified that she believed these times were accurate. (Tr. at 91-92.)

Specifically, Manera took four photographs before commencing the search of the master bedroom. (Tr. at 92; Gov't

13

Exs. 100-A – 100-D.)  These photographs are time-stamped between 6:53 a.m. and 6:54 a.m. on December 3, 2008.  (Tr. at 92-93; Gov't Exs. 100-A - 100-D.)

Manera took eleven photographs during her search of the master bedroom, which document the evidence seized therein, including the ivory Benin leopard statue, four small ivory carvings, miscellaneous papers, art catalogues and Sylla's cellular phone and wallet.  (Tr. at 88, 94-108; Gov't Exs. 100-E – 100-O, 101-110.)  Manera also took photographs after the search was completed.  (Tr. at 94; Gov't Exs. 100-P – 100-S.)

After taking the last picture at 7:47 a.m., Manera gathered the items from the bedroom and took them downstairs. (Tr. at 91, 109; Gov't Ex. 100.)  Based on the record, it appears that all items seized were found in the master bedroom. (Tr. at 73; Sylla Aff. at ¶ 9 (describing seized items coming from upstairs).)  No evidence was seized from the basement. (Tr. at 73.)

## E. Timing of the Signing of the Consent to Search Form and Watta Bamba's Testimony

At the suppression hearing, Alegranti, Ferrante and Manera all consistently testified that no search and seizure were conducted of Sylla's residence before his consent was obtained.  (Tr. at 24 (no agents searched before consent was obtained), 73-74 ("no one was searching until we got that

14

consent"), 86, (agents went into the basement *after* consent to search was given), 116-117 (same), 141-142 (nothing seized during protective sweep or prior to consent).)

However, Bamba testified that agents searched the basement before Sylla was brought into the kitchen. (Tr. at 152-153.) Specifically, although Bamba testified that she could not see the basement door from the living room, she testified that she could hear commotion when someone went down to the basement (Tr. at 164), and that she heard commotion in the basement before Sylla was taken into the kitchen. (Tr. at 152-153.) Upon questioning from the court, Bamba stated that she heard commotion in the basement one time. (Tr. at 164.) Bamba was unable to provide a definitive or estimated length of time when asked how long after the agents entered the house she heard commotion in the basement. (Tr. at 164-165.)

## DISCUSSION

The parties do not dispute that Sylla signed a consent form. Rather, they dispute whether Sylla signed the consent form before or after the search began, and whether Sylla's consent was voluntary, given the totality of the circumstances. (Doc. No. 171, Def. Kemo Sylla's Mem. of Law In Further Supp. of Mot. for Suppression ("Def.'s Mem.") at 17-21.) Defendant further argues that *Steagald v. United* States, 451 U.S. 204

(1981), renders the evidence seized in Sylla's residence
unlawful because that evidence is the fruit of either the
illegal search for Mfomboutmoun in Sylla's residence or the
fruits of an impermissible protective sweep.  (Def.'s Mem. at
12-16.)

### A. General Principles

### i.  Consent-Based Searches

A warrantless search, although generally considered
unreasonable, is permissible under the Fourth Amendment if
conducted on the basis of "consent" of an authorized person.
*See, e.g.*, *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973);
*United States v. Lewis*, 386 F.3d 475, 481 (2d Cir. 2004)
(recognizing that where authorized party consents to search
"neither a warrant nor probable cause is necessary").  Because
"[c]onsent must be a product of that individual's free and
unconstrained choice, rather than a mere acquiescence in a show
of authority," *United States v. Wilson*, 11 F.3d 346, 351 (2d
Cir. 1993) (internal citations omitted), when the government
relies on consent to justify a warrantless search, it bears the
burden of proving by a preponderance of the evidence that the
consent was voluntary.  *Florida v. Royer*, 460 U.S. 491, 497
(1983); *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968);
*United States v. Snype*, 441 F.3d 119, 131 (2d Cir. 2006).

