# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

```
------------------------------X    Docket#
UNITED STATES OF AMERICA,      :    08-cr-906(KAM)(JO)
                               :
     - versus -                :    U.S. Courthouse
                               :    Brooklyn, New York
SYLLA, et al.,                 :
                               :    October 13, 2010
               Defendant       :
------------------------------X
```

### TRANSCRIPT OF CRIMINAL CAUSE FOR FATICO HEARING
### BEFORE THE HONORABLE KIYO A. MATSUMOTO
### UNITED STATES DISTRICT JUDGE

## A P P E A R A N C E S:

**For the Government:**          **Loretta E. Lynch, Esq.**
                                 United States Attorney

                          BY:    **Patrick Sinclair, Esq.**
                                 Assistant U.S. Attorney
                                 271 Cadman Plaza East
                                 Brooklyn, New York  11201


**For Defendant Sylla:**         **Zachary Margulis-Ohnuma, Esq**
                                 Law Office of
                                 Zachary Margulis-Ohnuma
                                 260 Madison Avenue
                                 18th Floor
                                 New York, NY 10016


**For Defendant Doumbouya:**     **Michael O. Hueston, Esq.**
                                 Michael Hueston,
                                 Attorney at Law
                                 350 Fifth Avenue
                                 Suite 4810
                                 New York, NY 10118

```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK
```

**APPEARANCES CONTINUED:**

<u>**For Defendant Drissa Diane**</u>:    **Anthony L. Ricco, Esq.**
```
                              20 Vesey Street
                              Suite 400
                              New York, NY 10007
```

                                                         **Steven Z. Legon, Esq.**
```
                              Steven Zachary Legon,
                              Attorney At Law
                              20 Vesey Street
                              Suite 400
                              New York, NY 10007
```

<u>**Official Transcriber**</u>:       **Rosalie Lombardi**
                                                     **L.F.**

<u>**Transcription Service**</u>:     <u>**Transcription Plus II**</u>
```
                              3859 Tiana Street
                              Seaford, N.Y.  11783
                              (516) 358-7352
                              Transcriptions2@verizon.net
```

```
Proceedings recorded by electronic sound-recording,
transcript produced by transcription service
```

### Proceedings

1    THE COURT:  We're switching to the recording in

2    the Fatico hearing.  United States v. Sylla, et al.,

3    08-CR-906.

4    Mr. Ricco?

5    MR. SINCLAIR:

6    MR. RICCO:  Okay, thank you very much,

7    your Honor.

8    CROSS-EXAMINATION BY

9    MR. RICCO:

10   Q.   The undercover tells -- this is in the October 20

11   meeting, that -- he tells of Mr. Diane that he just has a

12   limited amount of money.  We can do another trip for the

13   mast.  He wanted the full percent of what he was

14   interested in it, which is ivory; isn't that right?

15   A.   Yeah, he was definitely trying to focus the

16   conversation on the ivory.

17   Q.   And your undercover had been working in the Chelsea

18   African market for some months at -- by October; isn't

19   that correct?

20   A.   That's correct.

21   Q.   And you had told us that his purpose of going there

22   was sort of to infiltrate and find out and get back to

23   you information about possible ivory dealers could be;

24   isn't that correct?

25   A.   In part to identify possible ivory dealers.  Also as

Mr. Alegranti - Cross - Mr. Ricco

1  we've identified already, we had shipments had already
2  come in including the shipment for Mr. Diane.  As you saw
3  on the first case, in the March 2006 shipment, just
4  controlled delivery where you contact someone at the end
5  of that and say okay, whose ivory is it, you don't always
6  get, and in fact, historically, you don't get people to
7  say okay, it's mine.
8       So part of the undercover is to, in fact, determine
9  who is in fact selling it to understand the chain, who is
10 actually the responsible parties for bringing in this
11 ivory.
12 Q.  One, just because somebody says it, doesn't make it
13 true; correct?
14 A.  Just because someone says it's true, that's --
15 Q.  Right.
16 A.  -- true statement.
17 Q.  And in your course of this investigation, these items
18 were shipped to addresses that was in the middle of a
19 park; right?
20 A.  That's correct.
21 Q.  And if they --
22 A.  Well they --
23 Q.  -- shipped to individuals --
24 A.  -- addressed to, they weren't actually shipped there.
25 Q.  -- addressed to a park.  And they were sent to

Mr. Alegranti - Cross - Mr. Ricco

1    individuals that you interviewed with that were giving

2    you all kinds of stories; isn't that correct?

3              MR. SINCLAIR:  Objection, your Honor.  Can the

4    counsel please clarify the question.

5              MR. RICCO:  I can --

6              THE COURT:  Can you be more specific,

7    Mr. Ricco?

8              MR. RICCO:  Yes.

9    Q.   You told us that you met with Mr. Sessa (ph.);

10   right?  His name was listed as one of the recipients of

11   the shipment; right?

12   A.   Mamadi Sessa, yes, I did meet with him.

13   Q.   Sure.  Now one thing that we know for sure is that

14   320 Manhattan Avenue is not in a park; isn't that

15   correct?

16   A.   I believe that's correct.  That's not in a park.

17   Q.   320 Manhattan Avenue is where he lives with his

18   family.  He and Mr. Diane; right?

19   A.   Yes.

20   Q.   That's a real address; right?

21   A.   Yes.

22   Q.   And the reason why the shipment went to Chelsea Piers

23   is because Mr. Diane called and asked that the shipment

24   be taken down to Chelsea; right?

25   A.   That's -- that is my understanding; yes.

Mr. Alegranti - Cross - Mr. Ricco

1  Q.   And when Mr. Diane was arrested, taken into custody

2  in this case, and he was asked about the transactions

3  that he was involved in, he said yes, he had sold the two

4  ivory pieces to the person he thought was Andy Carter

5  (ph.); right?

6  A.   He said he did sell those ivory pieces to him; yes.

7  Q.   And he said yes, that on December 2, he had agreed to

8  sell other -- the other three items to Andy Carter; isn't

9  that correct?

10  A.   Yes, it is.

11  Q.   And he said, yes, that he had gotten the items in New

12  York and he himself had transported them down to

13  Virginia.

14  A.   Well, my understanding of that interview was that he

15  denied knowing there was ivory in that shipment, that

16  he --

17  Q.   I didn't ask you about a shipment.

18  A.   You just said that he -- you just said that he stated

19  that he received the shipment and transported the items

20  down to New York.

21  Q.   The word shipment was not in my question, sir.  I

22  asked you did he say that he had transported the items

23  down to Virginia.

24  A.   He did say that he transported the items from New

25  York to Virginia.

Mr. Alegranti - Cross - Mr. Ricco

1  Q.   And he said that he had gotten them in New York;

2  isn't that correct?

3  A.   Yes, he did.

4  Q.   Now three of the items that he sold on December 2,

5  they were not of the nine that came in that box; were

6  they?

7  A.   No.

8  Q.   But he told you where he got them from; isn't that

9  correct?

10  A.   In fact, I remember just the opposite.  I remember

11  that we asked him who he had acquired them and my

12  recollection is he refused to tell our agent who he

13  acquired those pieces of ivory from.

