UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
------------------------------X     Docket#
UNITED STATES OF AMERICA,      :     08-cr-906(KAM)(JO)
                               :
      - versus -               :     U.S. Courthouse
                               :     Brooklyn, New York
SYLLA, et al.,                 :
                               :     October 15, 2010
                 Defendant     :
------------------------------X
```

TRANSCRIPT OF CRIMINAL CAUSE FOR FATICO HEARING
BEFORE THE HONORABLE KIYO A. MATSUMOTO
UNITED STATES DISTRICT JUDGE

A  P  P  E  A  R  A  N  C  E  S:


<u>For the Government</u>:          **Loretta E. Lynch, Esq.**
                              United States Attorney

                         BY:  **Patrick Sinclair, Esq.**
                              Assistant U.S. Attorney
                              271 Cadman Plaza East
                              Brooklyn, New York  11201



<u>For Defendant Sylla</u>:         **Zachary Margulis-Ohnuma, Esq**
                              Law Office of
                              Zachary Margulis-Ohnuma
                              260 Madison Avenue
                              18th Floor
                              New York, NY 10016



<u>For Defendant Doumbouya</u>:     **Michael O. Hueston, Esq.**
                              Michael Hueston,
                              Attorney at Law
                              350 Fifth Avenue
                              Suite 4810
                              New York, NY 10118

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


**APPEARANCES CONTINUED:**


<u>**For Defendant Drissa Diane**</u>:   **Steven Z. Legon, Esq.**
Steven Zachary Legon,
Attorney At Law
20 Vesey Street
Suite 400
New York, NY 10007


<u>**Official Transcriber**</u>:     **Rosalie Lombardi**
      **L.F.**


<u>**Transcription Service**</u>:   <u>**Transcription Plus II**</u>
3859 Tiana Street
Seaford, N.Y.  11783
(516) 358-7352
<u>Transcriptions2@verizon.net</u>


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

## Proceedings

1    THE CLERK:  This is Criminal Cause for a Fatico

2 hearing, 08-CR-906, <u>United States v. Kemo Sylla, Mamadi</u>

3 <u>Doumbouya and Drissa Diane</u>.

4    Will counsel please state their appearances?

5    MR. SINCLAIR:  On behalf of the United States,

6 Patrick Sinclair, joining me at counsel table is Special

7 Agent Phil Alegranti from the Fish and Wildlife Service.

8    Good morning, your Honor.

9    MR. MARGULIS-OHNUMA:  For the defendant Kemo

10 Sylla, Zachary Margulis-Ohnuma.  I'm at 260 Madison

11 Avenue. I'm joined at counsel by Bradley Miller, a

12 paralegal from my office.

13    Good morning, your Honor.

14    MR. HUESTON:  Good morning, your Honor.

15 Michael Hueston for Mamadi Doumbouya.

16    THE COURT:  Good morning.

17    MR. LEGON:  Good morning, your Honor.  For the

18 office of attorney Anthony Ricco, Steven Legon on behalf

19 of Drissa Diane.

20    THE COURT:  All right.  thank you.  Good

21 morning.  And we have two interpreters here for the

22 record.  Ma'am, your name?

23    THE INTERPRETER:  Debra Diarme (ph.).

24    THE COURT:  Good morning, Ms. Diarme.

25 (INTERPRETER SWORN)

# Proceedings

1          THE COURT:  And your language is?

2          THE INTERPRETER:  Mandingo.

3          THE COURT:  Thank you, ma'am.  And we have

4   another interpreter, sir.

5          THE INTERPRETER:  Good morning.  Pa Drammeh.

6          THE COURT:  Okay, thank you, Mr. Drammeh.

7   (INTERPRETER SWORN)

8          THE COURT:  Thank you.  And your language, sir?

9          THE INTERPRETER:  Mandingo.

10          THE COURT:  Thank you.  All right.  Mr.

11   Margulis-Ohnuma, I would be happy to hear from you.

12          MR. MARGULIS-OHNUMA:  Thank you, your Honor.  I

13   sent a letter via ECF to the government in this regard

14   yesterday.  On Wednesday, your Honor received testimony

15   alleging that my client had lived in Ivory Coast.  It's

16   our position that that's untrue and should have been

17   reflected in discovery that was turned over more than a

18   year ago that would reveal the immigration records that

19   the agent discussed that he was relying on for this

20   assertion.

21          The government's left an impression that

22   Mr. Sylla's involved in a number of ivory transactions

23   that originated in the Ivory Coast.  It's therefore --

24   and again, it's impressionistic but it's therefore

25   relevant.  They've left -- they've, I think sought to

**Proceedings**

1   leave whether explicitly or implicitly, to ask the Court

2   to draw an inference because he lived in Ivory Coast, he

3   has connections in Ivory Coast, all of the ivory comes

4   from Ivory Coast, that's evidence that he was involved in

5   a large number of ivory transactions would we contend he

6   was not involved in.

7          It's our position that the testimony is false

8   and that the records that were relied on should have been

9   turned over already.  I reviewed during the break

10  yesterday the discovery in full.  I found his passport

11  which goes back just to 2004.

12         But we haven't received the A file or any other

13  records that would indicate where he lives.  So I have no

14  way to contradict this sworn testimony of an officer on a

15  highly relevant matter.  I've asked the government to

16  turn over the records and they've essentially ignored the

17  request.

18         So I am asking you to order them to turn over

19  the records on the basis of that assertion which is now

20  both in the complaint and in the sworn testimony

21  yesterday.

22             THE COURT:  Mr. Sinclair?

23             MR. SINCLAIR:  Your Honor, I think Mr.

24  Margulis-Ohnuma mischaracterizes the issue.  The

25  affidavit that was sworn to by the agent indicates that

# Proceedings

1  the source of the information in the affidavit which

2  contains the statement that Kemo Sylla resided in the

3  Ivory Coast, was based in part on his own observations

4  and part on his review of the record and in part on his

5  conversation with other law enforcement agents which

6  would have included ICE agents who were part of this

7  joint investigation.