Whether an individual has voluntarily consented to a search by law enforcement is a fact-based inquiry that must be determined by the totality of all the circumstances. *See, e.g.*, *Schneckloth*, 412 U.S. at 227; *Snype*, 441 F.3d at 131. Relevant factors in determining the voluntariness of the consent are age, education, intelligence, length of detention, repeated and prolonged nature of the questioning, use of physical punishments or deprivations, and whether the alleged consenting person was advised of his constitutional rights. *See, e.g.*, *Schneckloth*, 412 U.S. at 226; *United States v. Puglisi*, 790 F.2d 240, 243 (2d Cir. 1986), *cert. denied*, 479 U.S. 827 (1986). Additionally, in cases where, as here, consent is obtained from a person in custody, courts in this circuit have found "that whether guns were drawn or the consenting individual was frisked or whether the consenting individual was threatened, was in a public area, or was informed that he had the option of refusing consent to the search are simply relevant factors in determining the voluntariness of the consent." *Puglisi*, 790 F.2d at 243-44 (internal citations omitted).

The factual inquiry concerning the voluntariness of consent is guided by an objective standard. *United States v. Garcia*, 56 F.3d 418, 423 (2d Cir. 1995). "[T]he ultimate question presented is whether the officer had a reasonable basis for believing that there had been consent to the search." *Id.*

at 423 (quotation marks and citation omitted); *see also Florida v. Jimeno*, 500 U.S. 248, 251 (1991) ("The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?")

### ii. The Protective Sweep Doctrine

When arresting a person in a residence, officers may perform a protective sweep "after, and while making, the arrest" to protect themselves or others. *Maryland v. Buie*, 494 U.S. 325, 334 (1990); *see also United States v. Lauter*, 57 F.3d 212, 216 (2d Cir. 1995) (holding that, "[w]hen arresting a person in a residence, officers may perform a protective sweep incident to the arrest to protect themselves or others."). During an in-home arrest, officers may "without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Buie*, 494 U.S. at 334. In order for a protective sweep to extend beyond the spaces reasonably adjoining the place of arrest, the officers must have "articulable facts, which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.*

Under these circumstances, a "cursory inspection of spaces where a person may be found" is justified in order to ensure "that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack." *Id*. at 333, 335.  Such a sweep must "last[] no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id.* at 335-36.  If officers observe patently incriminating evidence in plain view during the course of conducting a protective sweep, they may seize that evidence without a warrant. *United States v. Kiyuyung*, 171 F.3d 78, 83 (2d Cir. 1999).

### B. Timing of the Search

The first issue for the court's determination is whether Sylla signed the consent form before or after the agents searched his residence.  Defendant asserts that the search preceded his consent, and that because the search was already underway when his consent was procured, his consent was invalid. (Def.'s Mem. at 17-18.)  However, the agents' credible testimony, along with the timing of events as reflected in the evidence before the court, supports a finding that Sylla signed the consent form before the search began.

Here, the testimony established that the consent form was signed at 6:30 a.m., approximately 20 minutes after the

agents arrived at Sylla's residence, and that the first photograph documenting search was taken at 6:53 a.m., 23 minutes after the consent form was signed. Importantly, Manera testified that she photographed the bedroom: 1) as it was before the search began; 2) during the search; and 3) after the search was completed. As there is no evidence to show that either the time or date on the consent form or on the digital camera were inaccurate, the photos taken at 6:53 a.m. demonstrate that the items that were eventually seized were untouched 23 minutes after Sylla signed the consent form. This eliminates the possibility that the search of the master bedroom was conducted before Sylla signed the consent form.

Furthermore, as to the possible search of the basement, at the suppression hearing, Alegranti, Ferrante and Manera all consistently testified that no search was conducted of Sylla's residence before his consent was obtained. (Tr. at 24, 73-74, 116-117, 141-142.) Bamba's testimony provided the only evidence that Sylla may have signed the consent form *after* the search of the basement occurred.