14  Q.   Well, it says that he -- did he write a statement?

15  Did you memorialize his statement?

16  A.   Well that again, there was agents in Virginia that

17  did the interview and I believe they took a written

18  statement from him and there's also a three -- what we

19  call a 332 record of interview from Agent Dan Rowlins

20  (ph.) that I reviewed in preparation for this.

21  Q.   And you did review those statement.  Can you show me

22  in the statements where he refused to say the individual

23  that he got them from?

24  A.   Sure.  Please provide me with the 332 and the

25  affidavit.

Mr. Alegranti - Cross - Mr. Ricco

1  A.   I sure will.

2           MR. SINCLAIR:  What's the exhibit?

3           MR. RICCO:  It's in the government large book,

4  it's Exhibit 18.

5  A.   Okay. I am missing page 1 of 6 but let me just review

6  the --

7  Q.   I'll give you 1 of 6.

8           (Pause)

9           MR. RICCO:  Do you have a complete --

10          MR. SINCLAIR:  Well, I just gave him page 1 of

11  6.

12          MR. RICCO:  Thank you very much.

13          THE COURT:  What attachment please for the

14  record?

15          MR. SINCLAIR:  We're referring to attachment 4,

16  I believe.

17          THE COURT:  Attachment 4?

18          MR. SINCLAIR:  In ROI-33 which is marked as PA-

19  18.

20          THE COURT:  Page 1 of 6?

21          MR. SINCLAIR:  1.

22          THE COURT:  1.  Thank you.  Attachment 4, page

23  1 of 6 to 3500-PA-Exhibit 18.

24  A.   Page 5 of 6.

25  Q.   Yes.

Mr. Alegranti - Cross - Mr. Ricco

1  A.   "Again, Diane refused to reveal from whom he received

2  the Irish statutes and the carved ivory tusks he sold to

3  Carter, other than to state they were from two different

4  persons and the statues were not from Kamaro."

5  Q.   Okay.  But he didn't have to tell you where two of

6  the statutes came from because you had a microchip; isn't

7  that correct?

8  A.   Well also in that same 332 he denies that he ever

9  imported ivory.

10  Q.   I'm not asking about would he -- about importing

11  ivory.  The question was in two of the items there was a

12  microchip.

13  A.   Yes, I know exactly where those came in.  They

14  entered the United States in the May 2008 shipment that

15  we looked at the pictures that have been sealed in the

16  ivory -- in the coating.

17  Q.   And you were on surveillance when the box was

18  delivered to none other than Mr. Diane himself.

19  A.   That's correct.

20  Q.   And you didn't say to him, come on, Mr. Diane, we saw

21  you accept the box with the ivory in it; did you?  No?

22  A.   I think it actually says in there he was confronted

23  with the pictures.

24  Q.   I didn't ask you about the pictures.  I am talking

25  about the surveillance.

Mr. Alegranti - Cross - Mr. Ricco

1  A.   I'm sorry, what -- at what point are you asking this

2  questioning took place?

3  Q.   The question is you never said to him look, I saw you

4  receive the box with the ivory.  Now don't tell you don't

5  know where it came from.  That was never said to him;

6  right?

7  A.   I would have to review that again.  I didn't -- I've

8  never actually -- I never spoke to him.  I mean, I am

9  having to base this on the review of the agent's report.

10 Q.   You wouldn't have revealed your investigation until

11 the person had been taken into custody, now would you?

12 A.   Are you talking about the time --

13         MR. SINCLAIR:  Objection, your Honor.

14 A.   -- after he was arrested?

15 Q.   Yes.

16         THE COURT:  Sustained.

17 A.   He was confronted with the pictures --

18         MR. SINCLAIR:  The objection had just been

19 sustained.

20         THE COURT:  Sustained.

21         THE WITNESS:  Oh, sorry.

22 Q.   But what we do know is that he admitted that he made

23 the sale of the two pieces of items; correct?

24 A.   Yes, we do.

25 Q.   He admitted that he -- and that was October; isn't

1  that correct?

2  A.   Yes, it was.

3  Q.   He admitted that he made the sale of the three on

4  December 2; isn't that correct?

5  A.   Yes, he did.

6  Q.   And he admitted that he had brought them down to

7  Virginia for the purposes of selling it; isn't that

8  correct?

9  A.   That is correct.

10  Q.   He also admitted that he understood that the selling

11  of ivory was illegal; didn't he say that?

12  A.   Yes, he did.  I mean you're paraphrasing but yes.

13  Q.   And he also stated to you that he had a -- part of

14  his business had storage at Chelsea Piers; isn't that

15  correct?

16  A.   Yes.

17  Q.   And you knew that because you had observed him there;

18  correct?

19  A.   I had observed him there.  I didn't know he had a

20  business there.

21  Q.   Okay.  But he was observed there; correct?

22  A.   Yes.

23  Q.   And just so that we're clear, you gave us a lot of

24  testimony about seizures that took place in 2006;

25  correct?

Mr. Alegranti - Cross - Mr. Ricco

1  A.   Yes.

2  Q.   And 2007; right?

3  A.   Pass throughs; yes.  Ivory that came in that we let

4  it pass through.

5  Q.   Okay.  But the ivory that Mr. Diane is involved in

6  this investigation are the nine items that come into the

7  airport in May 2008; right?  I'm going to take it one by

8  one.  I'm not going to leave anything out.

9  A.   Correct.

10  Q.   All right.  From the nine, two we know come up in the

11  transaction months later with Mr. Diane himself in 2008;

12  correct?

13  A.   That's right.

14  Q.   Those items were sold for a grand total of $6,000;

15  right?

16  A.   That's right.

17  Q.   And Mr. Diane is involved in a subsequent transaction

18  on December 2, 2008; right?

19  A.   That's correct.

20  Q.   And that involves three ivory pieces; correct?

21  A.   Yes, it does.

22  Q.   And those were sold for a grand total of $7,300;

23  correct?

24  A.   Yes.

25  Q.   When Mr. Diane is discussing the photographs on the

Mr. Alegranti - Cross - Mr. Ricco

1  digital camera, he's telling the potential buyer, the

2  undercover, about the individual who he can in touch with

3  to get those tusks; isn't that correct?

4  A.   Yes.

5  Q.   And he's telling him this -- that the man, whoever

6  this man may be, if he exists, won't give him the tusks,

7  him being Mr. Diane; correct?

8  A.   That's -- that's correct.  He will not give them to

9  him.

10 Q.   He's saying because this man, whoever he is, is an

11 older man, had been burnt before; correct?

12 A.   Correct.

13 Q.   And so if the undercover wants these tusks, he's

14 going to have to deal with this older man himself; isn't

15 that correct?

16 A.   That's correct.

17 Q.   And he says that's willing to connect him to them if

18 he wants; correct?

19          MR. SINCLAIR:  Objection, your Honor.  The

20 recordings speak for themselves.  They're in evidence.

21          THE COURT:  I did sustain a similar objection.

22 I will be reviewing these recordings.

23          MR. RICCO:  That's fine.

24          THE COURT:  But if you have specific

25 questions --

Mr. Alegranti - Cross - Mr. Ricco

1    MR. RICCO:  This is a specific question.  I'm

2  almost done with you.