8          In the course of yesterday, we did seek out the

9  source of this information from ICE.  Unfortunately, the

10 case agent who was assigned to the case from ICE has

11 subsequently in the interim retired from ICE.  So we're

12 unable to reach out to him.  We did, however, speak with

13 a subsequent agent who is responsible for the case now

14 and he was unable to identify where the source of this

15 information might have been.

16         So that's sort of what the record is.  There's

17 another part of the request which was to receive the

18 original passport.  The original passport has been turned

19 over to ICE which in turn turned it over to the Detention

20 and Removal Section of the Department of Homeland

21 Security in anticipation of deportation proceedings

22 against Mr. Sylla upon the completion of these

23 proceedings.  And I believe that the passport is

24 currently located in Garden City.  We've a request for it

25 to be brought to Brooklyn, as soon as possible and to the

## Proceedings

1    extent that it's still needed, we'll make it available

2    for inspection to the defense.  But that's all that we

3    have been able to do.

4              To the extent there's a request for the A file

5    and the Court has addressed that in this case and there's

6    no basis to turn over the immigration file here, so the

7    government declines to turn over the immigration file.

8    And we declined to turn over the immigration file

9    previously in this case and I don't recall if it was

10   your Honor or the magistrate judge at the time, who was

11   dealing with the detention proceeding but our decision

12   was essentially endorsed by the Court, that it's not

13   within the law for the government to have to turn over

14   the A file in this type of proceeding.

15             MR. MARGULIS-OHNUMA:  Your Honor, can I just

16   respond to this very quickly.

17             THE COURT:  Yes.

18             MR. MARGULIS-OHNUMA:  There was a decision on

19   the A file but that was not based on the government's

20   relying on those documents for an assertion tying

21   Mr. Sylla to particular transactions.  If they were going

22   to rely on them, I should be able to see the evidence.

23             And frankly, I'm pushing this point because it

24   is my belief and the position of my client that it's

25   simply false testimony.  There's no document that can

**Proceedings**

1  link him to the Ivory Coast because he never lived there.

2  And I want the Court to understand that.

3           MR. SINCLAIR:  And, your Honor, we don't --

4           MR. MARGULIS-OHNUMA:  And I want an opportunity

5  to prove that.

6           MR. SINCLAIR:  We don't decline -- we don't

7  deny that there's no documents that we've been able to

8  identify that links the defendant to the Ivory Coast.

9  Rather, the basis of Agent Alagrante's statement in his

10 complaint as stated in the complaint, and on the stand --

11 and stated on the stand and in the complaint, was based

12 on his conversations with Don Swiatoka (ph.), who was

13 then the agent assigned to the case from ICE.  We've been

14 unable to identify Agent Swiatoka and as I've represented

15 to the Court, we've also been unable to identify any

16 document or record that indicates that Mr. Sylla lived in

17 the Ivory Coast.

18          MR. MARGULIS-OHNUMA:  Your Honor, he swore

19 under oath that he looked at records with Don Swiatoka.

20 It was not an oral representation.  They looked at

21 records together is what they said.  He refuses to turn

22 over those records.

23          MR. SINCLAIR:  Your Honor, he's

24 mischaracterizing the evidence.  We can look at the

25 record.  What the agent's testimony was is that in the

**Proceedings**

1    course of preparing the complaint when they were putting

2    it together, the paragraphs that relate to each and every

3    one of the defendants, you know, immigration status and

4    their national origin and what not, they did look at A

5    files, that is correct and accurate, and the agent will

6    get on the stand and testify to that.

7            With respect to this particular sentence that

8    he resided in the Ivory Coast, it was not in those

9    records and the agent believes it was based on

10   conversations with Agent Swiatoka.  It's -- which is

11   consistent with what he testified to and this is all a

12   tempest in the teapot at the end of the day because we're

13   in a Fatico hearing to determine the market value of

14   ivory.

15           So the government concedes that there's no

16   record or document that links him to the Ivory Coast and

17   to the extent that there was a miscommunication in those

18   conversations with Agent Swiatoka, maybe that's what

19   happened, maybe that's not what happened, we can't say

20   now two or three years later but at the end of the day,

21   the government tells the Court that there was no document

22   or record that we've been able to identify that links him

23   to the Ivory Coast for a period residing there.

24           THE COURT:  Well I can take note of that, that

25   the government has made this concession and with respect

**Proceedings**

1  to any testimony on that point, I certainly will be

2  reviewing the transcript and you know, give that

3  testimony whatever weight I think it deserves.

4        MR. MARGULIS-OHNUMA:  Okay.  Thank you,

5  your Honor.

6        THE COURT:  They've made a concession.  They

7  have nothing to give you.  If they had it, I would order

8  it.

9        MR. MARGULIS-OHNUMA:  Okay.

10       THE COURT:  Okay?

11       MR. MARGULIS-OHNUMA:  Thank you, Judge.

12       THE COURT:  Thank you.

13       MR. SINCLAIR:  I have one brief legal matter

14  that I hope it's a brief legal matter.  At the end of the

15  proceedings last time, I think I represented to the Court

16  that there was a body of Second Circuit case law which

17  would disallow the Court from considering the affidavit

18  of the defendant in connection with the Fatico hearings.

19  That's inaccurate.  I apologize to the Court.  I was

20  considering the body of case law that relates to

21  evidentiary hearings for suppression motions and it is

22  permissible.  The Court has full discretion to consider

23  anything and everything that it wishes to consider in the

24  course of these Fatico proceedings.  So to the extent

25  that I misrepresented the state of the law, I apologize

Mr. Oliver - Direct - Mr. Sinclair

1   to the Court.

2          THE COURT:  All right.  Thank you for that

3   clarification.  I was -- I will consider Mr. Sylla's

4   affidavit, if you wish me to do so.