Specifically, Bamba testified that agents searched the basement before Sylla was brought into the kitchen. (Tr. at 152-153.) Although both she and Manera confirmed that one could not see the basement door from the living room (Tr. at 122, 164), and by logical extension could not see what was

transpiring in the basement, Bamba testified that she could hear commotion when someone went down to the basement. (Tr. 164.) Bamba clarified that she heard commotion in the basement before Sylla was taken into the kitchen. (Tr. at 152-153.) Importantly, Bamba stated that she only heard commotion in the basement one time and was unable to provide a definitive or estimated length of time that she heard commotion in the basement after the agents first entered the house. (Tr. at 164-165.)

Although the court finds Bamba's testimony to be credible, it finds that the commotion Bamba heard in the basement was the protective sweep of the basement. The testimony at the suppression hearing established that Bamba was handcuffed and placed in the living room as soon as the agents arrived at the residence. Thus, Bamba was already seated in the living room when the agents initiated the protective sweep of the residence in response to Sylla's and Bamba's statements that other adults were in the house. Although there is no direct testimony that the protective sweep included the basement, Ferrante testified that it would have been normal practice in the course of an arrest to check the basement as part of a protective sweep. (Tr. at 135.) Further, Alegranti testified that some of the agents began the protective sweep in the kitchen, which is near the entrance to the basement. Moreover,

Bamba testified that she left the living room at some point and was brought upstairs to be with her daughter. (Tr. at 150-151.) Based on all of these factors, the court finds that Bamba heard the commotion in the basement when the agents conducted the protective sweep, executed before Sylla signed the consent form, and not during an unauthorized search of the residence.

Because the court makes the factual finding that the search of the residence occurred after Sylla signed the consent form, the court rejects defendant's argument that his consent was involuntary because the search was already underway when it was given.

### C. Voluntariness of Consent

The next disputed issue is whether, given the totality of the circumstances, Sylla's consent was given voluntarily. Defendant argues that because his consent was procured under inherently coercive circumstances, it is invalid. Specifically, defendant argues that the following inherently coercive circumstances rendered his consent involuntary: 1) Sylla was handcuffed and placed under arrest at the time his consent was obtained; 2) the agent's treatment of Sylla's family tainted the consent; 3) Sylla believed he was under arrest because of his immigration status and was never told by the agents that they would be searching for ivory; 4) he was isolated from his family and friends and surrounded by at least three agents when he

signed the consent form; and 5) Sylla, an illiterate, non-native English speaker, was only informed of his right to refuse consent by being read an overly-broad and confusing consent form. (Def.'s Mem. at 18-20.)

Contrary to defendant's arguments, the record before the court indicates that, given the totality of the circumstances, the agents had a reasonable belief that Sylla's consent to search was freely and voluntarily given, and therefore valid. First, although Sylla had been arrested and was in custody at the time he gave consent to search, "the fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search." *United States v. Watson*, 423 U.S. 411, 424 (1976); *see also Snype*, 441 F.3d at 131 ("While more than mere acquiescence in a show of authority is necessary to establish the voluntariness of a consent, the fact that a person is in custody or has been subjected to a display of force does not automatically preclude a finding of voluntariness.") (internal quotation marks and citations omitted), *cert. denied*, 549 U.S. 923 (2006); *United States v. Crespo*, 834 F.2d 267, 271 (2d Cir. 1987) (that defendant was "under arrest and in custody, or even handcuffed" does not necessitate finding that consent to search was coerced), *cert. denied*, 485 U.S. 1007 (1988); *United States v. Marin*, 669 F.2d 73, 82 (2d Cir. 1982) ("The fact that a person is in official

custody does not mean that he is incapable of giving his free and voluntary consent.")

Second, there is no evidence to indicate that any of the agents intimated, threatened, deceived, made promises or exhibited more subtle forms of coercion in order to procure Sylla's consent. Nor is there evidence that the agents treated Sylla's family in such a way as to taint his consent. Quite the opposite, the record demonstrates that at no point were any guns drawn, that the agents were "polite" and worked with Bamba to make sure her daughter was kept upstairs. (Tr. at 19, 83-84, 118-119, 161-162.) Apart from the use of handcuffs, there is no indication that the agents used any physical punishments or deprivations against Sylla, his family or his house guests in order to obtain Sylla's consent. The fact that the adults in the house were temporarily placed in handcuffs and a female ICE agent watched Sylla's daughter upstairs does not change this result. *See, e.g., Snype*, 441 F.3d at 131 (holding that apartment owner's consent to search was voluntary despite the fact that "a heavily armed SWAT team . . . initially secured her and her boyfriend in handcuffs and raised the possibility of taking the couple into custody while placing [the owner's] young daughter in protective care").