3    THE COURT:  Okay.

4    MR. RICCO:  All right?

5    THE COURT:  A little bit --

6  A.   He says he -- I think he can facilitate the

7  transaction.  I don't know if he was going to put him in

8  contact.  I mean I guess to clarify, Mr. Diane had been

9  at that location with those tusks if that's what you're

10  specifying is that he's just showing --

11  Q.   I'm not asking you.  I know you want to tell me.  I'm

12  asking you --

13  A.   Okay.

14  Q.   I'm asking you were these tusks that Mr. Diane had in

15  his possession; yes or no?

16  A.   No, I do not.

17  Q.   Were these tusks that he had any control or authority

18  over as far as you know; yes or no?

19  A.   No, he did not own them.  He did not own them.  I

20  mean it sounds like a consignment-type thing to me.

21  Q.   I'm not asking you what it sounds like.  We're asking

22  you what is.

23  A.   He does not own them, if that's what you mean by

24  control?

25  Q.   And as a part of your investigation, you checked out

Mr. Alegranti - Cross - Mr. Ricco

1  his story and sure enough, you raided a person in

2  Philadelphia who had those items; isn't that correct?

3  A.  Yes.

4  Q.  And you interviewed him; isn't that correct?

5  A.  Yes.

6  Q.  He has no business relationship with Mr. Diane; isn't

7  that correct?

8  A.  I don't think I would assert that he has no business

9  relationship with Mr. Diane.

10 Q.  Other than the photographs and the ivory sold to the

11 undercover in October of 2008 and in December 2008, no

12 other involvement with Enuma (sic) importation that came

13 through JFK, no other involvement with Mr. Diane and

14 ivory; isn't that correct?

15 A.  Are you asking me whether or not Mr. Diane had ever

16 sold anything to the man in Philadelphia or if he had

17 ever had transactions with him?

18        MR. RICCO:  No further questions.  Thank you

19 very much, sir.

20        THE COURT:  All right.

21        Mr. Hueston?

22        MR. HUESTON:  Your Honor, I apologize.  I was

23 looking at my calendar.  I have a -- I am going to do

24 what I can to try to get this done.

25        THE COURT:  Okay.

Mr. Alegranti - Cross - Mr. Hueston

1    MR. HUESTON:  But I have a problem going much

2  past 6 o'clock because of an engagement that I have to

3  attend to.  I can maybe go to about 6:15, if I push it

4  out.  I will see what I can do in that time.

5    And before adjourning anyway, we should really

6  tell the witnesses --

7    MR. RICCO:  Well before we do (inaudible).

8  Your Honor, Mr. Legon is going to remain in my stay.  I

9  have a flight to Mobile, Alabama tonight.  And if I don't

10  leave, I will be here tomorrow morning.  So he's going to

11  stay.  He's prepared and --

12    THE COURT:  And he'll be prepared --

13    MR. RICCO:  He's prepared to stay.

14    THE COURT:  -- if we continue tomorrow to --

15    MR. RICCO:  Yes.  And Mr. Legon will be

16  prepared to carry on.  He's doing the next witness.

17    THE COURT:  All right.

18    MR. RICCO:  Thank you very much, your Honor.

19  CROSS-EXAMINATION

20  BY MR. HUESTON:

21  Q.   It looks worse than it really is, Agent.

22  A.   Yes.

23  Q.   I've got a -- I got a lot of stuff up here but I'm

24  going to try to get right to it.  I want to talk about

25  the March 21 shipment; okay?  You recall that; right?

1  A.   Yes, I do.

2  Q.   And do you recall during your direct examination you

3  were shown Exhibit, I believe it was I; do you recall

4  that?

5  A.   Can you tell me what Exhibit I was?

6  Q.   Sure.  You were shown a money transfer or maybe --

7  A.   Yes.

8  Q.   -- a --

9  A.   A wire transfer.

10  Q.   A wire transfer --

11  A.   Uh-huh.

12  Q.   -- from my client, Mr. Doumbouya; correct?

13  A.   That's correct.

14  Q.   Let's see.  I will put it on the Elmo.  Do you see it

15  there?

16  A.   Yes, I do.

17  Q.   I got it.  Okay, so you see that there; right?

18  A.   Yes, I do.

19  Q.   And Mr. Sinclair asked you or do you recall

20  Mr. Sinclair saying that Mr. Souare had been given I

21  guess some sort of fee of $1,600.  Do you remember that?

22  A.   He had been given $1,600 from the Kemo Sylla.

23  Q.   And you said that was ten percent of what this wire

24  transfer is; right?

25  A.   Roughly, yes.

Mr. Alegranti - Cross - Mr. Hueston

1  Q.  Now the inference I guess is that Mr. Doumbouya was

2  part of that shipment.  He had some interest in that

3  shipment from May (sic) 21, 2006; correct?

4          MR. SINCLAIR:  Objection.  Calls for what the

5  purpose of the prosecutor's question was.

6          MR. HUESTON:  Well let me ask you this question

7  -- I'll withdraw it.

8  Q.  Did you in your investigation ever make a

9  determination linking Mr. Doumbouya to the May 21, 2006

10  shipment?

11  A.  I would -- I would say this, that what I was able to

12  -- what this document -- I was able to look at this

13  document that showed a payment of $16,600 from Mamadi

14  Doumbouya to the recipient of the ivory shipment within a

15  period of approximately two weeks after it was received

16  and that my investigation showed that your client was in

17  the -- was selling ivory.  I think that's what the link

18  to this was.

19  Q.  That's the extent of it; correct?  That's it.

20  A.  It's a payment made to a person that was receiving an

21  ivory shipment shortly thereafter.

22  Q.  Two weeks later about; correct?  And that's the only

23  thing your investigation showed Mr. Doumbouya being part

24  of the March 21, 2006 shipment; correct?

25  A.  Well I would also -- I would say that this document

Mr. Alegranti - Cross - Mr. Hueston

1    showed --

2    Q.    This --

3    A.    Well I mean, if I can answer --

4            THE COURT:  Do you want him to answer the

5    question?

6            MR. HUESTON:  Yes, I do.

7            THE COURT:  Okay.  Please let him do so.

8    A.    I think what it shows me is you have that payment

9    coming but it's also consistent with what the shipment

10   was in the November, I believe, 2007 shipment where you

11   have a shipment of elephant ivory coming from West

12   Africa, Ghana or Ivory Coast, which are adjacent, share a

13   border and you have them coming into New York, concealed

14   in a similar fashion using a fictitious name and then you

15   have Mamadi Doumbouya sending a payment to the person

16   that received the shipment, again whose name is not on

17   the paperwork which is one of the common MO's we see in

18   this type of illegal conduct.  So that's what that

19   document links it to.

20   Q.    Let me ask the question this way.  Is there any

21   surveillance of Mr. Doumbouya picking up or receiving the

22   March 21 shipment?

23   A.    No.

24   Q.    Are there any phone records of him communicating with

25   Mr. Souare or Mr. Sylla about the March 21, 2006

Mr. Alegranti - Cross - Mr. Hueston

1  shipment?

2  A.   I can't recall and I certainly can't identify any

3  from -- at this point.