5          MR. MARGULIS-OHNUMA:  Thank you, your Honor.

6          THE COURT:  Okay.  Now one other matter, I

7   think we had some exhibits.  I just wasn't sure if we had

8   done this in the proceedings, Government Exhibits, I

9   think it was -- and maybe we did this on the record at

10  the end of the day, I'm sorry if I am not accurately

11  recalling but there was Government Exhibits J and J-1

12  which were the recordings and there was V and Y.  I think

13  the government did want to move them in.  I don't know

14  whether we did that formally on the record or whether the

15  parties on the defense side of the table had any

16  objections to those exhibits coming in.

17         MR. MARGULIS-OHNUMA:  No objection, your Honor.

18         THE COURT:  Okay.

19         MR. HUESTON:  No objection, your Honor.

20         MR. LEGON:  No objection, your Honor.

21         THE COURT:  Thank you, just to make sure.

22  We'll then receive J, J-1, V and Y of the government's

23  exhibits.

24         All right, now we have a gentleman waiting on

25  the witness stand here.  His name, Mr. Sinclair, is what?

1    MR. SINCLAIR:  The government calls Michael

2 Oliver.

3    THE COURT:  Okay, thank you, sir.

4 M I C H A E L   O L I V E R ,

5    called as a witness, having been first duly sworn,

6 was examined and testified as follows:

7    THE COURT:  Thank you.  Have a seat.  Please

8 speak into the microphone and state and spell your full

9 name, please.

10    THE WITNESS:  My name is Michael Oliver, M-i-c-

11 h-a-e-l  O-l-i-v-e-r.

12    THE COURT:  Thank you.  Could you please

13 proceed?

14 DIRECT EXAMINATION

15 BY MR. SINCLAIR:

16 Q.   Good morning, Mr. Oliver.  What do you do for a

17 living?

18 A.   I'm an African art dealer and appraiser and advisor.

19 Q.   And what is your educational background, Mr. Oliver?

20 A.   I have a bachelor's degree in fine art and philosophy

21 from the University of Wisconsin and I have a masters

22 degree in urban design, also from the University of

23 Wisconsin.

24 Q.   Where do you currently work?

25 A.   I work from -- I work in Manhattan.

Mr. Oliver - Direct - Mr. Sinclair

1  Q.  And what do you do on a day-to-day basis as it

2  relates to the dealing and appraising of African art as

3  you've described?

4  A.  I buy and sell African art and I appraise as well as

5  advise a number of collectors on acquisitions and de-

6  acquisitions from their collection.

7  Q.  Have you ever been associated with a gallery?

8  A.  Yes, I had a gallery on 72nd and Madison in Manhattan

9  from 1976 to 1988.

10 Q.  And you mentioned that you buy and sell African art.

11 What type of African art do you buy and sell?

12 A.  I buy and sell antique African art, art that's been

13 ritually used.

14 Q.  You use the term "ethnographic".  Can you tell the

15 Court what you mean by that term?

16 A.  Well ethnographic is kind of a catch word.  It means

17 anything having to do with any of the artists, people who

18 live in -- well in this case in Africa because I deal

19 with African art but years ago it was called primitive

20 art.  But we don't use that expression anymore.

21 Q.  And you also mentioned that you seek to buy pieces

22 that have been used ritualistically.

23 A.  That's correct.

24 Q.  Can you describe what you mean by that?

25

Mr. Oliver - Direct - Mr. Sinclair

1  A.   There are two kinds of pieces actually, pieces that

2  are used by the indigenous people for their own

3  ritualistic use and pieces that are carved for sale or

4  gifts.  I'm  not interested very much in pieces that are

5  carved for sales or gifts in terms of doing business with

6  them.  I look only for things that have been used in the

7  context -- in the proper context for the proper ritual.

8  Q.   During the course of your work buying and selling, do

9  you have to make a distinction between those pieces of

10  artwork that have been used ritualistically and those

11  that have been carved simply for sale as you described

12  it.

13  A.   Yes, I do.

14  Q.   What type of materials are African art typically

15  made of?

16  A.   Most of the things that I deal with are made of wood

17  but there's an occasional object of ivory and some metal

18  objects.

19  Q.   You mentioned that you conduct appraisals.  Who do

20  you do appraisals of African artwork for?

21  A.   Well, I've done appraisals for a number of

22  individuals and I've -- private people and I've done

23  appraisals for the three major museums in New York City,

24  the Metropolitan, the Brooklyn Museum and the Museum for

25  African Art.  And I've done appraisals for the Detroit

1  Art Institute, the Chicago Art Institute, the Minneapolis

2  Art Institute, the Buffalo Museum of Science and the

3  Smithsonian Institute.

4  Q.   Why typically do museums need to appraise the art

5  that they are in a collection that they're considering

6  buying?

7  A.   Most museums are self-insured and as such, they need

8  an independent appraiser usually in order to settle a

9  claim, if indeed there is a claim, when they loan --

10 especially when they loan objects to other museums

11 usually for exhibit.

12 Q.   Have you ever lectured in the area of African art?

13 A.   I have.

14 Q.   And have you traveled in Africa?

15 A.   Many times; yes.

16 Q.   And when you're there in Africa, do you purchase

17 African art?

18 A.   Well I traveled in Africa every two months for two

19 months; two months on and two months off, between 1974

20 and 1980.  I haven't been there since 1980.  And it was

21 for the purpose of looking to see how objects are used,

22 as well as buying.

23 Q.   And in the course of your career, have you had any

24 affiliation with the Internal Revenue Service, other than

25 as a taxpayer?

Mr. Oliver - Direct - Mr. Sinclair

1   A.   Yes, I was on the art evaluation panel for the IRS

2   from 1988 until 1994.  And I have been a consultant to

3   the IRS since then.