Third, contrary to Sylla's contention that he believed he was under arrest because of his immigration status and was

never told by the agents that they were searching for ivory, the court credits the agents' testimony that they told Sylla that he was being arrested for smuggling.  Further, Sylla consented to a search of his entire residence, without limitation, and was specifically informed that "anything discovered during this search may be used against [him] in any criminal, civil, or administrative proceedings."  (Gov't Ex. 111.)  *See, e.g.*, *United States v. Ansaldi*, 372 F.3d 118, 129-130 (2d Cir. 2004) (upholding consented-to search even though "prior conversation may have led [defendant] to believe the agents were looking only for weapons, guns and drugs . . .[because] what the agents requested, and what [defendant] - knowingly and voluntarily - permitted, was a search of his house.")

Fourth, Sylla's detention as a whole was very brief. Sylla was placed in handcuffs for only approximately 30 minutes before his consent was obtained.  *See United States v. Arango-Correa*, 851 F.2d 54, 57 (2d Cir. 1988) (upholding consent to search where defendant had been in custody for five hours before he consented to the search); *United States v. Alcantara*, No. 09-CR-231, 2009 WL 4756491, at *12 n.13 (S.D.N.Y. Dec. 2, 2009) (finding the "very brief" 30-45 minutes period between the initial detention and execution of written consent militated in favor of finding of valid consent).  Of that 30 minutes, Sylla was only separated from the other people in the house, including

the mother of his child and house guests, for somewhere between 10 to 15 minutes. Even then, he was in an open room adjacent to where they were sitting. Additionally, although as many as 10 to 12 law enforcement officers were present in the residence at certain points in time, only three officers accompanied Sylla to the kitchen as he signed the consent form. As discussed above, in the very brief encounter, the officers did not display weapons, raise their voices, threaten or coerce Sylla. The mere presence of three officers in the kitchen does not, without more, support any claim of coercion. *See, e.g.*, *United States v. Kon Yu-Leung*, 51 F.3d 1116, 1118-19 (2d Cir. 1995) (six officers present). Moreover, Sylla's consent was given while in his own home, not in the confines of the police station. *See Watson*, 423 U.S. at 424.

Fifth, Sylla, who conceded that he speaks and understands English, was orally advised that he had the right to refuse to consent to a search when the agent read him the consent form and the agents testified that he appeared to understand that right.[12] As Sylla cannot contend the agents

---

[12] In fact, Sylla evidences his own ability to understand and attest to forms that have been read out loud to him in his affidavit, which states "I do not know how to read English well enough to read this Affidavit . . . However, my attorney . . . read this Affidavit to me word-for-word before I signed it. By signing below, I am certifying that I understood everything he read and swear that it is all true to the best of my knowledge." (Sylla Aff. at ¶¶ 20-21.)

failed to advise him of his right to refuse to consent, which, incidentally is not dispositive to the voluntariness analysis, *see Schneckloth*, 412 U.S. at 249 ("while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent"), he instead takes issue with the way in which he was informed of the right. Contrary to defendant's contentions, there is nothing constitutionally deficient about being advised of the right to refuse to consent by an agent reading that right aloud and verbatim from a consent form. *See, e.g.*, *Puglisi*, 790 F.2d at 244 (upholding finding of voluntary consent where, *inter alia*, the district court noted that defendant "may have had some difficulty with written English, the agents . . . advised him of his rights orally, and he understood them") (internal quotation marks omitted); *United States v. Irving*, No. 08-CR-0038, 2009 WL 2244779, at *3 (N.D.N.Y. July 27, 2009) (finding search consent form "fully availed the Defendant of his right" to refuse consent and noting that consent would still be valid even if defendant had not been advised of that right per the consent form). Nor is there any merit to defendant's contention that the consent form read to him was confusing or that the scope of the search was too broad to be voluntary. *See, e.g.*, *id*. at *3 (holding search pursuant to similarly worded consent form, which

generally allowed "a *complete* search of my residence" and seizure of "*any and all* evidence relating to *any* crime" to be constitutional) (emphasis in original).