4  Q.   Well do you recall during your direct testimony that

5  the government provided you with the phone records for

6  Mr. Sylla; correct?

7  A.   That we subpoenaed phone records for Mr. Sylla?

8  Q.   Yes.

9  A.   Yes.

10 Q.   Government Exhibit G.

11 A.   Okay.

12 Q.   It's in evidence.  Do you recall that?

13 A.   Yeah, I don't remember the exhibit number but yes, I

14 do.  I know what you're talking about.

15 Q.   And you went through all of the phone records;

16 correct, to link individuals who were involved in this

17 case.

18 A.   Yes.

19 Q.   Right?

20 A.   Yes.  I mean -- yes, we did do that.

21 Q.   And there's no phone calls between -- excuse me, let

22 me ask you this question first.  You seized

23 Mr. Doumbouya's telephone, correct, when you arrested

24 him?

25 A.   Yes, we did.

Mr. Alegranti - Cross - Mr. Hueston

1  Q.   You know his telephone number.  That's part of the

2  investigation; correct?

3  A.   Yes.

4  Q.   And in your review of the records for Mr. Sylla was

5  there any phone records linking him with Mr. Doumbouya

6  with any phone number that you're aware of that he

7  controlled?

8  A.   I don't recall there being any records that I

9  identified.

10 Q.   There isn't.

11 A.   I mean I am not saying that there isn't.  I mean, I

12 literally have millions of phone calls. So whether

13 there's a call between Mr. Doumbouya and Mr. Souare, I

14 don't want to testify that there wasn't because I just

15 don't know.  But I can't say affirmatively that there is

16 one.

17 Q.   Well --

18 A.   So I am not aware of one, is my answer.

19 Q.   Do you recall that when you were asked questions by

20 Mr. Sinclair, you noted -- you highlighted portions that

21 were of interest or showed a link between Mr. Sylla and

22 Mr. Souare; correct?

23 A.   Yes.

24 Q.   You didn't do that for Mr. Doumbouya.

25 A.   No.

Mr. Alegranti - Cross - Mr. Hueston

1  Q.   Because you did not see them in the record.  You

2  would have done it if you saw a link; isn't that correct?

3  A.   I didn't identify any calls in that period of time.

4  Q.   Now you also had telephone records for Mr. Souare;

5  correct?

6  A.   Yes.

7  Q.   And that's Government Exhibit H that's in evidence;

8  do you recall that?

9  A.   Yes.

10 Q.   And again, you went through these records and you

11 highlighted portions, for instance --

12 A.   Just for the record, I didn't highlight these

13 portions of the records.

14 Q.   Well --

15 A.   Someone in the government -- I mean the prosecutor or

16 the paralegal but I did not highlight these.

17 Q.   I understand.  The highlighted portions though show

18 telephone numbers that are -- that the government's using

19 to track or show a linkage between two individuals with

20 respect to the March 21, 2006 shipment; correct?

21 A.   Yes.

22 Q.   And there are no tracking or telephone numbers listed

23 in Mr. Souare's records concerning Mr. Doumbouya to your

24 knowledge; isn't that correct?

25 A.   To my knowledge.

Mr. Alegranti - Cross - Mr. Hueston

1  Q.   Now Mr. Souare asked you some questions about him.

2  He was interviewed by law enforcement; correct?

3  A.   Yes.

4  Q.   And he was interviewed along with Lancine Conde and

5  Kaba Abdoul Karim; is that true?

6  A.   That's correct.

7  Q.   And he was asked about the shipment of March 21,

8  2006; correct?

9  A.   Yes, he was.

10 Q.   And he described to the government who was -- who the

11 individuals were who were involved in the shipment;

12 correct?

13 A.   That's correct.

14 Q.   He did not mention Mr. Doumbouya; did he?

15 A.   No.

16 Q.   Did Mr. Conde mention Mr. Doumbouya?

17 A.   No.

18 Q.   How about Mr. Karim, did he mention Mr. Doumbouya?

19         THE COURT:  Would you spell that just so have

20 it for the record?

21 A.   No.

22         MR. HUESTON:  Conde, it's L-a-n-c-i-n-e, that's

23 the first name.  Conde's like Conde Nast, C-o-n-d-e.  And

24 then Kramo, K-r-a-m-o, Sekou, S-e-k-o-u and that's

25 Souare, that's S-o-u-a-r-e and then Kabah Abdoul, in this

Transcription Plus II        Rosalie Lombardi

Mr. Alegranti - Cross - Mr. Hueston

1  case it's Abdoul, A-b-d-o-u-l and Karim, K-a-r-i-m.

2              THE COURT:  And Kaba?

3              MR. HUESTON:  Oh, Kaba's K-a-b-a, Your Honor.

4              THE COURT:  Thank you.

5  Q.   So they were interviewed and part of your

6  investigation, you took phone numbers of -- and whatever

7  pedigree information you could from these individuals?

8  A.   Yes.

9  Q.   And did you run investigations?  Did you pull their

10 telephone records?

11 A.   Yes.

12 Q.   And isn't it true, you had phone records also from

13 Mr. Doumbouya from Special Agent, I think, Cortes (ph.)

14 was the undercover; correct?

15 A.   I subpoenaed the phone records.

16 Q.   And you had at least two telephone numbers from Mr.

17 Doumbouya; correct?

18 A.   Correct.

19 Q.   And I presume you obtained those and you looked those

20 other; correct -- looked those over as well; correct?

21 A.   Yes, I did.

22 Q.   Or at least you tasked someone from your office to do

23 that; correct?

24 A.   I wish that were the case.  No, I do it.

25 Q.   Oh, you did it yourself then.  And in no place is

Mr. Alegranti - Cross - Mr. Hueston

1  there anything showing in any of the telephone records

2  that you have from Mr. Doumbouya in this case that he had

3  any contact with Mr. Souare.

4  A.   I -- no, I can't identify any phone calls and I think

5  I may go look now, but you may have pointed out something

6  I overlooked.

7  Q.   Well --

8  A.   But I -- to answer your question, I have not

9  identified those -- any such calls.

10  Q.   And so -- let me just step back for a second.  Okay,

11  I'm going to move on then.

12       Now do you recall also being asked questions about it

13  was Government Exhibit M which is in evidence which is a

14  check written to -- I saw it yes.  Oh, we lost

15  everything.

16            THE COURT:  Just a moment.

17            (Pause).

18            MR. SINCLAIR:  Do you have a copy?

19            MR. HUESTON:  I do have a copy.

20  Q.   I just want to step back to --

21            THE COURT:  Just a moment.  I just want to make

22  sure.

23            (Pause).

24            THE COURT:  All right.  Please proceed,

25  Mr. Hueston.

Mr. Alegranti - Cross - Mr. Hueston

1    MR. HUESTON:  Okay.

2    THE COURT:  I'm sorry.

3    MR. HUESTON:  Thank you.

4    THE COURT:  Exhibit M.

5    Q.   Exhibit M, now you see this -- you see the document.

6    It gives a check number on the right, a portion of the

7    check next to Dallas National Bank.  Do you see that

8    there?

9    A.   Yes, I do.

10   Q.   And those appear to be maybe 838?

11   A.   Yeah, it may be cut off at the end there but it's

12   000838.