4   Q.   And what is it that you do with the IRS?

5   A.   Well, I review the appraisals that are given to the

6   IRS when either an estate is filing for taxes or

7   donations are given to museums.  At that time, they have

8   to put in an appraisal of the value of the objects and

9   it's then reviewed by the IRS and I am the -- well when I

10  was on the panel, I actually did the primary review and

11  now I do reviews of anything that they need help with.

12  Q.   And what -- are you familiar with the term "fair

13  market value?"

14  A.   Yes.

15  Q.   And are you familiar with the term "fair market value

16  as it relates to African art?"

17  A.   Yes.

18  Q.   And tell us what you -- how you use that term, what

19  that term means to you.

20  A.   Fair market value is price paid by a willing and

21  informed buyer to a seller who is willing and informed

22  and not under undue pressure.

23  Q.   Okay.  Have you ever testified previously as an

24  expert about African art?

25  A.   I have.

Mr. Oliver - Voir Dire - Mr. Margulis-Ohnuma

Q.   Can you tell the Court about your experience
testifying as an expert in the area of African art?
A.   Yeah, I've testified in the -- in Dayton, Ohio in I
think it's called the northern district federal court.
And I've testified in this US court in Brooklyn.
Q.   Was that in a proceeding before Judge Johnson?
A.   Yes, it was.
Q.   This past summer?
A.   Yes, it was.
Q.   And at that time were you qualified as an expert to
testify about the values of African art?
A.   Yes, I was.
         MR. SINCLAIR:  Your Honor, at this time we
would offer Mr. Oliver as an expert in the area of
African art and valuation and appraisals.
         MR. MARGULIS-OHNUMA:  Voir dire, your Honor?
         THE COURT:  All right, briefly.
VOIR DIRE EXAMINATION
BY MR. MARGULIS-OHNUMA:
Q.   Are -- Mr. Oliver, do you have any certifications by
any of the appraisal organizations?
A.   No.
Q.   Do you have any special training in appraisal itself?
A.   Well I don't think that there is any special training
for African art specifically.  But I have been trained by

Mr. Oliver - Voir Dire - Mr. Margulis-Ohnuma

1  the IRS, as well as by twenty-five years of doing this.

2  Q.   Are you member of the Antique Tribal Art Dealers

3  Association?

4  A.   No, I am not.

5  Q.   You're familiar with that association though;

6  correct?

7  A.   No, I am not.

8  Q.   Are you a member of the American Society of

9  Appraisers?

10  A.   No.

11  Q.   Are you a member of the Appraisers Association of

12  America?

13  A.   No.

14  Q.   Are you a member of the International Society of

15  Appraisers?

16  A.   No.

17  Q.   Have you received -- you said that there's no

18  training in African art.  Have you received any training

19  in the appraisal of fine or decorative arts in general?

20  A.   No.

21  Q.   And would you agree with me there are many courses

22  available in that field; isn't that right?

23  A.   Yes.

24       MR. MARGULIS-OHNUMA:  I have nothing further,

25  your Honor.  We -- I would object to the motion to

Mr. Oliver - Voir Dire - Mr. Margulis-Ohnuma

1   qualify this witness as an expert appraiser.

2           THE COURT:  All right.  Is there anyone else on

3   the defense side of the table who --

4           MR. HUESTON:  I'm just going to join the

5   application, your Honor.

6           THE COURT:  I"m sorry?

7           MR. HUESTON:  I'm going to join -- this is

8   Michael Hueston.  I am joining the application of Mr.

9   Margulis-Ohnuma.

10          THE COURT:  The objection?

11          MR. HUESTON:  Yes, exactly.

12          THE COURT:  All right.

13          MR. LEGON:  And Steven Legon on behalf of

14  Drissa Diane, I would join the application as well,

15  your Honor.

16          THE COURT:  All right.  Let me just ask you,

17  sir, about your twenty-five years of experience in

18  appraising African art, if you could tell me about that.

19  I understand there have been no specific educational

20  courses but if you could tell me about your twenty-five

21  years that you just testified to.

22          THE WITNESS:  Well, I started when I was named

23  to the Art Evaluation Panel at the IRS.  The person who

24  had been there before explained to me what had to be

25  done, the nature of the appraisals and we reviewed twice

Mr. Oliver - Voir Dire - Mr. Margulis-Ohnuma

1  a year somewhere between 500 and 1,500 objects that were

2  donated to museums or were in estates.

3          THE COURT:  About 500 to 1,500 pieces of

4  African art specifically?

5          THE WITNESS:  Oh, just of African art; yeah.

6          THE COURT:  And was this West African or --

7          THE WITNESS:  All from --

8          THE COURT:  -- all over?

9          THE WITNESS:  All over in Africa.  I served

10  with -- they had someone from the private sector and

11  someone from the public sector.  The private sector

12  person being a professor and we would meet in Washington

13  twice a year with the IRS panel.  And with various people

14  who have had inspected the individual objects and would

15  go over the abstracts of the appraisals, as well as

16  photographs.  And if, in fact, we needed more

17  information, we could then ask the people who had

18  examined them and if, in fact, there wasn't still enough

19  information, we would go and see the actual objects.

20          THE COURT:  Would you independently ascertain

21  the materials used in the art?  For example with ivory --

22          THE WITNESS:  Uh-huh.

23          THE COURT:  I heard testimony earlier about

24  attempts to disguise the appearance of the ivory, would

25  you rely on someone else to ascertain whether or not that

Mr. Oliver - - Direct - Mr. Sinclair

1  object was ivory and the age of the ivory?  Because we've

2  heard testimony that the age of the ivory sometimes being

3  an issue.  Or would you independently verify the content

4  of that object?

5         THE WITNESS:  Well there were two things that

6  happened.  The first would be the person who had done the

7  examination would describe exactly what he or she saw.

8  The weight of the piece, what the surface looked like, if

9  there was any exfoliation, if there was any -- if they

10 knew the difference between the ivory and bone, for

11 example, the porosity of the material.