Finally, although Sylla only went to school for five years (Sylla Aff. at ¶ 20), there is else nothing in the record to indicate that his age or intelligence weigh in favor of finding his consent involuntary. Given the totality of the circumstances, none of the circumstances raised by Sylla are sufficient to render his consent invalid.[13]

After weighing all the evidence, the court finds that the government has sustained its burden of proving, by a preponderance of the evidence, that the defendant's consent to search his residence was in fact freely and voluntarily given and that the agents reasonably understood his consent to be valid. *See Ansaldi*, 372 F.3d at 129 (upholding a finding of voluntary consent to a search even though, prior to his consent, defendant was arrested by five or six officers who had previously pulled out their guns to effectuate the arrest and placed defendant in handcuffs); *Kon Yu-Leung*, 51 F.3d at 1118-19 (upholding a finding of voluntary consent provided by a former police officer to six law enforcement officers who entered his home in the early morning hours, handcuffed him and who assured

---

[13] The record is unclear as to whether Sylla was advised of his *Miranda* rights before consent was given. Accordingly, this factor is not considered in the voluntariness analysis.

him that if he refused to consent to a search they would remain there until a warrant was obtained); *Arango-Correa*, 851 F.2d at 57-58 (upholding a finding of voluntary consent where defendant had been in custody for five hours, was strip-searched and questioned by Drug Enforcement Administration agents before providing consent); *United States v. Ceballos*, 812 F. 2d 42, 46, 51 (2d Cir. 1987) (upholding a finding of voluntary consent where defendant had been forcibly arrested and questioned for several hours and officers had threatened to disrupt his home if he did not cooperate with them and promised the defendant low bail and retention of his job); *Puglisi*, 790 F.2d at 243-44 (upholding a finding of voluntary consent where defendant had been frisked and arrested by agents with weapons drawn and was advised orally of his rights because of defendant's difficulty with written English).  Thus, the court finds that the evidence was procured pursuant to a valid consent, which was given before the search began, and that all of the physical evidence seized from Sylla's residence was within the scope of that consented-to search.

### D. Defendant's *Steagald* Argument and Constitutionality of Protective Sweep

Sylla offers an alternative theory of suppression, arguing that the evidence at issue should be suppressed as the fruits of an impermissible search for Mfomboutmoun in Sylla's

home.  Specifically, while Sylla concedes that the officers lawfully entered Sylla's residence in order to execute an arrest warrant on Sylla, he argues that under *Steagald v. United States*, 451 U.S. 204 (1981), the officers had no right to search his home for Mfomboutmoun, a non-resident of Sylla's home, once Sylla had been arrested.  (Def.'s Mem. at 12-13.)  Sylla therefore concludes that the evidence collected in his home was not the fruit of the unlawful arrest of Sylla, but the fruits of the unlawful search for Mfomboutmoun.  (*Id.*)  Further, Sylla argues that even if the government tries to validate the "search" for Mfomboutmoun as "a mere [protective] sweep of the kind authorized by the Supreme Court incident for an in-home arrest in the case *Buie v. Maryland*," placing the adults in handcuffs and sweeping the basement rendered the protective sweep impermissibly broad*.*  (*Id.* at 14-16.)