13   Q.   And if I recall correctly, the testimony that was

14   given earlier concerning the issuance of these checks

15   from the individual down in Texas was that this $9,000

16   was the payment for ivory that he purchased; correct?

17   A.   Yes, it was.

18   Q.   And this was a document that he provided; correct?

19   A.   That's correct.

20   Q.   And presumably he put in the word "ivory

21   accessories."  Correct?

22   A.   Yes.

23   Q.   Now Mr. Sinclair also put into evidence Government

24   Exhibit, I believe it's M-1 which is a series of checks

25   from the same individual; do you recall that?

Mr. Alegranti - Cross - Mr. Hueston

1  A.   Yes.

2  Q.   And all I have is -- I don't know if the Elmo is

3  still up; is it?  Yes, it is.  Thank you.

4       Now these are checks that your -- that law

5  enforcement -- that your investigation had these taken or

6  these photographs -- or these -- I guess copies made from

7  Mr. Doumbouya's bank account; correct?

8  A.   Correct.

9  Q.   And the check -- Government Exhibit M though is not

10 one of the checks in the M1 series; is that correct?

11 A.   That's correct.

12 Q.   So the check that -- let me ask you this question,

13 this check which is -- that's depicted in Government

14 Exhibit M, did you ever find that in Mr. Doumbouya's bank

15 account?

16 A.   No.

17 Q.   The checks that you have actually are -- for Mr.

18 Doumbouya's bank account from this fellow down in Texas

19 in Government Exhibit M, you have one for $1,400, another

20 one for $1,800, another one for $2,100 and another for

21 $6,500 and then you have one for $9,000.  None of these

22 have any statements that say they have to do with ivory;

23 isn't that correct??

24 A.   That's correct.

25 Q.   And this fellow down in Texas never produced to you

Mr. Alegranti - Cross - Mr. Hueston

1  any sort of inventory or an invoice saying that these

2  checks had anything to do with ivory; did he?

3  A.   No.  In fact, my recollection was that the -- he said

4  the only ivory he purchased from Doumbouya was this check

5  for $9,000 and the three ivory statutes that he turned

6  over to us.

7           THE COURT:  Now when you say "this check," it's

8  Government Exhibit M?

9           THE WITNESS:  Government Exhibit M.  We just

10  used those checks to locate him.  The -- and the

11  information he provided was during the course of that

12  interview.  Our agents asked, "Did you purchase ivory

13  from Mr. Doumbouya?"  "Yes, I did.  Here are the three

14  pieces and here's the copy of the check" in a nutshell.

15  Q.   And so the checks listed in the M-1 series, it's your

16  understanding these are -- have no association with

17  ivory; correct?

18  A.   Based on what Mr. Demerell (ph.) told us that those

19  were not for sales of ivory.

20  Q.   Now I want to ask you about Exhibit M, though.  Now

21  you didn't see any record of this transaction in Mr.

22  Doumbouya's bank account; correct?

23  A.   No, that's not one of the checks I recovered.  I

24  don't know if I didn't recover -- if I didn't go through

25  that time period or if Mr. Doumbouya has other accounts

Mr. Alegranti - Cross - Mr. Hueston

1   or where this check may have gone.  This is a check -- a

2   copy of the check that was provided to us by

3   Mr. Demerell.  Where it was deposited, I don't know.

4   Q.   And did you subpoena Mr. Demerell's records to see

5   how the check was negotiated?

6   A.   No, I did not.

7   Q.   Okay.  I am going to move on to a different area.

8   I'm going to ask you some questions about -- there is the

9   airway bill from Air France.  Do you recall that?

10  A.   Yes, I do.

11  Q.   Now --

12  A.   You're talking about the Paris seizure?

13  Q.   That's correct.  Now let me just find the exhibit.  P

14  as in Peter; okay.

15       Now according to your testimony this document was

16  found in Mr. Doumbouya's home?

17  A.   Yes, it was found in his bedroom.

18  Q.   I mean this -- I will put it on the Elmo.  It's a

19  difficult document to read.  I don't -- it just occurs to

20  me, I don't know, is there an original of the document?

21            MR. SINCLAIR:  Would that be helpful?

22            MR. HUESTON:  That's not the original, it's a

23  better copy.

24  Q.   Agent, the copy is better than I have.  I will use

25  the government's copy.  Do you know where the original of

Mr. Alegranti - Cross - Mr. Hueston

1  this document is?

2  A.   Yes, it's in -- the government seized it.  We have

3  it.

4  Q.   It's in your office or a different or -- you know,

5  the prosecutor's office; do you know?

6  A.   It would be in the prosecutor's office.

7  Q.   And when you received the Air France or when you

8  located it or seized this item, you contacted the

9  authorities in France?

10 A.   When we obtained this document?

11 Q.   Yes.

12 A.   Yes, we did.

13 Q.   And you had communications with them?

14 A.   Yes.

15 Q.   And I know what's been presented so far are

16 photographs of the seizures that apparently relate to

17 this airway bill, however were there any reports provided

18 to you from the French authorities regarding this

19 seizure?

20 A.   No, there weren't.  They -- they originally gave us

21 information that we had in our system.  That's how I knew

22 about it.  They had given us the details of the seizure,

23 the airway bill number, the consignee information and the

24 original photographs.  After we located this document, we

25 went back to them seeking more information and verifying

Mr. Alegranti - Cross - Mr. Hueston

1  that this fact seizure happened.  We received a letter

2  confirming it and from the Customs attache, the French

3  Customs Attache to the US saying that they could provide

4  someone to testify with respect to the shipment if

5  necessary.

6  Q.    Did they provide you with any reports regarding the

7  seizure, the actual items giving weights of individual

8  items --

9  A.    No.

10  Q.    -- sizes, measurements?

11  A.    No, I went through our Washington office to try to

12  obtain more details than the ones initially provided and

13  I was not able to obtain any additional details.

14  Q.    So all you were provided in terms of a description, a

15  physical description of the items that were seized were

16  the photographs that are at Government Exhibit W; isn't

17  that correct?

18  A.    Well there was the -- the initial information we had

19  had additional details.  I mean it didn't itemize the

20  actual number, like the sizes of the pieces or anything

21  like that.  But it provided details about where the

22  shipment had come from, where it was destined to, you

23  know, the events of when it was seized; that type of

24  information.  So I mean we -- it was not as though we

25  just had pictures.

Mr. Alegranti - Cross - Mr. Hueston

1  Q.   Were people arrested with respect to this incident?

2  A.   No, this -- this was seized transiting -- this

3  shipment was seized from Ivory Coast, transiting Paris,

4  en route to New York and that address on there is 615

5  West New York is basically short for Chelsea Mini

6  Storage.  That's what that corresponds to.

7  Q.   Were people arrested in France, if you know, with

8  regard to this?

9  A.   No, they weren't.  They provided us with the

10  information saying this looks like it was en route to New

11  York.  You guys should probably look into this.  They --

12  I mean, they don't -- the shipment was just transiting

13  there.  It wasn't even off -- it wasn't even imported

14  there.

15  Q.   Now you did question Mr. Torre (ph.).  You mentioned

16  that briefly on direct examination.  Did you do it or did

17  someone else from your office do it?