12        And then if we -- if there was still a doubt,

13 we would go and examine the actual object and determine

14 for ourselves.  There are a number of ways that one can

15 tell, maybe not as sophisticated as the government uses

16 but both from handling the piece and by examining it in

17 terms of its hardness or its surface characteristics,

18 generally one can tell if it's plastic or its ivory or

19 some composite.

20        THE COURT:  So your expertise in appraising an

21 object would be based upon some other independent

22 determination that this was an object that was bone or

23 ivory or wood; correct?

24        THE WITNESS:  That's correct.

25        THE COURT:  And your appraisal would be based

Mr. Oliver - - Direct - Mr. Sinclair

1  on that --

2          THE WITNESS:  That's correct.

3          THE COURT:  -- predetermined information.

4          THE WITNESS:  Yes.

5          THE COURT:  All right.  I'm going to overrule

6  the objection.  I think this witness has adequately

7  established that he's had twenty-five years examining

8  multiple hundreds of objects of African art, including

9  some of which were ivory.

10          THE WITNESS:  Oh, yes.

11          THE COURT:  So I am going to overrule the

12  objection and I've determined that he is qualified to

13  testify in this area of appraising African art.

14          MR. SINCLAIR:  Thank you, your Honor.

15  DIRECT EXAMINATION

16  BY MR. SINCLAIR:

17  Q.   I would like to return to the term that we were

18  using, fair market value.  Tell us again what you

19  understand  the term fair market value to mean in this

20  area.

21  A.   Well as I said before, I think it's fair market value

22  is the value -- is the price that a willing and an

23  informed buyer would pay for an object to a seller who

24  was not under duress.

25  Q.   And how do you go about determining that?

Mr. Oliver - - Direct - Mr. Sinclair

1 A.   Well usually it's done by people stating that but in

2 most instances, I'm not really called upon to at the time

3 of the transaction, it's really after that I'm asked to

4 do an independent view as to what the object per se is

5 worth.

6 Q.   You've mentioned at least two different markets for

7 ivory -- African ivory in the United States.  You've

8 mentioned the sort of ritualistic use, high art ivory if

9 you will and then you've mentioned ivory for sale or

10 decoration.  Is that true?

11 A.   That's right.

12        MR. MARGULIS-OHNUMA:  Objection to the form of

13 the question.

14        THE COURT:  Can you refrain (sic),

15 Mr. Sinclair, please.

16 Q.   Are there multiple types of markets for ivory within

17 the United States?

18 A.   Yes, I think there's a market for -- there's an art

19 market that you might see at Sotheby's or at -- or in the

20 major galleries of objects that are known.  Usually they

21 have a provenance.  They can be dated back to a -- being

22 collected at a certain period of time.  Generally,

23 they've been vetted in terms of having many people look

24 at them, experts in both specific areas, as well as in

25 African art in general and then there's a secondary

Mr. Oliver - - Direct - Mr. Sinclair

1   market which is a market mainly for people who want to

2   decorate their office or their homes with the things that

3   kind of look like African art but don't have the --

4   neither the value nor the use in terms of age of the kind

5   of piece that would come in the, if you will, high art

6   market.

7   Q.   And in the course -- have you had the occasion to

8   appraise some ivory along with Agent Alagrante and other

9   members of the Fish and Wildlife Service in connection

10  with this ongoing investigation that led up to this case?

11  A.   Yes, I have.

12  Q.   And of the ivory that you've seen in the course of

13  those requests to do appraisals, which market does the

14  ivory that you've been shown fall into?

15  A.   Well almost all of the ivory that I've been shown and

16  certainly all of the figured objects fall into the

17  decorative category and there were one or two bracelets,

18  I think, that were little abstract bracelets with

19  geometric designs on them in the very first group of

20  objects that I looked at which look like they had been

21  used, worn.  Although bracelets are not really ritually

22  worn.  You could see by the wear on them that they had

23  been actually used.  But the figured things were all made

24  for sale objects.

25  Q.   And in the course of doing your appraisals for the

Mr. Oliver - - Direct - Mr. Sinclair

1  government, were there any impediments to your ability to

2  assess the ivory at all?

3  A.   Well the only -- the only problem is that some of the

4  objects are covered over, so it's hard to see the color

5  of the ivory itself and the finesse of the carving.  And

6  I think that that even in terms of decorative art makes

7  it that a difference as to the value of the individual

8  object.

9  Q.   And have you been asked to do appraisal by looking at

10  photographs?

11  A.   Yes, I have.

12  Q.   And does that impede in any way your ability to do

13  complete appraisals?

14  A.   Well yes and some photographs if there's no scale,

15  it's hard to tell how big the pieces are.  Again, when it

16  comes to these kinds of objects, size makes a difference.

17  I shouldn't say that but -- and some of the objects in

18  the photographs were also covered with whatever they're

19  covered with.  So I couldn't -- again, I couldn't see the

20  quality of the carving or the color of the ivory.

21  Q.   Okay.  So I think you just touched on an answer to my

22  next question which is what factors then are -- do you

23  consider as you look at this decorative African ivory art

24  to assess what the fair market value would be?

25  A.   Okay.  In the art market, there's a term that's

Mr. Oliver - - Direct - Mr. Sinclair

1  called carry and it means how does the object took from a

2  distance?  How does it -- does it project an image of

3  harmony or of beauty, subjective terms I realize but --

4  and also, of course, the -- as I said before, the color,

5  the patina of the ivory and the finesse of the carving.

6  Q.   You just used the term patina.  Can you tell us what

7  you mean by that term?

8  A.    Patina is the color of the ivory.  Usually ivory

9  tends to be more light in color but sometimes either

10  through handling or through applications of various

11  pigments like tea for example, ivory can be made darker

12  and more sensual looking.