Defendant's argument is misplaced.  In *Steagald*, the Supreme Court dealt with the issue of whether an arrest warrant for one person was sufficient to protect the Fourth Amendment rights of persons not named in the warrant, but in whose home the suspect was believed to be visiting.  *Steagald,* 451 U.S. at 205-206, 212.  There, police obtained an arrest warrant for Lyons, a suspect whom they believed to be visiting Steagald, a third party.  *Id.* at 206.  Based on the arrest warrant for Lyons, the police entered Steagald's home without a search

warrant. *Id.* While in Steagald's home searching for Lyons, who was not present, the police found in plain view drugs and other incriminating evidence belonging to Steagald. *Id.* at 206-207. In suppressing the evidence, the Supreme Court held that the police may not legally search for the subject of an arrest warrant in the home of a third party without a search warrant, absent consent or exigent circumstances. *Id.* at 216. *See also United States v. Lovelock*, 170 F.3d 339, 344 (2d Cir. 1999) (noting that in order to search home of third party for arrestee, officers in *Steagald* would have needed a search warrant or consent from that third party); *United States v. Luckey*, No. 09-CR-889, 2009 WL 4730198, at *6 (S.D.N.Y. Dec. 10, 2009). ("Where the officers had no reasonable basis to believe they were entering an arrestee's residence, *Steagald* requires a search warrant, consent, or exigent circumstances.")

However, *Steagald* does not apply to the facts of this case. This is not a case where agents entered Sylla's house with an arrest warrant only for Mfomboutmoun, who was not a resident of Sylla's home, and searched for and seized items in Sylla's house during the course of the search for Mfomboutmoun. Rather, here, both Sylla and Mfomboutmoun were the subjects of separate arrest warrants and, as defendant concedes, the agents lawfully entered Sylla's home in order to execute an arrest warrant for Sylla. (Def.'s Mem. at 12 (citing *Payton v. New*

*York*, 445 U.S. 573 (1980)).)  *See also Lovelock*, 170 F.3d at 344

(noting *Steagald* does not prohibit entry into a residence

reasonably believed to belong to the suspect).  Thereafter, the

agents conducted a protective sweep of the apartment incident to

Sylla's arrest, which the court finds was based upon legitimate

safety concerns, and therefore did not exceed its permissible

scope under the Fourth Amendment.[14]  During that protective

sweep, the agents came upon a man whom they immediately

recognized as Mfomboutmoun and executed the arrest warrant for

him.  Subsequent to the protective sweep but prior to the

search, Sylla consented to a search of his home, wherein all of

---

[14] Here, the agents articulated specific facts that would warrant
a reasonably prudent officer in believing that Sylla's home may
harbor individuals posing a danger to the agents.  *See Buie*, 494
U.S. at 334.  Specifically, testimony established that the
agents preformed a protective sweep of the residence incident to
Sylla's arrest based on Sylla's and Bamba's statements that
there were other people in the house, and based on their belief
that a second defendant and co-conspirator, Mfomboutmoun, had
arrived at Sylla's house the night before and was still in the
house.  (Tr. at 9-10, 12, 35, 83, 133, 149.)  *See, e.g.*, *United
States v. Manley*, 632 F.2d 978, 987 (2d Cir. 1980)
(acknowledging concern about presence of co-conspirators as a
factor justifying protective sweep); *United States v. James*, 415
F. Supp. 2d 132, 148 (E.D.N.Y. 2006); (acknowledging concern
about presence of third party in residence as a factor
justifying protective sweep); *United States v. Medina*, 301 F.
Supp. 2d 322, 332 (S.D.N.Y. 2004) (acknowledging "at least the
possibility" of presence of a third party as a factor justifying
protective sweep).  It was therefore permissible for the agents
to protectively sweep the entire residence and to briefly
restrain the adults found therein.

the evidence at issue was seized.  Unlike in officers in
*Steagald,* the agents acted in accordance with the Fourth
Amendment at all times while present in Sylla's residence.  As
the court previously found, no evidence was seized during the
protective sweep.  Thus, Mfomboutmoun was arrested in the course
of the lawful entry and during a permissible protective sweep of
Sylla's house, and the evidence at issue was procured after the
sweep and during a consented-to search.  Accordingly, there was
no impermissible police action to taint the seized evidence and
to justify its suppression.

<u>**CONCLUSION**</u>

For the foregoing reasons, defendant's motion to
suppress the physical evidence recovered from his residence is
denied.

**SO ORDERED.**

Dated: February 16, 2010
       Brooklyn, New York

_____        /s/_____
KIYO A. MATSUMOTO
United States District Judge
Eastern District of New York