18  A.   I've interviewed Mr. Torre three times.

19  Q.   And in your interviews with Mr. Torre, I think you

20  stated on direct that he denied that the ivory that was

21  seized in France was his.

22  A.   That's correct.

23  Q.   And he mentioned Mr. Doumbouya; correct?

24  A.   He did.

25  Q.   I want to ask you some questions about -- you

Mr. Alegranti - Cross - Mr. Hueston

1  mentioned --

2         MR. SINCLAIR:  I apologize for interrupting,

3  Mr. Hueston.

4         MR. HUESTON:  Okay.

5         MR. SINCLAIR:  The only thing I want to call

6  the Court's attention to is that Mr. Torre's in the

7  audience and to the extent there's going to be further

8  inquisition about this line, I suggest that we ask

9  Mr. Torre to leave the audience in the event that any of

10 the defendants ever wish to call him as a witness, that

11 this testimony does not influence in any way his

12 testimony.

13        THE COURT:  All right.

14        MR. HUESTON:  I think that's completely

15 appropriate.

16        THE COURT:  All right.  Sir, Mr. Torre, there

17 is a possibility that you may be called by one of the

18 lawyers here to testify and we generally don't have

19 present in the courtroom anyone who may be a witness.

20        MR. SINCLAIR:  Mr. Torre, may not understand

21 you, your Honor, because he needs the assistance of a

22 French interpreter.

23        THE COURT:  Oh, I am sorry.

24        MR. HUESTON:  Perhaps one of us could just ask

25 him to leave.

Mr. Alegranti - Cross - Mr. Hueston

1          THE COURT:  All right.  Does somebody -- does

2    he speak Mandingo?  Should we have an interpreter --

3    Mr. Sinclair?  Mr. Sinclair?

4               MR. SINCLAIR:  Yes.

5          THE COURT:  I'm going to have the interpreter

6    assist you.

7               (Mr. Torre excused from the courtroom.)

8          THE COURT:  May I just ask briefly, counsel,

9    we're trying to figure out what we're going to do about

10   continuing this, if you do continue until tomorrow.

11   Would we be continuing tomorrow?  I do have some matters

12   I need to move now if we're going to continue.

13          MARGULIS-OHNUMA:  Judge, I'm going to have a

14   real scheduling problem with continuing tomorrow.  I have

15   a witness coming in from Puerto Rico tonight.  He's a

16   client for a guilty plea at noon.  I mean, it probably

17   could be resolved and it may take a call or two by you to

18   make sure I don't get in trouble.

19          THE COURT:  A guilty plea?

20          MARGULIS-OHNUMA:  It's in the Southern District

21   at Magistrate's court at noon but the witness -- the

22   defendant is coming in -- is flying in -- flew in tonight

23   from Puerto Rico.

24          MR. HUESTON:  Your Honor, I'm going to -- I'll

25   try to push on and try to get this done.  I mean, but --

Mr. Alegranti - Cross - Mr. Hueston

1    THE COURT:  Yes, did you -- oh, we need to have

2  a little break, please.  Let's just take five minutes.

3  I'm sorry.

4         MARGULIS-OHNUMA:  Thank you, Judge.

5         THE COURT:  In the meantime, let's just figure

6  out -- consult please and let's figure out our scheduling

7  because we might have to move matters off our morning

8  calendar.  You can step down, sir.

9         (Off the record)

10        MR. HUESTON:  Five minutes.

11        THE COURT:  Apologies to your wife.

12        MR. HUESTON:  Thank you.  I appreciate it.

13        THE COURT:  All right.  Thank you.

14        Are we back on the record, Ms. Jackson?

15        MS. JACKSON:  Yes, Judge.

16        THE COURT:  Okay.

17        MR. HUESTON:  Okay.

18 Q.  Agent, I was asking you about France.  You had

19 interviewed Mr. Torre; correct?

20 A.  Yes, I interviewed Mr. Torre.

21        MR. HUESTON:  Okay.  I don't know if the mic's

22 on.  I don't know if that's a problem.

23        (Pause)

24        THE COURT:  Just one more word of caution.

25 Please speak your objections or say it into the mic and

Mr. Alegranti - Cross - Mr. Hueston

1  then we're going to mute the defense table just for now

2  because the interpreters will interfere with our

3  transcription.

4          All right, please proceed.

5          MR. HUESTON:  Sure.

6  Q.   In terms of the shipment from France, Mr. Torre he

7  spoke to you about his relationship with Mr. Doumbouya;

8  correct?

9  A.   Yes, he did.

10 Q.   And suffice to say he made a claim that he didn't

11 know what was in the packaging; correct?  He didn't know

12 ivory was inside there.

13 A.   That's correct.

14         THE COURT:  "He" meaning Mr. Torre?

15 Q.   Mr. Torre did not know that ivory was inside the

16 shipment; correct?

17 A.   Correct.

18 Q.   Okay.  Moving on to a different subject area.  You

19 were also asked about Government Exhibit F which is the

20 Hemingway (ph.) African Gallery appraisal; do you recall

21 that?

22 A.   Yes, I do.

23 Q.   And this has to do with the March 21, 2006 --

24 A.   Yes, it does.

25 Q.   -- shipment?

Mr. Alegranti - Cross - Mr. Hueston

1  A.   Yes.

2  Q.   Now you're not an appraiser of ivory obviously;

3  correct?

4  A.   No.

5  Q.   Okay.  Do you see the bottom where it says "Fair

6  market contemporary value with the approximately fifty

7  percent less than retail antique value?"

8  A.   Yes, I do.

9  Q.   Do you know what that terms mean?

10  A.   I -- yes, I think I do know what they mean.

11  Q.   And fair market contemporary value, was that

12  explained to you by anyone or that something that you

13  picked up on your own?

14  A.   No, we -- when I spoke with him just this week, we --

15  I asked him about that term.  So I do know what both of

16  those terms mean; yes.

17  Q.   And he's saying that it would be approximately fifty

18  percent less than retail antique value; correct?

19  A.   Correct.

20  Q.   So that is it your understanding that that could be

21  discounted by fifty percent?

22  A.   My understanding is that the retail antique value, if

23  these items were legitimately, authentic antiques, which

24  they're not, they're new ivory but they're made to look

25  like that, the fair market contemporary value is what

Mr. Alegranti - Cross - Mr. Hueston

1  these pieces would go at for auction -- not at auction,

2  I'm sorry, at a gallery.  He said specifically like on

3  Lexington Ave., if you were to come across these same

4  pieces at a gallery, that value, the fair market

5  contemporary value would be approximately fifty percent

6  less than if they were legitimately old items, antique

7  value.  That's the way he explained it to me.

8  Q.  So legitimate items are worth fifty percent more than

9  illegitimate items; is that your taking -- that's your

10 understanding?

11 A.  That's -- I mean that's what he told me those terms

12 -- that's what fair market contemporary value was and

13 that's what written here.  That's -- I think you're --

14 Q.  Okay, thank you.  I'll move on to a different area.

15    I have a couple of questions about the people that

16 you interviewed down in Texas with respect to

17 Mr. Doumbouya. And first I want to ask you -- well let me

18 ask -- not about Texas, let me ask about Tennessee.  That

19 was Robert Bain (ph.)?