13  Q.   I would like to show you the two statutes that the

14  Court has already received testimony or part of a March

15  2006 shipment into the United States.  Both of these

16  statutes bear seizure tag 818148.  And I would ask

17  Mr. Oliver, for you to -- I'm showing you one that's been

18  marked as item 18 which I hold here before you, 18.  And

19  the second one is marked as item number 13, also before

20  you and I would ask that you tell us sort of what factors

21  you consider in assessing the value of these two pieces

22  of ivory.  And how one might be more valuable or less

23  valuable and assess that.

24  A.    Okay.  Should I refer to them by the number?

25  Q.   Yes, please.

Mr. Oliver - - Direct - Mr. Sinclair

1    A.    Okay.

2            MR. MARGULIS-OHNUMA:  I apologizse for

3    interrupting.  Are these referenced in the report that

4    was provided?  Just to make sure that we're looking at

5    the same thing.

6            MR. SINCLAIR:  Yes, they are --

7            MR. MARGULIS-OHNUMA:  So it's number 13, bates

8    stamped 5177, item number 13 and bates stamp 5178, item

9    number 18; is that correct, counsel?

10            MR. SINCLAIR:  These are --

11            THE WITNESS:  No, these are --

12            MR. SINCLAIR:  No, these are not.  These are

13    3500-MO-5, part of the March 2006 shipment.

14            THE COURT:  March '06 shipment?

15            MR. SINCLAIR:  March '06 shipment.

16            THE COURT:  Okay.

17            MR. MARGULIS-OHNUMA:  3500 -- okay.

18            THE COURT:  Mr. Ohnuma, could you just push the

19    stalk of the mic away?  Yes.  Thank you.  It's very

20    sensitive that sponge, so okay.

21            THE WITNESS:  Do you need the number?

22            THE COURT:  Would you like the witness to give

23    you the number Mr. Ohnuma?

24            MR. MARGULIS-OHNUMA:  Yeah, it's --

25            THE WITNESS:  It's 818 --

Mr. Oliver - - Direct - Mr. Sinclair

1    MR. MARGULIS-OHNUMA:  Oh, no, no, no.  I don't

2    need that.  It's -- so it's 3500-MO-5, which is a two-

3    paged handwritten document; is that right, sir?

4    MR. SINCLAIR:  That's right.

5    MR. MARGULIS-OHNUMA:  Okay.

6    Q.   Would it help you to refer to your notes?

7    A.   So it's 18 and 13.

8    Q.   And so can you describe what things you consider in

9    assessing the value of these two pieces of ivory?

10   A.   Okay.  Well, obviously 18 -- let's start with 18.

11   It's covered, so it's very hard for me to tell the color

12   of the ivory but the first thing that I can see is the

13   arms have been attached.  In ritualistic sculpture that's

14   used tribally, pieces are monoxylous.  That means carved

15   in one piece wood, so that when you see these cracks in

16   here, it indicates that the arms have been attached which

17   would immediately make it a tourist piece, a piece made

18   for sale.

19        The same is true with number 13.  Again, there are

20   two lines on the shoulders from the separate piece being

21   attached.  I suspect that the feet are also attached on

22   number 13 because of the way the covering, whatever that

23   is, has kind of clumped down at the bottom.  It looks

24   like it's -- there's too much of it in the undercut for

25   it just to be an even application on a single piece of

1  ivory.  Assuming these pieces are both made of ivory, I

2  can obviously see number 13 made of ivory, neither of

3  these tribal groups, number 18 being Baule from the Ivory

4  Coast and number 13 being Benin from Nigeria.  They don't

5  carve these type of objects out of ivory.  They always

6  carved the Baule one, number 18, would be carved of one.

7  And number 13 would be bronze.  The --

8  Q.  I just want to stop you there and clarify.  You just

9  identified -- you just used the term Benin and Baule. Can

10  you tell us what you mean by those terms and also spell

11  those terms please.

12  A.    Okay.  Baule, B-a-u-l-e, I believe they're the

13  largest ethnic group in the Ivory Coast.  And they're

14  Akan, A-k-a-n, people.  That's the origin.  And they

15  inhabit the eastern end -- I'm sorry, the western end --

16  sorry, eastern -- eastern and southern and central

17  regions of Ivory Coast.

18      Benin, it was a kingdom that existed in the -- prior

19  to the twentieth century which was invaded and more or

20  less destroyed in 1897 by the British punitive

21  expedition.  They're in Nigeria and in the area that's

22  now called Benin.  And there are still Benin who are

23  there but -- and some of the court material has been

24  returned.  In 1897 the British sacked the capital of

25  Benin, most of the objects that were taken hundreds and

Mr. Oliver - - Direct - Mr. Sinclair

1  hundreds of them, ended up in the British museum or --

2  Q.   If I can interrupt for a moment.

3  A.   Yup.

4  Q.   What --

5  A.   Too much information?

6  Q.   It's interesting but I did want to tie it back to

7  these two pieces of ivory that we're looking at.

8  A.   Okay.

9  Q.   And what I think I heard you say and please correct

10  me if I'm wrong, is that the piece marked as 18 which

11  you've identified as a Baule piece ordinarily would not

12  be presented in ivory but would be presented in some sort

13  of wooden sculpture.

14  A.   That's correct.  They don't carve --

15  Q.   And so for purposes of the appraisal that you've

16  done, that immediately takes it out of the area of what

17  we call high art; right?

18  A.   Okay.

19  Q.   And puts it in this decorative art market because

20  this wouldn't be ivory in the actual ritualistic use.

21         MR. MARGULIS-OHNUMA:  Your Honor, you know, I'm

22  going to object to --

23         THE COURT:  The form of the question.

24         MR. MARGULIS-OHNUMA:  I'm going to let it go to

25  the leading -- yes.  Let's have the witness testify,

Mr. Oliver - - Direct - Mr. Sinclair

1  please.

2          THE COURT:  All right.  Would you extract that

3  information from the witness please.