20 A.  Yes.

21 Q.  Did you interview them or did someone in the field do

22 it?

23 A.  Initially I sent agents out to interview them.  They

24 interviewed them and I subsequently spoke to him when we

25 prepped, as we thought this was going to trial. I spoke

Mr. Alegranti - Cross - Mr. Hueston

1    to him at that point.

2    Q.   Now, if I recall correctly, Mr. Doumbouya according

3    to Mr. Bain had left the ivory tusk at his shop on

4    consignment, was asking for a $20,000 price; correct?

5    A.   A pair of ivory tusks; correct.

6    Q.   And that price was not met; correct?

7    A.   Correct.

8    Q.   Did you have those ivory tusks appraised?

9    A.   I had -- no, I don't know where those ivory tusks are

10   today.

11   Q.   The items that you seized from Joseph Demerell, did

12   you have those items appraised?

13   A.   No.

14   Q.   And how about the items that you seized from Jara --

15   or Syliva Man Jara (ph.)., Dr. Jara?

16   A.   No.

17   Q.   Those weren't appraised either; correct?

18   A.   No.

19          MR. HUESTON:  One moment, your Honor.  I may be

20   done.  Your Honor, may I just confer with Mr. Doumbouya?

21          THE COURT:  Of course.

22          (Counsel and client confer)

23   Q.   Just a couple of questions about Mr. Torre and his

24   relationship with Mr. Doumbouya.  So from talking with

25   him, he denied that the ivory was his.  That's correct;

Mr. Alegranti - Cross - Mr. Hueston

1 right?

2 A.   That's correct.

3 Q.   And he said he didn't learn about it until some time

4 later, correct, that there had been some interception of

5 the seizure?

6 A.   That's correct.

7 Q.   And according to Mr. Torre, he was -- he had wood

8 carvings or wood items that were in this shipment that

9 was coming from France or via France.

10 A.   That was coming from Africa via France; yes.

11 Q.   Mr. Torre never informed you that Mr. Doumbouya

12 ordered him or told him what to do; correct?

13 A.   No, he didn't.

14 Q.   And Mr. Doumbouya -- Mr. Torre never told you that

15 Mr. Doumbouya had any ownership over the wood items that

16 were inside the seized items that were seized in France.

17 A.   Mr. Torre said his items were the wood items.

18 Q.   And they were seized when Mr. Doumbouya did not have

19 any ownership over them.

20 A.   No, not of his items; no.

21 Q.   And Mr. Torre said he didn't have any ownership over

22 the ivory.

23 A.   That's correct.

24          THE COURT:  So Mr. Torre said the wood items

25 seized in France were Mr. Torre's?

Mr. Alegranti - Cross - Mr. Hueston

1      MR. HUESTON:  Only his.  That's correct.

2      THE WITNESS:  That's not what I was saying; no.

3   Mr. Torre said his items in the shipment which was a

4   consolidation shipment meaning two persons put a shipment

5   together, his portion of the shipment was 100 percent

6   non-ivory items, was wood items.  The other items he

7   didn't know what was in them, whether it was some ivory,

8   some wood that was coming in; those are the items that he

9   attributed to Doumbouya but he said he had no

10  responsibility for the ivory in the shipment -- did not,

11  was not aware it was in there.

12  Q.   And Mr. Doumbouya didn't have any responsibility for

13  the wooden items that Mr. Torre's?

14  A.   They were Mr. Torre's.  Now whether Mr. Doumbouya

15  also had wood items, that we didn't discuss.  So, just to

16  clarify.

17  Q.   And when the shipment was intercepted, isn't it true

18  that Mr. Torre said that he had contacted Mohammed Sylla

19  to tell him that the shipment hadn't arrived?

20  A.   Yes, he said he had -- he spoke with Mohammed (ph.)

21  Sylla.

22  Q.   He didn't contact Mr. Doumbouya.  He didn't tell you

23  that; did he?

24  A.   He --

25  Q.   About whether it had arrived or not.

Mr. Alegranti - Cross - Mr. Hueston

1  A.  He told us that he -- initially in the interview he

2  told us that he had confronted Mr. Doumbouya about the

3  ivory and the shipment.

4  Q.  Well that's not the -- my question though, Agent.

5  I'm really trying to be specific.

6  A.  Okay.

7  Q.  Isn't it true that he contacted Mr. Sylla to tell him

8  that the shipment had not arrived?

9       MR. SINCLAIR:  Objection.

10  A.  Okay.  And just for the record, it's not the

11  defendant Sylla.

12  Q.  I said --

13  A.  It's Mamadou (sic) Sylla in Africa.

14  Q.  That's -- we agree on that.

15  A.  Right.

16  Q.  We're not talking about the defendant, Mr. Sylla,

17  we're talking about Momadad (sic) -- Mohammed Sylla in

18  Africa.  He contacted him.  That's what he told you, Mr.

19  -- that's what Mr. Torre told you.

20  A.  He said -- yes, he did say he spoke to Mr. Sylla in

21  Africa.

22  Q.  And according to Mr. Torre, he and Mr. Doumbouya

23  planned to go to the Chelsea Piers to pick up the -- or

24  Chelsea Mini Storage, excuse me, to pick up the shipment

25  and parse out, you know, their individual items and that

Transcription Plus II     Rosalie Lombardi

Mr. Alegranti - Cross - Mr. Hueston

1  was the agreement; right?

2  A.    That was my -- yes, that's what he explained to me.

3  Q.    Nothing more, nothing less than that; correct?

4  A.    That's correct.

5  Q.    Now just some questions about Mr. Doumbouya's contact

6  with Special Agent Cortes, the undercover.

7  A.    Okay.

8  Q.    It's true that Mr. Doumbouya sold Mr. Cortes wood

9  carvings; isn't that correct?

10  A.    That's correct.

11  Q.    He never sold him ivory.

12  A.    No, he did not.

13  Q.    Now let me ask you about the November 2007 control

14  delivery to Mr. Doumbouya; do you recall that?

15  A.    Yes, I do.

16  Q.    The one that's on videotape.

17  A.    Yes.

18  Q.    Did you observe -- you watched that personally;

19  correct?

20  A.    Yes, I did.

21  Q.    Did you observe Mr. Doumbouya ordering or directing

22  anyone in relationship to that control delivery?  Let me

23  put it this way, I'm sorry, poor question.

24      Was anyone with him when he picked up the shipment?

25  A.    He was by himself when he took delivery of it.  He's

Mr. Alegranti - Cross - Mr. Hueston

1  -- it's an active place, so people come in to the -- you

2  know, he talks to people during the course of the day.

3  They walk away.  He walks with them.  I mean but when he

4  took delivery of it, he was by himself.

5  Q.   Is he --

6  A.   He left with other people with the ivory but when he

7  took delivery of it, he was by himself.

8  Q.   And to your knowledge, those other people who are

9  with him did he have any control over them?  Was he

10  giving them any direction with respect to this November

11  2007 shipment?

12  A.   I'm not aware of whether those individuals knew that

13  ivory was present in Mr. Doumbouya's bag or not.

14  Q.   And then I also wanted to ask you -- excuse me --

15  just one more question about the way bill -- the wire

16  transfer, if you recall.