4  Q.   What is the fact that the statute that's marked as 18

5  made of ivory tell you about whether or not it's high art

6  or decorative art?

7          MR. MARGULIS-OHNUMA:  Objection to the form.

8  Could we just define high art?

9  Q.   There's --

10          THE COURT:  He did.  He did define it, as I

11  recall.

12          MR. MARGULIS-OHNUMA:  Okay.

13          THE COURT:  I mean, I think I have the

14  understanding of what he's talking about.

15  A.   Yes, I'm using -- in terms of ritual use, the Baule

16  people only carve very small objects out of ivory.  They

17  carve cones, small little cones, an occasional hairpin,

18  and they do not carve these figures, these large figures

19  out of ivory ever.

20  Q.   And then with respect to number 13, the Benin statute

21  you've identified, what's the significance that it's in

22  ivory and not bronze?

23  A.   There were -- you can see by the way the hands were

24  in this piece -- well aside from the fact that it's

25  pieced together, you can see from the hands it held

Mr. Oliver - - Direct - Mr. Sinclair

1  something.  The large pieces that have things in the

2  hands were cast of bronze, although -- and not of ivory.

3  The Benin carve very -- only very simple figures out of

4  ivory, some of them being probably half to maybe two-

5  thirds of the size at the most, I would say half of this

6  figure but not with anything in their hands, not with

7  anything -- not with arms extended, arms that are always

8  at the side.  And this is -- the ones that are in the

9  British museum and in Berlin, which is where the other

10 group went from 1897, all display exactly the same

11 characteristics.  There are none that display these

12 characteristics.

13          These characteristics are found in bronze

14 figures and figures that are on the plaques, Benin

15 plaques which were used to decorate the walls and told

16 historical, either parables or actual history, and did

17 have, in fact, warriors and figures holding other things.

18 They were always carved in bronze in hieroglyph.

19 Q.   Mr. Oliver, in the course of your work at the IRS in

20 setting fair market value for ivory that had been donated

21 to various museums and whatnot, did you come across this

22 type of art that is decorative art, as you've described

23 it?

24 A.   Yes, we did.

25 Q.   And were you able to set market values for those

Mr. Oliver - - Direct - Mr. Sinclair

1  pieces?

2  A.   Yeah, we used a category which we called designer

3  objects and those are objects that one would find in

4  interior decorators exhibits or people who -- small

5  galleries who sold to people who wanted to kind of

6  decorate their houses and their offices and didn't really

7  care about the fact of the piece being an authentic

8  object.

9  Q.   And so for the value of the statute that's before

10 you, number 18, what market value had you set for that?

11 A.   Number 18, it's a very -- I put a value on it based

12 on the fact that it's an attractive carving.  As a -- it

13 has a maternity; maternities are always sought after

14 because there's something endearing about them.  And I

15 put a value of $8,000 or $7,500 on it, I believe --

16 $7,500.

17 Q.   And the piece marked as 13, the warrior statute from

18 the Benin tribe ostensibly, what market value would you

19 put at least on that?

20 A.   Well here I can see the color of the ivory.  It does,

21 however, have a large crack down the front on the --

22 running from the neck all of the way down to the waist.

23 And I put a range on 13 from 6 to $8,000.  Again, that's

24 based on the size and the kind of the carry -- it has a

25 very nice face.  That is an easily comprehensible hairdo.

Mr. Oliver - - Direct - Mr. Sinclair

1  It's a -- it's just a -- it's an attractive object from

2  the point of view of decoration.

3      MR. SINCLAIR:  I would ask, your Honor, if you

4  do have no objection to actually holding it, because I

5  think that the -- I would ask you to hold the actual

6  exhibit for purposes of assessing it.

7      THE COURT:  All right.

8      MR. SINCLAIR:  And I'm going to ask you, Mr.

9  Oliver, if the weight of the various objects mean

10 anything.

11 A.   Yes, of course, ivory is much heavier than wood and

12 not as heavy as metal.

13     THE COURT:  All right.  I will just note for

14 the record, I did hold the object that was marked as

15 number 18.  And it was quite heavy.

16 Q.   Now I am going to ask you, Mr. Oliver, you have

17 before you your notes, MO -- marked as 3500-MO-5.  Did

18 you -- have you had the opportunity to review -- and if

19 you need to come down and look at it, you can, but did

20 you have the opportunity recently to review the ivory

21 that was contained in the March 2006 shipment which is

22 now on this cart that -- at the United States Attorney's

23 Office?

24 A.   I did.

25 Q.   Okay.  And at the time that you inspected it, were

Mr. Oliver - - Direct - Mr. Sinclair

1  you able to pick up the pieces?

2  A.   Yes, I was.

3  Q.   And were you able to inspect them outside of the

4  plastic covering that's now on them?

5  A.   Yes, I was.

6  Q.   And were you able to -- did you have as much time as

7  you needed to conduct an analysis of it in terms of what

8  their value might be?

9  A.   Yes, I did.

10  Q.   And did you prepare notes on the value of the pieces

11  that were contained in that March 2006 shipment?

12  A.   Yes, I did.

13  Q.   Okay.  And were you able to pinpoint an exact price

14  for all of the pieces?

15  A.   Well it's hard to pinpoint -- and no, the answer is

16  no.

17  Q.   Okay.  And at times did you have to use a range?

18  A.   I did have to use a range; y es.

19  Q.   Why is that?

20  A.   The pieces that are covered, it's -- it's really

21  impossible to tell how attractive they actually are

22  because you can't tell again, the color of the carving or

23  if there's surface decoration and the kind of things that

24  would bring the price up even as a decorator object.

25  Q.   And so based on your review of the pieces contained

Mr. Oliver - - Direct - Mr. Sinclair

1  in the March 2006 shipment, did you set a range of prices

2  for that shipment?

3  A.   Yes, I did.

4  Q.   And what was the total range that you were able to

5  determine?