17  A.   Uh-huh.  Yes, I do.

18  Q.   Okay.  And I won't put the exhibit up.

19  A.   I remember.

20  Q.   You say that there was a wire transfer to an

21  individual.  Did Mr. Doumbouya, to your knowledge, ever

22  make any similar type of wire transfers to that

23  individual any other time?

24  A.   I don't know.

25  Q.   Okay.  And just so I'm clear, we're talking about the

Mr. Alegranti - Cross - Mr. Hueston

1  name of the beneficiary is Souare Sekou Kramo?

2  A.  Kramo.

3  Q.  Kramo.

4  A.  K-r-a-m-o, Kramo.

5  Q.  And to your knowledge, did Mr. Doumbouya give any

6  wire transfers to him at any other time?

7  A.  I'm not aware of any other wire transfers from

8  Mr. Doumbouya to Mr. Souare.

9        MR. HUESTON:  Let me see.  One moment,

10 your Honor.

11       THE COURT:  Just for the record, that was in

12 reference to Government Exhibit I.

13       MR. HUESTON:  Thank you, your Honor.

14       (Pause).

15       MR. HUESTON:  Nothing further.

16       THE COURT:  All right.  Thank you.

17       Is there anything else from the government?

18       MR. SINCLAIR:  There's no redirect examination,

19 your Honor.

20       THE COURT:  All right.  I just note that

21 Government Exhibit's J, J-1 and V are not in evidence.

22 Did you want to move those in at this time?

23       MR. SINCLAIR:  Yes, your Honor.  We do move

24 those and we also move Government Exhibit Y, to the

25 extent we didn't previously move it into evidence.  And I

Proceedings

1  understand as I have spoken with defense counsel, there's

2  no objection to any of that.

3          THE COURT:  All right.  Is there any objection,

4  counsel, on the defense side of the table?

5          MR. RICCO:  No objection.

6          MR. HUESTON:  No, your Honor.

7          THE COURT:  All right.  The Court will receive

8  into evidence Government Exhibits J, J-1, V and Y.

9  (Government's Exhibit J, J-1, V and Y are marked in

10  evidence.)

11          THE COURT:  All right.  Is there anything else

12  from this witness?

13          MR. SINCLAIR:  No, your Honor.

14          THE COURT:  All right.  Thank you, sir.  You

15  may step down.

16          THE WITNESS:  Thank you.

17          (Witness excused.).

18          THE COURT:  At this time, I guess we'll adjourn

19  until -- unless you wanted to call someone else this

20  evening.  We would otherwise adjourn until Friday morning

21  at 8:30.

22          MR. SINCLAIR:  Yes, your Honor.  We released

23  our only other witness based on our earlier conversation.

24          THE COURT:  Oh, okay.

25          MR. SINCLAIR:  We were prepared to go forward,

Proceedings

1  your Honor.

2          THE COURT:  No, that's fine.  I am sure you

3  were.  I think Mr. Hueston probably stretched his

4  goodwill with his wife, as far as he could.

5          All right.  So, I will see you all at 8:30.

6  Maybe you'll take that back tonight out of the courtroom,

7  right?  I just--

8          MR. SINCLAIR:  I was going to ask if there's a

9  place for us to put it here but if --

10          THE COURT:  Okay.  Well my only concern is --

11  oh, we could lock it in a storage room, I guess.

12          Ms. Jackson will assist you in locking it.

13          MR. SINCLAIR:  And it's a locked storage closet

14  that only you have possession of the key?  Okay.

15          THE COURT:  Yes.

16          MARGULIS-OHNUMA:  Your Honor, may I make an

17  inquiry of the Court.  It's something I just discussed

18  during the break with Mr. Sinclair is that in our pre-

19  Fatico submissions that you had requested, put in an

20  affidavit from Mr. Sylla.  I understand that Mr. Sinclair

21  is going to object to the admission of that affidavit.

22          It would be helpful if you could let us know

23  your thinking on that in terms of whether or not Mr.

24  Sylla is going to be testifying -- whether you're going

25  to be accepting as evidence that affidavit.

Proceedings

1      THE COURT:  Well is he going to be testifying

2  consistently with the affidavit or will he be covering

3  that ground?

4      MARGULIS-OHNUMA:  Yes.  Yes, he is.  My only

5  (inaudible) testify, my intention in submitting the

6  affidavit was to avoid the expenditure of time and

7  (inaudible) in testifying.

8      MR. SINCLAIR:  To be clear though, of the

9  government's position, your Honor, os that the government

10  does intend to object to the admission or the

11  consideration in any respect of that affidavit.  It's

12  entirely inappropriate under the Second Circuit

13  jurisprudence and I will provide you with the case law to

14  the extent you're not familiar with it or you don't have

15  it available.  And we'll do that in a submission.

16      And the government would object to be

17  considered in any respect because that's the purpose of a

18  hearing is to subject everyone to cross-examination and

19  that goes just as much for the government as it does for

20  the defense.

21      And so we do intent to object to the

22  consideration of that affidavit in any respect, just as

23  we would at a suppression hearing and I believe even in

24  this case, the Court has already ruled that the

25  consideration of an affidavit at a suppression hearing

1  would be inappropriate, that's the purpose of such a

2  hearing which is Mr. Sylla took the stand in the

3  suppression hearing.  And so again, we object to all of

4  that.

5          THE COURT:  He did testify.

6          MR. SINCLAIR:  Owatta Bomba (ph.) testified.

7          THE COURT:  I'm sorry.  I'm sorry, not --

8          MR. SINCLAIR:  We did address this issue at the

9  suppression -- at the juncture of the suppression

10  hearing.

11          THE COURT:  (Indiscernible) testified, I

12  apologize.

13          I am concerned -- look, he's going to be here.

14  He's going to testify.  I think if he's going to cover

15  the same ground, we might as well -- let's just hear from

16  Mr. Sylla on the stand and the affidavit, I think is not

17  really necessary in those circumstances.

18          In addition, the government would want to be

19  able to cross-examine him.  So if you were to just put in

20  the affidavit in lieu of testimony, I don't think it

21  would be appropriate.

22          MARGULIS-OHNUMA:  Okay.  Thank you.

23          THE COURT:  Okay.  All right.  So, we will

24  maybe move the items out of the courtroom.  Is that the

25  only -- the box and the --

Proceedings

1    MR. SINCLAIR:  The box and the bag -- yeah,

2  we'll take the documents back.

3    THE COURT:  We're off the record then.  We're

4  adjourned until Friday.  Thank you.

5           (Matter concluded)

6              -o0o-

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# I N D E X

**Agent Philip Alegranti**:

Cross Examination by Mr. Ricco. . . . . . . . . . . 3

Cross Examination by Mr. Hueston. . . . . . . . 16


# E X H I B I T S

**Government's Exhibit Marked in Evidence:**

Government's Exhibit J. . . . . . . . . . . . . . 46

Government Exhibit J-1. . . . . . . . . . . . . . 46

Government Exhibit Y. . . . . . . . . . . . . . 46

Government Exhibit V. . . . . . . . . . . . . . 46

# C E R T I F I C A T E

I, ROSALIE LOMBARDI, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **18th** day of **October** , 2010.



Rosalie Lombardi
Transcription Plus II