6  A.   It ranged from $76,500 on the low end to $96,500 on

7  the high end.

8  Q.   And is that range reflected in your notes marked as

9  3500-MO-5?

10 A.   Yes, it is.

11         MR. SINCLAIR:  Your Honor, at this time we

12 would offer 3500-MO-5 into evidence.

13         MR. MARGULIS-OHNUMA:  Objection, your Honor.

14         MR. HUESTON:  Objection, your Honor.

15         THE COURT:  Was -- these were notes that were

16 prepared contemporaneously with your inspection?

17         THE WITNESS:  That's correct, your Honor.

18         THE COURT:  Is your objection based on hearsay?

19         MR. MARGULIS-OHNUMA:  No.

20         THE COURT:  Or --

21         MR. MARGULIS-OHNUMA:  My objection is based on

22 reliability, your Honor.  This is so far short of a real

23 appraisal it's mind-boggling.  I mean, these are random,

24 rather indecipherable notes that have no evidentiary

25 value at all except perhaps for impeachment.  This is not

Mr. Oliver - - Direct - Mr. Sinclair

1  an appraisal, your Honor. This is -- these are random

2  notes.  He can -- I mean he can keep stalking as much as

3  he likes about the value of the objects but I don't think

4  these notes should come into evidence.

5        MR. SINCLAIR:  Your Honor, we could go through

6  piece by piece and have the defendant -- and have the

7  witness explain how he reached of these or we can have

8  the Court rely upon his notes as a summary of, you know,

9  what his review was.  He's testified that he was able to

10  review these documents -- these pieces of ivory, that he

11  considered them based on all of the factors that he's

12  just described.  And he set down market values for them

13  here.

14        Now whether or not Mr. Margulis-Ohnuma or the

15  other defense counsel want to cross-examine him on the

16  basis of that, they're able to do that but this will

17  assist the Court in capturing Mr. Oliver's assessment of

18  the value of each of these pieces without having for us

19  to sit here and show him each piece and him describe, you

20  know, what factors go into his consideration.

21        THE COURT:  Well I would like some explanation

22  about the notes themselves.  There are numbers that run

23  down the left side of the column.  Are those -- do those

24  correspond --

25        MR. SINCLAIR:  Yes.

Mr. Oliver - - Direct - Mr. Sinclair

1    THE COURT:  I mean I would like to have some

2 explanation --

3    MR. SINCLAIR:  Let's --

4    THE COURT:  -- about what this is.

5    MR. SINCLAIR:  Let me lead him through this.

6 Q.  I'm showing you --

7    THE COURT:  For example -- can I just -- number

8 18 says Bale maternity and that I'm understanding is what

9 we saw here today in court; is that correct?

10    MR. SINCLAIR:  Yes, your Honor.

11    THE COURT:  Mr. Oliver?

12    MR. SINCLAIR:  Yes, that's correct. And I said

13 bird on baby's head because of the little figure on the

14 back, the baby has a little --

15    THE COURT:  Ah.

16    MR. SINCLAIR:  -- probably a chicken on the top

17 of the head.

18    THE COURT:  All right.  Why don't you have some

19 explanation about them then.

20    MR. SINCLAIR:  Sure.

21 Q.  So if you can explain -- I'm going to show you again

22 what's been marked as -- well I'll show you a different

23 one.  This is also in that same -- that bears that same

24 seizure tag.  This is seizure tag 818148, item number 3

25 and I'm showing that to you.

1    And with respect to the item numbers of the items

2 that you reviewed, can you set them forth on the lefthand

3 column of your notes?

4 A.   Yes, the item number is on the lefthand side.

5 Q.   And then just to the right of the item number, what

6 is reflected in your notes for each item number that you

7 reviewed?

8 A.   The estimate that I would put on the value -- the

9 value of the object on the open market.

10 Q.   Okay.  Just you've gone all of the way to the far

11 right of the page.  I was just going to move one column

12 over from the item number -- the writing there for

13 instance --

14 A.   Oh, well no I am sorry.  That's what the piece -- the

15 carving style that it's done in.  For example, item 3,

16 the shape of the piece is more or less like a Eurabo

17 (ph.) which is a ethnic group in Nigeria shape but the

18 figures themselves are kind of -- there's an expression

19 in French, I hate to do this, I know this is not -- it's

20 called "Opmiesta fantasize" (sic).  It means invented

21 piece.  It's a fantastic object.  It has no real style.

22 It's a kind of agglutination of a number of different

23 styles.

24    The scars on the -- next to the mouth of the lower

25 figure, for example, are Eurabo.  The next figure up also

Mr. Oliver - - Direct - Mr. Sinclair

1  could be Eurabo from a kind of face that -- a kind of

2  head that you see at the bottom of a mask that's called a

3  "hippa" (ph.) mask which is a large mask that's worn in a

4  masquerade.  I can't see on the top figure, there's no

5  head.  But it's -- these things don't really go together

6  to make any kind of identifiable object that was ever

7  used ritually by the Eurabo people.  On the other hand, I

8  suspect when it's cleaned up, it will have a certain

9  value as a piece of sculpture.

10  Q.  So, the fact that it doesn't really exist in any

11  tribe, does that detract even from its decorative value?

12  A.  Well --

13          (Conclusion of recorded audio 9:34:57)

14                  -o0o-

15

16

17

18

19

20

21

22

23

24

25

1                        **I  N  D  E  X**

2

3 **<u>Michael Oliver</u>:**

4 Direct Examination by Mr. Sinclair.. . . . . . . . . . 12

5 Voir Dire Examination by Mr. Margulis-Ohnuma. . . . . . 17

6 Direct Examination by Mr. Sinclair.. . . . . . . . . . 22

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T E

I, ROSALIE LOMBARDI, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **19th** day of **October**, 2010.



Rosalie Lombardi
Transcription Plus II