UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
------------------------------X    Docket#
UNITED STATES OF AMERICA,      :    08-cr-906(KAM)(JO)
                               :
      - versus -               :    U.S. Courthouse
                               :    Brooklyn, New York
KEMO SYLLA,                     :
                               :    March 2, 2011
                Defendant      :
------------------------------X
```

TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING HEARING
BEFORE THE HONORABLE KIYO A. MATSUMOTO
UNITED STATES DISTRICT JUDGE

A   P   P   E   A   R   A   N   C   E   S:


<u>For the Government</u>:          **Loretta E. Lynch, Esq.**
                                 United States Attorney

                          BY:    **Patrick Sinclair, Esq.**
                                 Assistant U.S. Attorney
                                 271 Cadman Plaza East
                                 Brooklyn, New York  11201



<u>For the Defendant</u>:          **Zachary Margulis-Ohnuma, Esq**
                                 Law Office of
                                 Zachary Margulis-Ohnuma
                                 260 Madison Avenue
                                 18th Floor
                                 New York, NY 10016



<u>Transcription Service</u>:     **Transcriptions Plus II, Inc.**
                                 740 Sharon Road
                                 Copiague, New York 11726
                                 <u>rl.transcriptions2@gmail.com</u>



Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

Proceedings

1          THE CLERK:  This is Criminal Cause for a

2   Sentencing, 08-CR-906, <u>United States v. Kemo Sylla</u>.

3          Please state your appearances?

4          MR. SINCLAIR:  Good afternoon, Judge.

5          Patrick Sinclair for the government.  I am

6   joining at counsel table by Jason Gummer (ph.), an intern

7   in our office.

8          THE COURT:  Good afternoon.

9          MR. MARGULIS-OHNUMA:  Zachary Margulis-Ohnuma

10  at 260 Madison Avenue. I'm joined at counsel by my

11  associate Celia Castro.

12         THE COURT:  Good afternoon.

13         MR. MARGULIS-OHNUMA:  And my client and an

14  interpreter.

15         Good afternoon, Judge.

16         THE COURT:  All right.  Good afternoon.  Thank

17  you.

18         I'll have the interpreter please rise and state

19  his name for the record.  If you can -- sir, you can sit

20  and just speak close to the microphone because we don't

21  have a court reporter today.

22         THE INTERPRETER:  Okay.

23         THE COURT:  If you would raise your right hand

24  and take an oath, I'd appreciate it.  Thank you.

25  (INTERPRETER SWORN)

Proceedings

1       THE COURT:  Thank you, sir.  And let me ask,

2  Mr. Sylla to also take an oath, please.  Sir, raise your

3  hand.

4  K E M O  S Y L L A ,

5       called as a witness, having been first duly sworn,

6       was examined and testified as follows:

7       THE COURT:  All right.  Thank you.  And good

8  afternoon.

9       I have reviewed the plea that's dated March 29,

10  2010, the presentence report dated August 12, 2010, as

11  well as government's objections to the presentence report

12  dated August 23, 2010 and an addendum -- the first

13  addendum to the presentence report dated September 3rd.

14       I've also reviewed the defendant's objections

15  to the presentence report dated September 15th, 2010 and

16  the second addendum to the presentence report based on

17  those objections dated October 8, 2010.

18       At the request of Mr. Sylla and his co-

19  defendants, Mr. Doumbouya and Mr. Diane, I held a Fatico

20  hearing in this case on October 13th, 15th and 21st,

21  2010.  In connection with the Fatico hearing, I heard

22  testimony from -- am I going too fast, sir?

23       THE INTERPRETER:  No, no, your Honor.

24       THE COURT:  Okay.  In connection with the

25  Fatico hearing, I heard testimony from Philip Alegranti,

Proceedings

1  Special Agent of the United States Fish and Wildlife

2  Service, Michael Oliver, an expert qualified by the Court

3  to testify about the market value of African art,

4  Fernando Peraja, an employee of Velocity Freight

5  Services, a freight forwarding company at JFK Airport and

6  defendant Kemo Sylla.

7            I've also reviewed all of the pre and post-

8  Fatico submissions including the pre-Fatico hearing

9  submissions by the government dated September 23rd and

10 October 4th, 2010 and by Mr. Margulis-Ohnuma dated

11 September 24th and October 1st, 2010.

12           I've also reviewed the exhibits attached to

13 each of those submissions including the video depositions

14 of Mfopa Yacouba.

15           I've also reviewed the transcripts from the

16 Fatico hearing and the exhibits admitted into evidence at

17 the Fatico hearing and the 3500 material that was made

18 available.

19           I've also reviewed a sentencing memorandum from

20 Mr. Margulis-Ohnuma dated December 30th, 2010 and

21 attached letters written by Mr. Sylla's father, the

22 mother of Mr. Sylla's daughter, and Mr. Sylla's cousin

23 and friends.  I've also reviewed a sentencing letter from

24 the government dated January 20th, 2011 and the attached

25 exhibits and a sentencing reply from Mr. Margulis-Ohnuma

1  dated January 27th, 2011.

2          Have I overlooked any submissions, counsel?

3          MR. SINCLAIR:  Nothing, your Honor.

4          THE COURT:  Mr. Ohnuma?

5          MR. MARGULIS-OHNUMA:  You have not, your Honor.

6  I don't think that I received a copy of the October 28,

7  2010 addendum  addendum to the PSR addressing my

8  objections.  At least, I don't have it with me.  It

9  wasn't in the file.

10          THE COURT:  Let me just make sure.  Hang on one

11  second.

12          (Pause)

13          THE COURT:  Let me see if we can make that

14  available to you, sir.

15          MR. MARGULIS-OHNUMA:  Thank you, your Honor.

16          THE COURT:  Just one minute.

17          MR. MARGULIS-OHNUMA:  I'm sorry about that.

18          (Pause)

19          THE COURT:  Did you say October -- I don't --

20          MR. MARGULIS-OHNUMA:  The October 8, 2010 (sic)

21  because I know you mentioned addressing my objections.

22          THE COURT:  Oh, I'm sorry, just one second.

23          (Pause)

24          THE COURT:  All right.  I'm sorry, sir.  I

25  misspoke about the date.  The second addendum was dated

Proceedings

1  November 23rd, 2010.  I apologize.  I don't have one for

2  October 8th.

3          MR. MARGULIS-OHNUMA:  I don't think I have that

4  either.  That specifically -- I have one addendum that's

5  dated at the bottom September 3, 2010 and it only

6  addresses the government's objections.

7          THE COURT:  All right.  Let me make my copy and

8  then we'll continue.

9          MR. MARGULIS-OHNUMA:  Thank you, your Honor.  I

10 apologize for that oversight.

11         THE COURT:  It attaches your letter dated

12 September 15th.  So, I'll just keep that off since you

13 have it.  All right.

14         Just for the record, it is -- the addendum is a

15 second addendum and it's dated October 8th and the reason

16 I got confused with that November 23rd is that was the

17 original sentence date.

18         (Pause)

19         MR. MARGULIS-OHNUMA:  That's fine, Judge.  The

20 only outstanding issues that are left for you to be

21 resolved, would be the Fatico evidence in any event.  So,

22 I've now reviewed this submission and I have nothing

23 further.

24         THE COURT:  All right.  You're free to hold

25 onto it if you would like.  Okay?

Proceedings

1          MR. MARGULIS-OHNUMA:  Thank you, Judge.

2          THE COURT:  All right.

3          Has Mr. Sylla had the opportunity to review the

4    presentence report with you?

5          MR. MARGULIS-OHNUMA:  Yes, your Honor.

6          THE COURT:  And did he have any difficulty

7    understanding the contents of that report, sir?

8          MR. MARGULIS-OHNUMA:  We've reviewed it

9    together and after I explained it, there was no

10   difficulty understanding it.

11         THE COURT:  Thank you.

12         Mr. Sylla, are you ready to be sentenced, sir?

13         THE DEFENDANT:  Yes.

14         THE COURT:  Because Mr. Sylla is not a United

15   States citizen, he does have the right to have his

16   national consulate notified regarding his arrest and have

17   officers of his consulate assist him.  Now I note that he

18   is characterized as an illegal alien who has removable

19   proceedings pending as of February 26, 2009.  However,

20   Mr. Sylla is on release on an immigration bond in the

21   amount of $15,000 and he is also described as an asylum

22   seeking refugee on immigration parole.

23         And that there is a pending application in 2004

24   under which Mr. Sylla requested a deferred enforcement

25   departure based on his Liberian status as a claimed

1  refugee.  And there is a provision for temporary

2  protected status in the United States for such

3  individuals.

4          But the point is, does Mr. Sylla wish to have

5  his consulate informed or --

6          MR. MARGULIS-OHNUMA:  No, your Honor, he's

7  going to waive his right to --

8          THE COURT:  Okay.

9          MR. MARGULIS-OHNUMA:  -- for that.

10         THE COURT:  All right.  Thank you.

11         Mr. Sylla, sir, are you satisfied with your

12  attorney's representation of you?

13         THE DEFENDANT:  Yes.

14         THE COURT:  Are there any unresolved conflicts,

15  Mr. Margulis-Ohnuma or motions or contentions, conflicts

16  or other issues between you and your client?

17         MR. MARGULIS-OHNUMA:  No, your Honor.

18         THE COURT:  Mr. Sylla does appear to be fully

19  aware of these proceedings and to be following closely.

20  Would you agree with that observation, sir?

21         MR. MARGULIS-OHNUMA:  Yes, your Honor.

22         THE COURT:  And do you know of any reason why

23  Mr. Sylla should not be sentenced today?

24         MR. MARGULIS-OHNUMA:  No, I do not, your Honor.

25         THE COURT:  All right.  And I would like to

Proceedings

1    confirm with Mr. Sinclair on behalf of the government

2    that there are not human victims associated with this

3    offense.  So, we need not address restitution; correct?

4            MR. SINCLAIR:  That's correct, your Honor.

5            THE COURT:  Now, sir, we are making a recording

6    of this proceeding.  It will be transcribed and made part

7    of the Court record, so that if you wish to utilize it on

8    any appeal, it will be available.

9            Does Mr. Sylla wish to contest the plea that he

10   entered on March 29, 2010?

11           MR. MARGULIS-OHNUMA:  No, your Honor.

12           THE COURT:  All right.  Mr. Sylla, you may

13   recall I put you under oath to tell the truth at your

14   plea and I then asked you questions about your

15   understanding of your rights and the consequences of your

16   plea.

17           In addition, sir, I did ask you what you did in

18   connection with the offense to which you pled guilty and

19   you did give me responses.

20           You may recall also that I asked you whether

21   any promises or threats were made to cause you to plead

22   guilty and in response, you answered no.

23           Mr. Sylla, were your answers to my questions at

24   your plea truthful?

25           THE DEFENDANT:  Yes, your Honor.

Proceedings

1          THE COURT:  All right.  Now, Mr. Sylla, I have

2    reviewed the transcript of your plea and I previously

3    determined that your waiver of indictment and your guilty

4    plea on March 29th, 2010 to a felony violation of the

5    Lacey Act was knowing and voluntary and based upon a full

6    understanding of your rights and the consequences of your

7    plea.  And that there was a factual basis for your plea.

8          I, therefore, did accept your plea of guilty to

9    the superseding information which charged that on or

10    about and between March 21st, 2006 and December 2nd,

11    2008, that you knowingly within the Eastern District of

12    New York and elsewhere, imported, transported, sold,

13    received, acquired and purchased wildlife with a market

14    value in excess of $350, specifically African elephant

15    ivory knowing that that wildlife was possessed and

16    transported in violation of Title 16 USC Section 1538(c)

17    and 4223, Title 18 USC Sections 545 and Title 50, Code of

18    Federal Regulations Part 23.

19          Mr. Sylla allocuted at his plea that between th

20    approximate dates of March 21, 2006 and December 2, 2008,

21    he purchased African elephant ivory worth more than $350

22    within the United States knowing that the ivory he

23    purchased was imported into the United States in

24    violation of federal law and knowing that the purchase of

25    ivory was in violation of federal law.

1    The government proffered that the ivory was

2 imported through JFK Airport in Queens, New York and Mr.

3 Sylla did waive any objections to venue.

4    Mr. Sylla also agreed to forfeit the items set

5 forth in his plea agreement and in the superseding

6 information during his allocution, including any

7 ownership interest he may have in ceratin pieces of

8 ivory, and in addition, one lot of uncut rough diamond

9 crystals totaling 17.55 carats in weight and two stones

10 determined not to be diamonds, with a wholesale value of

11 $10,500.

12    The parties requested and the Court conducted a

13 Fatico fact finding hearing at which the parties offered

14 evidence relevant to sentencing.

15    Now, Mr. Sylla, you do have the right to

16 address me personally and if you wish to exercise that

17 right, you may do so now.

18    THE DEFENDANT:  I just want to tell you, your

19 Honor, I'm very sorry what I did; was wrong.

20    THE COURT:  All right.  Thank you.  Thank you,

21 Mr. Sylla.

22    Mr. Margulis-Ohnuma, I did read your

23 submissions carefully and I would be happy to hear from

24 you now if you would like.  I'm not telling you, you know

25 -- I mean, I've read your submissions and I just want you

1   to know that I'm familiar with what you've submitted.

2           MR. MARGULIS-OHNUMA:  Okay.  I really do

3   appreciate that, your Honor.  I do want to make a few

4   remarks and I will try not to repeat what's said there

5   and I hope you will indulge me if there's a little bit of

6   cross-over but I will try to avoid that.

7           I've been with this case for two years -- more

8   than two years -- two and a quarter years when Mr. Sylla

9   was first arrested and he was released from jail about

10  four months later.  And from the beginning he maintained

11  to me that he was an art dealer.  That he dealt in some

12  art but that he never smuggled ivory.  That he had bought

13  some ivory and sold some ivory but that he was not an

14  ivory smuggler.

15          And what I'm here to argue and point out is

16  that in the face of a really impressive government

17  investigation, pervasive -- I think it looks like we have

18  six or seven Fish and Wildlife Service agents with us

19  here today for sentencing, they had years and years to

20  investigate this.  For some reason, they latched on at

21  the beginning and believed that Kemo Sylla was some sort

22  of big-time ivory smuggler but the facts just didn't bear

23  that out and I'll go through some of that a little bit

24  more specifically.

25          What Kemo Sylla did was he bought knowing --

1  bought ivory knowing that it had been smuggled and that

2  was wrong.  He's acknowledged that it was wrong.  He's

3  acknowledged that from the beginning essentially.

4          It's important to point out that the government

5  brought smuggling charges against Kemo Sylla and agreed

6  to let him plead to lesser charges, of possession of

7  smuggled ivory.

8          Let me -- I have a few general comments and a

9  few more specific comments to flush out what I just said.

10 Before I get to that, let me just introduce the people

11 who are in court with us today.  There's 13 members of

12 Mr. Sylla's friends and extended family -- sorry, members

13 of his extended family and his friends, his father, his

14 cousin, who wrote letters with our assistance.  They're

15 not literate people.  They're from Africa and they're

16 immigrants, are here with us.  His child, his common-law

17 wife are here with us and have been with us through much

18 of these proceedings and are supporting Mr. Sylla

19 throughout this.

20         I want to -- I had the opportunity to see what

21 the Court's general comments about the guidelines on

22 ivory importation in the other sentencings and I do want

23 to say one or two words in response to that view.  I hope

24 I won't be directly contradicting it but I think that

25 there's one or two points to be made on that.

Proceedings

1    I basically agree with your Honor and with

2 Judge Buchwald that the idea of sentencing based on the

3 dollar value of the ivory doesn't really capture the harm

4 to the environment, to elephants that is sought to be

5 captured by the guideline.  I actually I don't think

6 that's -- I think that's probably right and the way I see

7 it though is that really what the harm is, is the

8 quantity of ivory that's taken that means -- translates

9 to elephants killed and that that's what should be looked

10 at, the way we look at the quantity of drugs because, you

11 know -- and different drugs we look at differently.  You

12 know, crack hurts people more than powder and therefore

13 it's -- there's a ratio between crack and powder cocaine.

14 Child pornography hurts people; the more images you have,

15 the more children you've hurt.

16    Ivory, the more you have, the more elephants

17 you've hurt and really what we should be looking at is

18 the amount of ivory that was dealt in, that was traded,

19 that was smuggled.  But again, Mr. Sylla is a stepped

20 removed from that because he didn't smuggle the ivory.

21 What he did was he traded and smuggled ivory.

22    The anomaly is really brought out -- and I made

23 this point in the footnote but I want to emphasize it.

24 In looking at how the ivory -- the statute -- the

25 Wildlife statute incorporates the loss tables from the

1  fraud statute.  Now the loss tables were increased

2  dramatically in 2001 in response to Enron and the other

3  financial scandals.  But not with any thought given at

4  all to the affect on other -- on other guidelines.

5          So, you have this increase because of Enron

6  because we want to punish white collar fraud more harshly

7  but it just sort of is a happenstance that that increase

8  by, you know, a large percentage, three levels to

9  something like 30 or 50 percent increase in the guideline

10  sentence without any thought, any empirical study, no

11  reason for it except that it's a matter of administrative

12  convenience.

13          THE COURT:  May I just --

14          MR. MARGULIS-OHNUMA:  I mean, it --

15          THE COURT:  -- address that --

16          MR. MARGULIS-OHNUMA:  Sure.

17          THE COURT:  -- befor you go any further?  We

18  have applied not those enhanced guidelines.  We've

19  applied the earlier guidelines.  So, I know that you've

20  spent some ink on that argument in your submission and

21  the point that I wanted you to understand is we're not

22  applying that enhanced guideline.  We're applying the

23  guideline that was in effect during Mr. Sylla's offense.

24          MR. MARGULIS-OHNUMA:  But the increase I'm

25  talking about is in 2001, the three level increase in the

1  fraud table.

2          THE COURT:  Oh, all right.

3          MR. MARGULIS-OHNUMA:  So, I would be glad to go

4  back --

5          THE COURT:  I guess your footnote said 20-

6  something, 2010.  Maybe it was a typo.

7          MR. MARGULIS-OHNUMA:  Uh --

8          THE COURT:  All right.

9          MR. MARGULIS-OHNUMA:  It's on page 21, footnote

10 7 of my sentencing memo.  There are other specific

11 increases before that as well in the late '90s.  But that

12 increase would -- I mean, that increase would -- I mean,

13 that would be a level -- a three-increase level.  Let me

14 -- I'll pull it up on file to make sure we're on the same

15 page.

16         THE COURT:  Oh, I see.  Okay.

17         MR. MARGULIS-OHNUMA:  The other anamoly here,

18 your Honor, that makes the quantity of ivory a better

19 proxy for the harm -- sorry.

20         THE COURT:  No, go ahead.  I'm listening.

21         MR. MARGULIS-OHNUMA:  -- is that the quality of

22 the artwork made from ivory that Mr. Sylla traded in my

23 view, is fairly high but the value of it was driven by

24 the quality of the carving, not by the quantity of the

25 ivory.  And I think we've heard some of that from the

Proceedings

1  appraiser that if it was, you know -- I think at one

2  point he said this is some of the nicest work he's ever

3  seen.  So, when he's valuing something at thousands of

4  dollars, that's not the value of the raw ivory.  That's

5  the value of the raw ivory plus the quality of the

6  carving, which is also anomalous.  I mean, that has

7  nothing to do with how many elephants are hurt.

8      THE COURT:  Well, at least one judge has

9  assigned a value of $150,000 per slaughtered elephant.

10  So, you know, I think that if we use that valuation as

11  some judges have, that would draw up Mr. Sylla's amounts

12  far higher than they are under the valuation methods that

13  were used in this case.

14      MR. MARGULIS-OHNUMA:  Well, respectfully, your

15  Honor, I mean that would require the government proving

16  up the quantity of ivory which has never been done.  It's

17  been sort of ignored.  We've been looking only at the

18  money and I don't -- and I agree with what you said that

19  that's not -- looking at the money is not the right way

20  to go about this.  It should be looked at the quantity of

21  ivory overall.

22      The other sort of more specific disagreement I

23  had in terms of which valuation to use, whether to use a

24  valuation for antique ivory or the valuation that a

25  knowing buyer would have.  If I understood correctly,

Proceedings

1   what's happened in other cases, is the Court gave some

2   credence to the idea that the antique value, what it

3   would be worth if it were a real piece, an old piece,

4   should be given at least some deference.

5          In this case, with Mr. Sylla, I don't think

6   there's any evidence that he somehow misrepresented what

7   he was selling to anybody and therefore, I think -- and

8   he was selling to sophisticated people, people who

9   collected large amounts of ivory, people who were dealers

10  in ivory, who had a storefront in Trenton, New Jersey,

11  you might recall and that those people knew exactly what

12  they were buying and that that --

13         THE COURT:  What were they exactly buying?

14  What is your contention that they knew they were buying

15  antique ivory?

16         MR. MARGULIS-OHNUMA:  No, that it was not

17  antique ivory.

18         THE COURT:  Okay.

19         MR. MARGULIS-OHNUMA:  And they knew they were

20  buying --

21         THE COURT:  Because --

22         MR. MARGULIS-OHNUMA:  They knew they were

23  buying smuggled modern tourist ivory.

24         THE COURT:  So, even if they said they thought

25  it was old ivory or antique ivory, they knew better?

Proceedings

1          MR. MARGULIS-OHNUMA:  Well, I don't think they

2   said that.

3          THE COURT:  But antique ivory --

4          MR. MARGULIS-OHNUMA:  They might have tried to

5   pass it off to their customers as old but I don't think

6   they said that they knew it was that they were buying

7   something from Mr. Sylla that was -- there was no

8   testimony about that at all.

9          And, therefore, I would suggest that the

10  tourist market value is what should be used, not the

11  antique value.  So, those are some general --

12         THE COURT:  When you say tourist market value,

13  are you talking about the illegal market value?

14         MR. MARGULIS-OHNUMA:  The value --

15         THE COURT:  Because there isn't --

16         MR. MARGULIS-OHNUMA:  Yeah.

17         THE COURT:  -- really a legal market for ivory

18  from what I understand unless it is antique and has

19  proper  certifications of antiquity.  Otherwise, it's

20  illegal to traffic in new ivory period.  So, there's no

21  legal new ivory market.

22         MR. MARGULIS-OHNUMA:  I agree.

23         THE COURT:  Right?

24         MR. MARGULIS-OHNUMA:  But if someone --

25         THE COURT:  So, the tourist market you're

Proceedings

1  talking about is what?

2          MR. MARGULIS-OHNUMA:  If someone believes that

3  they are buying ivory -- that they know what they're

4  buying, they know it's illegal but they're buying it

5  anyway, they're not being ripped off by Mr. Sylla.  That

6  the price that they would pay under those circumstances

7  -- and, in fact, the other -- the appraisal that the

8  government submitted that the Court disregarded from the

9  Hemingway Gallery gave the two values.  They gave the --

10 they said it would be fifty percent discounted if it were

11 -- I forgot the term used, but market -- you know, modern

12 -- recently carved versus the values that they gave were

13 for antique value; right?  The --

14         THE COURT:  I think you argued though I should

15 disregard that one, as well; right?

16         MR. MARGULIS-OHNUMA:  Yes, I did.  I did.  I

17 mean, but you know, if you're not going to accept part of

18 my argument, I would sugest that -- if you're going to

19 acceptOliver's, you might as well accept that.

20         And the basic point stands that the lower

21 number should be used because Mr. Sylla never did

22 anything to rip somebody off.  I mean, he never

23 misrepresented what he was selling as old ivory.  It was

24 what it was.  There's no evidence that he represented it

25 was anything else and he was selling to dealers.  He was

1  selling to people who knew this.

2       THE COURT:  All right.  The problem I have with

3  the overall argument is that if I accept and every court

4  accepts an illegal market value, it's going to perpetuate

5  and continue to motivate folks to trade in illegal ivory

6  because they'll get the benefit of a lower value at

7  sentencing and the cost benefit analysis at the end of

8  the day may be worth it to somebody to be held

9  accountable for a lower value of illegal market rate

10  ivory.  I don't think courts should be doing that.

11       MR. MARGULIS-OHNUMA:  Yeah, I understand that

12  but it also punishes someone who misrepresents what

13  they're selling more harshly than someone who is honest

14  about what they're selling.  So, if someone says look,

15  this is an antique, buy it for me because, you know, it's

16  worth so much because it's antique, that to me is more

17  culpable conduct than saying look, you've know, I've got

18  this ivory.  It's beautiful.  It's -- we just got it and

19  it's recently carved.  It just came in from Africa, you

20  know.  Buy it because you want it for -- I think Michael

21  Oliver talked about decorators want this stuff.  They

22  don't care whether it's antique or not.  They think it

23  looks like.  They think it feels nice because it's heavy.

24       So, I'm just suggesting that there's a

25  difference in culpability between someone who

Proceedings

1   misrepresents what they have --

2          THE COURT:  But the statute doesn't -- I mean,

3   the Lacey Act doesn't make a distinction between the

4   intent of the seller or the trafficker or the smuggler,

5   whether fraudulent or truthful representations.  It's

6   just illegal to trade in new ivory period.  And it

7   doesn't matter what representations are made in

8   connection with that trade.  Would you agree?  Because

9   the statute doesn't give any exceptions for someone who

10  honestly says I'm selling or smuggling or importing

11  illegal ivory.

12         MR. MARGULIS-OHNUMA:  I would agree, your

13  Honor, as a statutory matter.  As far as the guidelines

14  go, the guidelines --

15         THE COURT:  And as a policy matter.  As a

16  statutory matter, as a policy matter and as looking at

17  the intent of the trees and the regulations, it's to stop

18  this trafficking, right?

19         MR. MARGULIS-OHNUMA:  Right, but there has to

20  be some relationship, your Honor, between the harm done

21  and the cost to society of locking people up and I'm just

22  suggesting and agreeing with you really that that is not

23  ferreted out by looking at how much value of ivory was

24  sold.  It's ferreted out by looking at how much ivory was

25  sold and bought.

Proceedings

1      And in this case, it really wasn't very much
2  and let me -- if I may, let me get to that.  I submit to
3  you, your Honor, that Mr. Sylla testified truthfully when
4  he addressed the Court in the Fatico hearing.  It's very
5  unusual, as you know, for a defendant to testify and
6  submit himself to cross-examination at a Fatico hearing.
7      As I said to you just now, I'm representing
8  that Mr. Sylla has vehemently denied knowing what was in
9  that March 2006 shipment from the moment I met him and he
10 is not an articulate person.  He has come an enormously
11 long way in the two years that I've been working with him
12 and the time leading up to the Fatico hearing.
13      He did not go to school.  I mean, he went for a
14 couple of years in Liberia and my fourth-grader's given
15 presentations and I can't believe how well she's being
16 trained to do that, you know, in talking to people in
17 public.  He doesn't really know how to do that.  But we
18 got him to a point where he was able to articulate.  I
19 didn't understand what he was saying about the March 2006
20 shipment because he was aware of it, because there was
21 scuttlebutt that the Fish and Wildlife Service had come
22 and something had happened.  And I didn't get what he was
23 saying but ultimately, we were able to I think make it
24 clear and his -- there may have been some little mistakes
25 or whatever in his testimony, minor inaccuracies that the

1  government seized upon but overall, it was credible.

2       And part of the reason we know it was credible,

3  not only on its face, which is what I'm submitting but

4  further, it was corroborated.  The customs broker

5  Fernando Peraja came in and told us that Kemo Sylla

6  speaks English better than a lot of these guys and this

7  his practice is to help out when there's

8  miscommunication.

9       The -- it was corroborated by the statements of

10  the person allegedly receiving that ivory.  The person

11  that ivory was sent to was Mr. Souare.  The agents chose

12  not to put the fact in the complaint that Souare said

13  this has nothing to do with Sylla.  He doesn't even know

14  the person sending it.

15       But I think they should have and I think that

16  they should have -- you know, I'm not sure where we would

17  be now in this particular allegation.  I asked the

18  government to make Mr. Souare available.  Apparently he's

19  gone back to Africa.  He wasn't available to tell us and,

20  you know, find out exactly what happened.  But he

21  corroborates what Mr. Sylla said about that 2006

22  transaction.

23       So, the notion from the get go that this guy,

24  Kemo Sylla, is a big time ivory smuggler and has, you

25  know, these big tens of thousands of dollars of

Proceedings

1  shipments, is just -- it's just wrong and I'm sorry but

2  the Fish and Wildlife Service seems to have believed that

3  and, you know, they have a hard job and they work in good

4  faith but I think they got it wrong in this case and I

5  think that's what the evidence really bore out.

6         Another motive of corroboration was the letter

7  that was accepted in evidence at the Fatico hearing from

8  Robert Banks, who is a guy who did business with Mr.

9  Sylla over the years and did business with people trying

10 to sell him ivory over the years and he just said Kemo

11 wasn't one of them.  He wasn't buying ivory.  Other

12 people tried to sell them and Kemo was not trying to sell

13 ivory.

14         Finally, the cooperator's testimony, I

15 appreciate that you reviewed it all and I'll try not to

16 say too much about it but I think that, you know, overall

17 the circumstances of Mfopa Yacouba, of his relationship

18 with Mr. Sylla which we admit to.  We admit that we

19 bought ivory from Mfopa Yacouba.  But the allegation that

20 they dealt directly together to arrange smuggling is just

21 not born out by that testimony.  It's not corroborated by

22 any documents that you would expect to be there.  It's

23 not corroborated by any telephone records, by any direct

24 contact and Mr. Yacouba in that situation had every

25 motivation to lie and when he was challenged on the

1 stand, as I'm sure you saw, he repeatedly contradicted

2 himself. He was not a credible witness because the power

3 relationship between the two of them is he's a prince of

4 a village of hundreds of thousands of people. He's an

5 international businessman. He had come to the United

6 States three times a year for years and years and years.

7 He claims he only took up ivory smuggling on the past two

8 trips because of Kemo Sylla. It's just not believable.

9       Kemo Sylla is an illiterate refugee who came

10 here as a very young man who was chased out of his home

11 in Liberia, who was chased out of his home in Sierra

12 Leone. He's here, you know, for the grace of God

13 surviving these horrible wars in Africa. He's never had

14 -- I mean, he does -- he is the signatory on his house

15 but he's not someone who had employees. He's not someone

16 who is sophisticated. He's not someone who is about to

17 go push around Mfopa Yacouba and explain to him how to

18 smuggle ivory. The testimony just doesn't stand up, I

19 think when it's submitted to scrutiny.

20       And again, I'm sorry about that but it seems to

21 have been pushed by this presupposition going back from

22 the 2006 seizure that Kemo was somehow this big player

23 and it's just not so.

24       Let me move on, your Honor, to -- well, let me

25 round out what I'm saying overall about the nature and

1  circumstances of the offense.  In our view, Kemo Sylla

2  traded over the years, several thousand dollars worth of

3  ivory, perhaps eight or $9,000 worth of ivory and he --

4  that's illegal and he led guilty to it and he needs to be

5  punished for it.

6       He's already done four months in prison and

7  we're here to ask you or to urge you to find that the

8  fourth months that he's already done has been sufficient

9  punishment, ample punishment really, given the scope of

10  the crime.

11       This is his first offense.  He stands quite

12  separately from the -- for example, Mamadi Doumbouya, who

13  had been prosecuted twice before for Wildlife violations.

14       I'm going to move on now to the 3553(a) factors

15  which whatever the guideline fine -- and yes, I think the

16  guideline line puts you squarely in Zone A or Zone B, and

17  that four months is a guideline sentence.  But were you

18  to find a higher guideline sentence, nonetheless we're

19  requesting under 3553(a) and Booker, a non-guideline

20  sentence of the four months time served and probation or

21  whatever community service that you felt was -- would

22  assist in that in achieving the goals of sentencing.

23       As I just mentioned, Mr. Sylla's a refugee.

24  His history is exceptional.  It's common for Liberians

25  but it's exception for Americans and it's something

1  that's hard for us, even to understand.

2  More importantly perhaps is he is the leader of

3  a stable and beautiful, frankly, family, that's out

4  there.  He has a young child and he's the primary

5  breadwinner for her.  He lives with his common law wife

6  and takes care of them.  He sends money when he can to

7  Africa.

8  The government started this case two years ago

9  and they've been having a real hard look at Mr. Sylla in

10  all that time.  There's been no allegation in those more

11  than two years, that he has somehow lapsed and tried to

12  sell or buy ivory again.  He understands he can't do

13  that.  He has no risk of recidivism.

14  He comes from a place that is so war torn and

15  lawless and difficult to survive in that he really, I

16  think, or than we can even imagine, respects the rule of

17  law and honors it and realizes he did something wrong and

18  that he's got to -- that he can't do that anymore.  He's

19  got to scrape by buying and selling art that is not

20  ivory.  And that's exactly what he is doing and the

21  government offers nothing in the least to suggest

22  otherwise in the last two years.

23  He is -- under 3553(a), the Court really has to

24  make a -- do an assessment of how much deterrence is

25  necessary and the cost to society and to the defendant of

Proceedings

1  locking him up and what I would suggest to you and

2  studies show this and I think I cited them and if I

3  didn't, I'd be happy to, that what really deters conduct

4  -- criminal conduct is not long sentences but the

5  certainty that you're going to get caught because if you

6  know you're going to get caught, you don't go and do it

7  again.

8        He as caught and he was punished.  I mean, he

9  has been punished and he's being punished and through

10  probation, he can be punished some more.

11        But in order to deter this going forward, the

12  government has chosen not in their discretion -- not to

13  prosecute Howard Henderson (ph.), Otis Williams (ph.),

14  Clarice Sabree; people who were openly buying and selling

15  ivory, people who were caught with large caches of ivory.

16  I mean, I -- again, I hate to go down this road but it's

17  Kemo Sylla is a poor African refugee.  These people are

18  American citizens and it's disturbing.  If they want to -

19  - if the goal is to dry up the market for ivory, Kemo

20  Sylla didn't create the market for ivory, your Honor.

21  Kemo Sylla exploited the market for ivory.  He saw that

22  there was an opportunity to buy and sell and make money

23  from it and he did that.

24        But the end buyers, the people who look the

25  other way, the Michael Oliver's customer he talked about,

Proceedings

1  who are decorators, who are not prosecuted in this case,

2  those are the ones creating a market for ivory.  And in

3  order to achieve some sort of balance, we have to say

4  enough is enough.  Four months in prison, you know, court

5  appearances for over a period of two years, fines,

6  probation, community service if that's appropriate, as I

7  saw happen in another case, which I think is a great

8  idea, is enough punishment to deter this kind of conduct

9  at the level in which Kemo Sylla was engaging in it.

10         THE COURT:  Just one point, Mr. Margulis-

11  Ohnuma, I don't believe the Court can give credit for

12  time in immigration custody.  It's got to just be

13  (indiscernible) --

14         MR. MARGULIS-OHNUMA:  Right, so my request, I

15  think he did --

16         THE COURT:  -- what we're talking about is a

17  month and two weeks, I believe, that he would be entitled

18  to have credited against any offenses.

19         MR. MARGULIS-OHNUMA:  I didn't do my homework

20  on that.  I'm sorry.

21         THE COURT:  Okay.  Ithink that from what I

22  understand from the sumissions before me, the arrest

23  occurred December -- in December and he was released on

24  bond.

25         MR. SINCLAIR:  December 3, 2008.

Proceedings

1        THE COURT:  Yes, December.  And he was released

2   in February -- mid-February.  December 3rd through

3   January 15th; one month and twelve days.  And the ICE

4   custody was between February 25th -- I mean, up until he

5   was just remanded to ICE and then stayed in ICE custody

6   until February 25th. So, the credit that you're seeking

7   is really the one month and twelve day.

8        MR. MARGULIS-OHNUMA:  That's what I'm

9   suggesting would be an appropriate punitive BOP sentence

10  and part of the reason for that request, under 3553(a),

11  is that he did additional time in ICE custody, which he

12  would not have done but for this prosecution because he

13  was already an asylum seeking refugee.  He was already

14  known to ICE and in the proceedings that he's in and

15  protected by the DED program.

16        So, yes, I guess as a technical matter, I would

17  be asking for the number of days that you just said; I'm

18  sorry, I don't remember what it was, as the sentence and

19  the rest to be considered under 3553(a).

20        Let me suggest also in ticking off the 3553(a)

21  factors that I know the government doesn't agree with

22  this but in comparison to the other defendants in this

23  particular case, he is actually among the least

24  sophisticated and the least culpable.  That the others

25  were older.  They were more established.

Proceedings

1        I mean, the most striking example of this is

2  the one I mentioned already which was Mfopa Yacouba who

3  is a prince and an international businessman with offices

4  all over the world but the others also were people who

5  had been art traders for a long amount of time.  One of

6  them, Mamadi Doumbouya had a prior criminal record in

7  committing these very acts.

8        So, that his sentence -- Mr. Sylla's sentence

9  should be closer to Drissa Diane's which was thirty days

10  which would be squarely within what I'm asking for than

11  it should be to the other co-defendants who are more

12  sophisticated and more culpable.  And, by the way, in

13  certain cases, pleaded to actually smuggling as opposed

14  to merely trading in smuggled ivory, which carries a

15  twenty-year mandatory -- twenty-year maximum sentence as

16  opposed to the five-year -- sorry, the five-year maximum

17  sentence at issue here.

18        Let me just, in conclusion, say that putting

19  Mr. Sylla in jail now is going to tear apart his family.

20  It's a fragile family.  He has learned his lesson.  He

21  hasn't recidivated.  He has no intention of recidivating.

22  And poses no danger to society.

23        He defended himself in court.  He's had me

24  advocating for him as vigorously as I could because

25  that's what he directed me to do and that's what I felt

1 the evidence fairly showed. He was -- has cooperated

2 with the proceedings. He hasn't cooperated with the

3 government but he's cooperated with the proceedings.

4 He's made every court appearance. He's never violated

5 probation.

6          Putting him in jail is just not necessary. It

7 would be a needless cruelty to him and his family and

8 there would be no benefit to deterrence at this time.

9 Thank you very much,

10          THE COURT: All right. Thank you.

11          Did you want to be heard, Mr. Sinclair?

12          MR. SINCLAIR: Your Honor, briefly, I'd like to

13 address some of the comments made by defense counsel and

14 focus primarily on what this proceeding is not. This

15 proceeding is not an indictment on the Fish and Wildlife

16 Service. They've done nothing wrong here. There's been

17 allegation that they've done nothing wrong. And to the

18 extent that the Court -- that the defendant is asking the

19 Court to consider some sort of nefarious conduct on the

20 part of the government, the government strongly objects

21 to that and to the extent the Court wishes to do that or

22 is considering doing that, we would ask to be given

23 notice of that. That's clearly not part of these

24 proceedings here today.

25          THE COURT: No, I --

Proceedings

1    MR. MARGULIS-OHNUMA:  For the record, I agree

2 with that, your Honor.

3    THE COURT:  Okay.

4    MR. MARGULIS-OHNUMA:  I'm not saying -- I'm

5 saying they got it wrong.  People makes mistakes.  I'm

6 not saying there was any nefarious conduct.

7    THE COURT:  I belive that the Fish and Wildlife

8 Service has acted in good faith and with integrity

9 throughout these proceedings and throughout its

10 investigation and I know that we had a lot of motions and

11 hearings and everything and I have never been -- I've

12 never doubted their good faith or their integrity.  So,

13 that's not what this is about.

14    MR. SINCLAIR:  And another thing that this is

15 not about, this is not about whether or not the defendant

16 is a nebulous, big-time ivory seller.  That's not a

17 factor under the statute.  It's not a factor in the

18 guidelines.  We certainly urge the Court to focus on the

19 facts that have been established by a preponderance of

20 the evidence at the Fatico hearing, including the

21 defendants culpability in the March 2006 sale as detailed

22 in our papers.

23    His conspiracy with Mfopa Yacouba and Seidou

24 Mfomboutmoun to import illegally ivory into the United

25 States as detailed in our papers and each of the domestic

Proceedings

1    sales that the defendant consummated.  And in large part,

2    concedes to as part of his plea agreement here.  That is

3    what we ask the Court to focus on.

4         We ask the Court not to focus on the fact that

5    the defendant has not recidivated in the course of the

6    pendency of the case.  Simple compliance with his bond

7    conditions not to engage in any other criminal activity

8    and abidance by the law is not something that the Court

9    should consider in determining the leniency or the

10   severity of a sentence here.

11        It is a neutral factor.  It's irrelevant.  He

12   was abiding by the law because otherwise he would have

13   been incarcerated for having broken the conditions of his

14   bond.

15        We also ask the Court to ignore the illegal

16   irrelevancy of the fact that some defendants in this case

17   have pled guilty to smuggling and others have pled guilty

18   to an ivory -- the Lacey Act.  Whereas there is a twenty-

19   year statutory maximum for smuggling and a five-year

20   statutory maximum for the Lacey Act, that's a distinction

21   without a difference.  The Court ought to and we trust

22   will focus on the conduct here which is the basis of the

23   conviction and the punishment.  Certainly the guideline

24   calculations are exactly the same whether or not the plea

25   was to an ivory smuggling conviction or a Lacey Act

1  conviction.  There's not a difference there.

2         The defendant mischaracterized the evidence at

3  the Fatico hearing in statements before the Court today.

4  With respect to the March 2006 shipment, trying to change

5  the evidence as to whether or not the defendant's story

6  is credible or not, defense counsel said that Mr. Peraja

7  had testified at the Fatico hearing, that he recalls

8  Sylla translating from English to the African languages.

9  That's simply not the evidence.  Peraja did testify that

10 Sylla speaks English and that on occasion, he recalls

11 some people calling to translate for other people but he

12 did not recall Sylla ever calling to translate for other

13 people and certainly he remembered nothing about the

14 facts and circumstances of the March 2006 shipment.

15        The government urges the Court to consider the

16 credible evidence here which is that the agents were able

17 to interview Mr. Souare in English that day.  That he

18 spoke English to them, presumably he was also able to

19 speak English to Peraja earlier that day and he would

20 have called Peraja if he was the one controlling the

21 shipment.

22        Based on the phone records and all of the other

23 evidence that the government has submitted, it's our

24 position that the defendant was responsible for that

25 shipment.  He was involved in the participation of that

Proceedings

1   being imported into the United States and disseminated

2   within the United States using the services of the

3   Velocity company.

4           And, therefore, to the extent that the

5   defendant urges the Court to find him akin to Mr. Sidime,

6   it's not an accurate -- or Mr. Diane, rather.  It's not

7   an accurate comparison.  There's far more evidence going

8   back further in time with respect to this defendant's

9   smuggling, illegal importation, and distribution of the

10  ivory within the United States.

11          I'll remind the Court that when Judge Gershon

12  was sentencing Mfopa Yacouba, Judge Gershon was

13  considering simply the January 2008 shipment of

14  approximately $30,000 of ivory.  At that time, the

15  evidence was not available to Judge Gershon to consider

16  Mfopa's previous trips into the United States, other than

17  the baseline that what we were able to provide in terms

18  of that there were trips.

19          And here, the defendant concedes that he has a

20  relationship with Mfopa.  In fact, we're trying to

21  diminish the amount of ivory that he says.  He concedes

22  that he took Mfopa's ivory in September of 2007 and later

23  sold it to Mr. Henderson here in the United States,

24  thereby trying to diminish the market value of what he

25  should be held accountable for based on Mfopa's

1  statements.

2       The Court urges -- the government urges the

3  Court to consider the full amount of the relationship

4  with Mfopa as detailed by Mfopa in his deposition and

5  outlined by the government in our papers.  And further

6  distinguishing this defendant from Mr. Diane is the fact

7  that he managed other people, not just Mfopa, the prince

8  to use the defendant's term, not that we have any

9  evidence as to what that term means in the record and the

10 government submits it's completely irrelevant term and to

11 the extent the Court is willing to assign some third-

12 grade definition of what the word prince means in today's

13 society, we ask the Court to completely reject that and

14 focus on what this defendant did with respect to other

15 people which was arrange for Mfopa to travel to Africa to

16 visit with the defendant's cousin in the Ivory Coast and

17 to return to the United States with illegally imported

18 Ivory.

19       This defendant also arranged for Alfa Jene

20 (ph.), another third-party to go to Howard Henderson's

21 house and consummate that sale.  This, by the way, is a

22 fact that the defendant denied in his early papers and

23 only later came to admit that this was a sale that in

24 fact he consummated.

25       And third, this defendant arranged Seidou

1  Mfomboutmoun to act as an assistant in the distribution

2  of ivory here in the United States.

3          Therefore, we urge the Court to assign a two

4  point enhancement as we've outlined in our papers for the

5  guidelines purposes but also in considering this

6  defendant's actions as compared to other defendants in

7  this case under 3553.  He is more culpable.  He as an

8  organizer of the ivory trade in the United States.  He

9  was creating a market for ivory which causes the damages

10  and it's the purpose of the protections under the

11  statute.  Therefore, we urge this Court to sentence the

12  defendant high within these guidelines that we've

13  determined that we've set forth in our papers.  Thank

14  you.

15          MR. MARGULIS-OHNUMA:  I have three quick

16  replies and they're really quick.

17          THE COURT:  All right.

18          MR. MARGULIS-OHNUMA:  I promise.  The -- four

19  actually, sorry.  You know, the point I was making about

20  recidivism, of course you're not supposed to break the

21  law once you're arrested.  The point is that they've had

22  two years with a real hard look at him.  He hasn't broken

23  the law and that to the extent that the Court is

24  concerned about deterrence -- that's important --

25  specific deterrence is important but it's not a concern

1  in this case because he's not going to go back to doing

2  this.  He's learned his lesson.  And I think I almost

3  heard the government concede that.

4          Number two, the government submits it's legally

5  irrelevant, I guess under the sentencing guidelines,

6  whether you plead guilty to smuggling or to a Lacey Act

7  violation and I disagree and I think it's both legally

8  and factually relevant.  The government -- the DOJ

9  guidelines stated the government is supposed to take a

10 plea only to the highest readily provable charge.

11         The charge of smuggling against Kemo Sylla is

12 not provable.  They could not have taken it to a jury.

13 We negotiated.  We were ready for trial.  When they

14 dropped the smuggling charge, we took the plea.  He never

15 smuggled ivory.

16         Congress has found fit to determine that

17 smuggling is in the range of zero to twenty years, as the

18 other defendants who were ivory smugglers.  Mfopa Yacouba

19 is an ivory smuggler.  That's what he does for a living.

20 That's what he did the day he was caught.  And that's

21 what he's done at least twice before that he admitted to

22 and I submit to you it is very likely that's what he did

23 constantly on those three trips a year that he took to

24 the United States.

25         That brings me to the point about the prince

Proceedings

1  and the third grade definition.  There was testimony.

2  You've probably reviewed it much more recently than we

3  have.  He discussed what it meant to be a prince.  He

4  discussed that he was a leader of his people.  He

5  discussed that he had forty employees.

6         All of that was testified to.  He is a totally

7  different individual; an educated, worldly man as

8  compared to Kemo Sylla which is relevant for two reasons,

9  as Judge Gershon said, he's more culpable because he's a

10 leader of the community and therefore, he has a higher

11 responsibility to set a good example for people.

12        And secondly, it underlines his false

13 testimony, I submit, that he was -- that Mr. Sylla taught

14 him how to smuggle.  He knew just where to go in Cameroon

15 to get these patinas put on these pieces.  Kemo Sylla

16 didn't tell him any of that.  He knew what to do because

17 he's an ivory smuggler.  Kemo Sylla is not an ivory

18 smuggler.

19        Finally, also on the point about I think

20 counsel said that we earlier denied the transaction with

21 Alfa Jenna and Mr. Henderson and then we came around,

22 once we were confronted with the evidence.  That is

23 inaccurate, your Honor.

24        We maintain denial that when Alfa sold ivory to

25 Henderson, that was on his own account and the check was

Proceedings

1    turned over as we said originally to Kemo, who cashed it

2    for him and it was signed in Kemo's name.  We admit to a

3    separate transaction for $2,000 from the ivory that was

4    purchased from Mfopa Yacouba.  It's a separate sale that

5    has nothing to do with that particular check.  We

6    maintain that the check with Kemo's name on it was

7    actually cashed for Alfa, if I have it correct.

8            That's it.  Thank you for hearing me out.

9            THE COURT:  All right.  Anything else, Mr.

10   Sinclair?

11           MR. SINCLAIR:  There's just one other point

12   that I would have made in my initial comments.  I

13   overlooked it in my notes.  I apologize.  But it has to

14   do with the comparison to Mamadi Doumbouya.  Obviously,

15   the Court was influenced by the fact that he had prior

16   interaction with the law and he knew that this was an

17   offense and he'd been confronted with it.

18           We submit that there's an analogous circumstance

19   for this particular defendant and it has to do with the

20   March 2006 shipment.  Even today in court, counsel

21   acknowledged that Kemo was aware in March 2006 or

22   thereafter, that the Fish and Wildlife Service somehow

23   injected themselves into that shipment and seized that

24   shipment.

25           So as of the time of that shipment coming into

Proceedings

1 the United States, this defendant was aware of the fact

2 that ivory smuggling is illegal in the United States and

3 that is has law enforcement ramifications.  This shipment

4 was seized.

5          Nevertheless, he continued to engage in

6 smuggling activities as proven by the government with

7 Mfopa Yacouba and certainly even concededly he continued

8 to engage in the sale of ivory that was imported into the

9 United States.

10          So, just like Mamadi Doumbouya who received a

11 more severe sentence than several other defendants in

12 part because of his prior interaction with law

13 enforcement and the provable knowledge that he had about

14 the illegality of these activities, this defendant too

15 knew that this type of activity was illegal as early as

16 March 2006 and nevertheless continued to engage in that

17 activity.  And so, we ask that the Court also consider

18 that in evaluating this defendant.

19          THE COURT:  Thank you.  Anything else, Mr.

20 Margulis-Ohnuma?

21          MR. MARGULIS-OHNUMA:  I'll bite my tongue, your

22 Honor.  Thank you.

23          THE COURT:  Okay.  And I appreciate notifying

24 and identifying the family members and friends who are

25 here in court.  I just want to say to them that I have

1  read their letters and I've appreciated hearing about

2  Mr. Sylla and who he is and what he means to them and the

3  background information which I do think is quite

4  extraordinary.  I mean, I think that whatever the

5  situation, even amongst the other defendants in this

6  case, Mr. Sylla did have a particularly horrific

7  childhood in his -- not just in his native country of

8  Liberia but throughout his childhood as he fled civil

9  war.  So, I acknowledge that and I appreciate the

10  presence and support of his family and friends.

11          I note that the PSR calculated Mr. Sylla's total

12  offense level to be a level 19, criminal history category

13  of one.  The government calculates Mr. Sylla's total

14  offense level to be 17 with a criminal history category

15  of one.

16          Now, the government had intended or at least

17  indicated that it would move for the third point decrease

18  for acceptance of responsibility, in addition to the one

19  level reduction for global disposition.  And if that were

20  to be applied, rather than a level 17, we would end up

21  with a level 16.

22          Is there any dispute about that, Mr. Sinclair?

23          MR. SINCLAIR:  No, there isn't.

24          THE COURT:  Okay.  Now, Mr. Margulis-Ohnuma

25  objects to Mr. Sylla being held accountable for a market

1   value of anything more than $10,000 and to the

2   government's and the PSR's application of a two level

3   aggravating role adjustment pursuant to advisory

4   guideline 3b1.1(c) -- and I will address this in a moment

5   -- I've heard extensively today from the parties, in

6   addition to reading their submissions.  Is there anything

7   else anybody else wants to bring to my attention before

8   we move forward?

9           MR. MARGULIS-OHNUMA:  No, your Honor.

10          THE COURT:  All right.  The defense asks that

11  the Court depart from the guidelines or impose a non-

12  guideline sentence of time served.  Now again, I think

13  we've clarified that time served for purposes of this

14  sentence would be one month and twelve days, not the

15  three months that he's spent in ICE custody.

16          And he also posits that a one-year period of

17  supervised release based on exceptional family

18  circumstances and on the 3553(a) factors would be

19  appropriate.

20          Mr. Ohnuma emphasizes that Mr. Sylla is the

21  primary care giver of his six-year-old daughter and that

22  his immediate and extended family do rely on him for

23  financial support and that he is likely to be deported to

24  Liberia if he receives a substantial sentence.

25          The government recommends a sentence within the

Proceedings

1    guidelines arguing that a within guidelines sentence is

2    necessary to address the seriousness of the crime, the

3    need for specific and general deterrence and to avoid

4    sentencing disparities.

5         The government also recommends imposing a fine

6    payable to the Lacey Act Reward Fund pursuant to Title 16

7    USC Section 3375(d) and 42 USC Section 10601(b)(1)(A)(2).

8         Now, I must first address the amount of ivory

9    for which Mr. Sylla should be held accountable.  It's a

10   point of major contention between the parties.  In order

11   to make this determination, I mus determine whether the

12   government has proven by a preponderance of the evidence

13   which of the specified instances of importation sale or

14   offers for sale of ivory Mr. Sylla is responsible for and

15   then second, the total market value of the ivory involved

16   in those transactions.

17        First addressing which transactions Mr. Sylla

18   should be held accountable for, I look at the arguments

19   of the parties.  First, the government argues that the

20   credible evidence at the Fatico hearing established that

21   Mr. Sylla is responsible for between $159,800 to $181,800

22   worth of ivory that was illegally imported and then

23   subsequently traded within the United States.

24        There was a bit, I think, of a change here.  The

25   government stated that Sylla was responsible for both

Proceedings

1  $149,200 and $181,800 and also between $144,000 --

2  $144,800 and $177,400.  That was in the government's

3  January 20, 2011 letter at 2.

4         The Court does not believe that the sum of any

5  of the figures that were provided by the government would

6  amount to that much.  Instead, the Court's calculation

7  came up with a range between $159,800 and $181,000 based

8  on the value presented in that particular submission.

9         The PSR calculated the market value attributable

10 to Mr. Sylla to be $204,400 before the Fatico hearing and

11 the probation department has not indicated any change to

12 its calculation following the Fatico hearing or based

13 upon the government's more recent valuation.

14        The government bases its valuation on the three

15 following instances of importation, sale or offer for

16 sale.  First, domestic sales of ivory valued between

17 $15,000 and $17,000 and then the March 2006 shipment of

18 ivory that was valued between $76,500 and $96,500 that

19 Mr. Sylla allegedly participated in smuggling into the

20 United States through Kemo Sekou Souare.  And third,

21 $68,300 worth of ivory that Mr. Sylla allegedly Mfopa

22 Yacouba to bring back from Africa.  That's again based on

23 the government's January 20th letter at page 2.

24        Mr. Sylla argues that he's only accountable for

25 $7,500 worth of ivory and that there's no evidence

Proceedings

1    linking him to the other ivory transactions.  I've

2    considered the credible evidence presented at the Fatico

3    hearing and by the parties and their submissions and I

4    make the following findings of fact and conclusions of

5    law.

6         First, with respect to Mr. Sylla's sale to

7    Clarisse Sabri (ph.), Mr. Sylla admits that he sold

8    twenty-two pieces of ivory to Clarisse Sabri for $900.  I

9    accordingly find that he's responsible for $900 from that

10   sale.

11        Next, Mr. Sylla is -- there's a sale to

12   Mr. Robert Banks which we've discussed a little bit

13   today.  He admits selling an ivory trumpet to Mr. Banks

14   for $300 but he argues that he believed that the trumpet

15   was made of antique ivory over 100 years old and had no

16   reason to believe that the ivory was illegally smuggled

17   into the United States and thus, should not be held

18   accountable.  That's his October 1st letter at pages 9

19   through 10.

20        Mr. Sylla did not expound on his assertion at

21   either the Fatico hearing or in his submissions as to why

22   he had that belief.  Instead, he simply points to a

23   letter from Mr. Banks which was admitted into evidence as

24   Defendant's Exhibit J at the Fatico hearing stating that

25   the ivory trumpet that Mr. Banks bought from Mr. Sylla

1  was made of ivory over a hundred years old.  But similar

2  to Mr. Sylla, Mr. Banks does not reveal the basis for his

3  belief that the statute was made of old ivory.  Neither

4  Mr. Sylla nor Mr. Banks indicate whether this was based

5  on a hunch or their own personal inspection, a

6  representation that was made by some person including

7  Mr. Sylla or some other form of documentation.

8          The government points out that in order for the

9  ivory trumpet to have been legally imported into the

10 United States, a CITES license would have been required

11 stating that the ivory was derived from a legal source.

12 I don't know if that is the case, Mr. Sinclair, if that

13 trumpet was imported into the United States before CITES

14 was enacted or whether there would have been some other

15 documentation required pre-CITES to import allegedly

16 antique ivory.

17          MR. SINCLAIR:  I --

18          THE COURT:  Would you --

19          MR. SINCLAIR:  The CITES treaty was enacted in

20 1976 when the defendant was less than a year old.  So, I

21 don't know.  I don't know the answer to that question.  I

22 know there wouldn't have been a CITES license because

23 there was no such thing.

24          THE COURT:  Okay.

25          MR. SINCLAIR:  But I don't know what their would

Proceedings

1  have been.

2       THE COURT:  No, okay.  All right.  Well, in any

3  event, Mr. Sylla has not shown any evidence of a CITES

4  license or any other documentation of antiquity regarding

5  this ivory trumpet.  The government urges that given Mr.

6  Sylla's demonstrated practice of receiving illegally

7  smuggled ivory from Africa, the Court should not accept

8  that more, Mr. Sylla's self-serving statement that the

9  ivory was legitimate.

10       I note that neither party has offered evidence

11  as to the actual age of the ivory trumpet or to evidence

12  as to when it was brought into the United States.

13  However, the absence of either a CITES license or any

14  documentation of antiquity or some other evidence that

15  the ivory trumpet had been legally imported into the

16  United States coupled with Mr. Sylla's admitted knowledge

17  of and participation in sales involving ivory that was

18  altered to appear old, supports the view that the ivory

19  trumpet was indeed illegally smuggled into the United

20  States and that Mr. Sylla knew or at least turned a blind

21  eye as to its illegal status in the United States.

22       There's ample evidence in the record that

23  Mr. Sylla sold new ivory which was manipulated and

24  altered to make the ivory appear old.  Mr. Sylla concedes

25  in his affidavit in connection with an admitted purchase

1  of ivory from Mr. Yacouba in September 2007, that he knew

2  the ivory was illegally smuggled into the United States

3  when there are no documents for that ivory and when the

4  ivory is recently brought into the country.

5       That was his affidavit attached to the October

6  1st letter at paragraph 31 and he states, "I was aware

7  that the ivory had been smuggled because there were no

8  documents for it and Mr. Mfomboutmoun told me that Mr.

9  Yacouba had just brought the pieces to the United States.

10      Now, Mr. Margulis-Ohnuma states in his September

11 15, 2010 objections to the PSR that Mr. Sylla bought what

12 he sold to Mr. Banks as old ivory at a flea market.

13 Mr. Sylla testified that he also bought a Benin leopard

14 that was seized at his house at a flea market.

15      In the latter case, Mr. Sylla testified at the

16 Fatico hearing that he knew that the Benin leopard was

17 made of new ivory, thus illegal ivory, and that therefore

18 he could have surmised that it was illegally smuggled.

19 He insisted that he thought that the ivory trumpet was

20 old despite its provenance at a flea market in which he

21 had testified he knew that illegal ivory trafficking

22 occurred.

23      Additionally, in his affidavit, he admits that

24 old pieces of ivory can still be illegally smuggled.

25 That was at paragraph 19 of his affidavit.

Proceedings

1        Based on these concessions and the lack of any

2    documentation, legitimizing the ivory trumpet and the

3    lack of any explanation as to why Mr. Sylla or Mr. Banks

4    believed that the ivory was antique and in light of Mr.

5    Sylla's admissions that he has traded in illegal ivory, I

6    find that Mr. Sylla's statement that he had no reason to

7    believe that the ivory trumpet was illegally smuggled

8    into the United States is not credible.  Accordingly, I

9    find that Mr. Sylla is responsible for $300 realized from

10   the sale of that ivory trumpet.

11       Now, we have ivory tusks that were sold on

12   behalf of Mr. Otis Williams for the amount of $4,400.

13   Mr. Sylla admits in his submissions and at the Fatico

14   hearing that he brokered a sale of two ivory tusks on

15   behalf of man named Otis Williams for $4,400.  As he did

16   in connection with the ivory trumpet, Mr. Sylla again

17   claims without supporting documentation or explanation

18   that the tusks were old ivory.  And for the same reasons

19   previously stated, I find that these self-serving

20   statements are not credible and that Mr. Sylla is

21   responsible for the $4,400 realized from the sale of

22   those tusks.

23       Moreover, I heard credible evidence through

24   Agent Alegranti at the Fatico hearing that Mr. Williams

25   had purchased ivory from Mr. Sylla at least twelve times

Proceedings

1 and purchased anywhere from between three to five pieces

2 of ivory from Mr. Sylla on each of those twelve

3 occasions.

4          Mr. Alegranti testified that one of those sales

5 was of an ivory Benin leopard statute for which Mr.

6 Williams paid Mr. Sylla $3,000.

7          The government introduced evidence of a check in

8 the amount of $1,500 which Mr. Williams had explained to

9 Mr. Alegranti represented the balance of the $3,000 sale

10 of the ivory leopard.  Even though the government did not

11 ask the Court to include the sale in the total domestic

12 sales, I do find that there is a preponderance of

13 evidence that Mr. Sylla sold a Benin leopard ivory

14 statute to Mr. Williams for $3,000 and I hold Mr. Sylla

15 responsible for that sale in the amount of $3,000.  Now

16 -- in addition to the ivory tusks for $4,400 that he sold

17 to Mr. Williams.

18          Now, there's a receipt for the sale of two

19 coupled Baule, B-A-U-L-E, ivory for $4,400.  At the

20 Fatico hearing, the government introduced evidence that

21 Mr. Sylla sold ivory to an individual named Kaba Ibrahami

22 -- well, I'm sorry, Ibrahima Kalil -- that's K-A-B-A I-B-

23 R-A-H-I-M-A, last name K-A-L-I-L, for $4,400.

24          Specifically, the government introduced into

25 evidence as Government Exhibit GG, Mr. Kalil's business

Proceedings

1  card which reads "Two couple Baule ivory from Kemo Sylla

2  equals $4,400."  Defense counsel does not contest that

3  Mr. Sylla should be found accountable for the market

4  value of the sale, in any of his submissions.

5        Further, Mr. Sylla testified at the Fatico

6  hearing that although he does not specifically remember

7  selling ivory to Mr. Kalil, the sale represented on his

8  card was separate from the $4,400 sale of tusks to Mr. --

9  on behalf of Mr. Williams.  Accordingly, the Court finds

10 that Mr. Sylla is responsible for the $4,400 realized

11 from the sale to Mr. Kalil of the Two couple Baule ivory

12 pieces.

13        Next, we turn to Mr. Sylla's December 2007 sale

14 to Howard Henderson.  Mr. Sylla does admit that he sold

15 ivory to Howard Henderson for $2,000 in December 2007.

16 However, he testified at the Fatico hearing and swore in

17 his affidavit that the ivory he sold Mr. Henderson was

18 one of the pieces that he purchased from Mr. Yacouba for

19 a total of $6,000 and that he knew this piece of ivory

20 was illegally smuggled into the United States.

21        He argues that this ivory should not be double

22 counted.  The government asserts that the Court should

23 disregard Mr. Sylla's self-serving and unreliable

24 testimony and hold Mr. Sylla acocuntable for this $2,000

25 sale in addition to the value of the ivory that the

Proceedings

government argues Mr. Yacouba smuggled into the United

States at Mr. Sylla's direction.

The government points out that Mr. Sylla

initially objected to the inclusion of the sale to Mr.

Henderson in the PSR and argues that he only -- Mr. Sylla

only addmited to the sale as an attempt to explain away

some of the market value associated with the ivory that

Mr. Yacouba smuggled into the United States at his

direction.

Whereas in the case of co-defendant Mr. Diane,

there was proof that the pieces that Mr. Diane sold to an

undercover agent came from a shipment that Mr. Diane was

being held accountable for, here there is no proof either

way whether or not the ivory that Mr. Sylla sold to

Mr. Henderson originally came from Mr. Yacouba or from

another source.

Accordingly, in order to avoid double counting

and in an excess of caution, the Court will subtract

$2,000 from the total value that it does find that Mr.

Sylla is responsible for as a result of his arrangements

with Mr. Yacouba.

Now let's talk about the value of the ivory

Benin leopard statue that was seized from Mr. Sylla's

home at the time of his arrest.  He does not dispute that

he bought that statue and that the statue was made of

1 smuggled ivory or that the value of the statue should be

2 attributable to him. Mr. Sylla does, however, contest

3 that the $3,000 to $5,000 appraisal value that Mr. Oliver

4 gives to that leopard statute is inaccurate and

5 unreliable and he argues instead that the $600 price that

6 he paid for the Benin leopard at the flea market is a

7 closer approximation of the statue's true market value.

8         And here I address Mr. Sylla's arguments

9 regarding market value and how the Court must grapple

10 with assessing the value of this ivory. Now, advisory

11 guideline 2q2.1(b)(3)(A)(2) directs that if the market

12 value of the wildlife exceeded $5,000, the Court is to

13 increase by the number of levels from the table in the

14 advisory guideline at 2b1.1B1. The commentary to Section

15 2q2.1 explains that when information is readily

16 available, market value under 2q2.1, 2q2.1(b)(3)(A)

17 "shall be based on the fair market retail price" of the

18 wildlife. However, it also counsels that where the fair

19 market retail price is difficult to ascertain, the Court

20 may make a reasonable estimate using any reliable

21 information such as the reasonable replacement or

22 restitution costs or the acquisition and preservation

23 costs.

24         The commentary specifies that the market value

25 may not be based on measurement of aesthetic loss. Now,

Proceedings

1  I must make a reasonable estimate using reliable

2  information available.  Mr. Oliver provided the only

3  evidence of the valuations of ivory in the record, except

4  for one valuation by a Mr. Gaysford (ph.) which the Court

5  does not find to be reliable.

6          As I found at the Fatico hearing, Mr. Oliver is

7  an expert qualified to testify regarding the appraised

8  value of African art including ivory and contrary to

9  defense counsel's arguments, I find that Mr. Oliver's

10 testimony was credible and his methods of valuation to be

11 reliable based on his extensive experience in African

12 art.

13         Mr. Oliver defines fair market value as the

14 price that a willing and informed buyer would pay for an

15 object to a seller who is not under duress where the

16 buyer and seller are negotiating a sale in a legal market

17 for ivory.

18         I accept Mr. Oliver's definition of fair market

19 value because there's evidence in the record that the

20 goal of ivory smugglers is to create pieces that look

21 like legitimate or antique pieces that may be sold on the

22 legal market such as at auction houses and art galleries.

23 I acknowledge that a market for illegally imported ivory

24 also does exist.  However, I will not use the presumably

25 lower illegal thieves market or illegal market value as a

1  basis to determine market value or to set the ceiling on

2  value in this case.  To do so, as I've indicated earlier,

3  would only fuel trafficking of elephant ivory and keep

4  the illegal market alive if defendants could benefit from

5  that lower value.

6        This is why when making findings as to the

7  market value of ivory during the sentencing of Mr. Sylla

8  and his co-defendants, I have accepted the price that the

9  defendant offered to sell or actually sold ivory for as

10 the fair market value, only where that price was the only

11 evidence of market value available.

12        However, where there's credible expert testimony

13 as to the market value of the ivory, in addition to the

14 offer or sale price, and the offer or sale price

15 conflicts with the expert's valuation range, I have

16 accepted and will accept here the expert's valuation over

17 the black market price or the price that the particular

18 defendant may have negotiated for the reasons detailed

19 above.

20        With these principles in mind, I turn back to

21 the valuation of the Benin leopard statue.  Mr. Oliver

22 appraised the Benin leopard statue seized from

23 Mr. Sylla's home to be worth between $3,000 and $5,000,

24 which I find to be reliable.  Mr. Alegranti, as I noted,

25 credibly testified that Mr. Sylla sold a Benin leopard

Proceedings

1  statue to Mr. Otis Williams for a total of $3,000 and

2  that provides further support for Mr. Oliver's valuation.

3          I accordingly find and using the conservative

4  end of the estimate, that the $3,000 assigned by

5  Mr. Oliver's appraisal is reliable and find Mr. Sylla is

6  accountable for the $3,000 value.

7          Now, let's turn to the March 21, 2006 shipment

8  which was another point of contention.  The government

9  seeks to hold Mr. Sylla accountable for the market value

10  of ivory contained in the shipment which arrived at JFK

11  on March 21, 2006 and was appraised by Mr. Oliver to be

12  valued between $76,500 and $96,500.

13          The evidence at the Fatico hearing and in the

14  submissions established the following:  On March 18,

15  2006, a shipment containing ivory disguised as wood

16  carvings and containing other non-ivory artwork, let

17  Ghana via British Airways and arrived at JFK on March 21,

18  2006.  The shipment was addressed to Mamadi Cisse, C-I-S-

19  S-E, at the Chelsea Mini Storage.  There was no evidence

20  presented at the hearing that Mr. Cisse was ever located

21  or is in fact a real person.

22          On March 24, 2006, agents from Fish and Wildlife

23  met with the Customs broker, Fernando Peraja of Velocity

24  freight Services to perform a controlled delivery of a

25  shipment.  Telephone records indicate calls between Mr.

Proceedings

1   Sylla, Mr. Souare, the addressee -- I'm sorry, not the

2   addressee, an individual known as Mr. Souare and

3   Mr. Peraja.  For example, Mr. Sylla had called Mr.

4   Peraja's cell phone five times in connection with the

5   shipment; once on March 18th, twice on March 22nd, once

6   on March 23rd and once on March 24th inquiring about the

7   shipment and directing that the delivery address be

8   changed from Chelsea Mini Storage to a residential

9   address at which Mr. Kramo, K-R-A-M-O, Seko, S-E-K-O,

10  Souare, was present at the time of the delivery.

11        Indeed, Mr. Sylla's repeated calls to Velocity

12  prompted a Velocity employee to write Mr. Sylla's name on

13  the British Airways bill.  That was Exhibit G and

14  Mr. Sylla's phone records and Exhibit E, the airway bill

15  in evidence.

16        Upon the delivery of the shipment to the address

17  provided by Mr. Sylla, Mr. Souare and Mr. Lancine Conde

18  (ph.) accepted the shipment on behalf of Mr. Cisse.  Upon

19  questioning by the Fish and Wildlife Service, apparently

20  in English, Mr. Souare informed the agents that Mr. Cisse

21  had asked Mr. Souare to accept the delivery for him and

22  that earlier that day, Mr. Sylla had given Mr. Souare

23  $1,600 in cash that Mr. Souare needed to pay the shipping

24  and freight expenses .  Mr. Souare explained that Mr.

25  Sylla owed him money for an unrelated debt and that Mr.

1 Sylla had driven from New Jersey that morning to give Mr.

2 Souare $1,600 that he owed him.

3          Mr. Souare told law enforcement that Mr. Sylla

4 was not receiving any part of the shipment.  That Mr.

5 Sylla did not know Mr. Cisse and that Mr. Sylla was in

6 the country illegally.

7          Now consistent with Mr. Souare's statements to

8 law enforcement, Mr. Sylla testified at the Fatico

9 hearing that he owed Mr. Souare $2,000 for ten wood

10 carvings in an unrelated transaction.  Mr. Souare told

11 Mr. Sylla that he needed $1,600 to pay for shipping costs

12 and that Mr. Souare told Mr. Sylla further that if he

13 paid Mr. Souare $1,600 immediately, Mr. Souare would

14 forgive the rest of that $2,000 debt.

15          Mr. Souare -- I'm sorry, Mr. Sylla testified

16 that the shipment did not belong to him and that he did

17 not know there was ivory in the shipment.  Contrary to

18 Mr. Souare's statement, however, Mr. Sylla testified that

19 he did not personally deliver the $1,600 to Mr. Souare as

20 Mr. Souare had told the Fish and Wildlife Service agents

21 but rather, Mr. Sylla had sent a friend to deliver the

22 money on his behalf.

23          Neither Mr. Sylla nor Mr. Souare offered any

24 explanation as to why Mr. Souare would reduce Mr. Sylla's

25 $2,000 debt by $400 to enable Mr. Souare to pay for a

Proceedings

1 shipping fee for Mr. Cisse's shipment when Mr. Souare

2 asserted that neither he nor Mr. Sylla had any interest

3 in that shipment.

4          The evidence at the Fatico hearing revealed that

5 in addition to the five calls Mr. Sylla made to Velocity

6 between March 18th and Marc 24th, 2006, Mr. Sylla and

7 Mr. Souare spoke twenty-two times between March 14th and

8 March 25th, 2006.  That was Government Exhibits G and H,

9 the phone records of Mr. Sylla, first indicating ten

10 calls for Mr. Sylla to Mr. Souare between March 14th and

11 March 24th and Government Exhibit H indicating twenty-two

12 calls from Mr. Souare to Mr. Sylla between March 17th and

13 March 25th.

14          Mr. Sylla testified that he made these calls in

15 order to help Mr. Souare arrange for the delivery because

16 Mr. Souare did not speak English very well and could not

17 understand what Mr. Peraja was saying.  The government

18 argues that Mr. Sylla's explanation for his reportedly

19 legitimate involvement in the March 21, 2006 shipment is

20 belied by the fact that Mr. Souare and Mr. Peraja speak

21 English and the government argues that the fact that

22 Mr. Sylla paid Mr. Souare the exact amount of shipping

23 charges on the day of the shipment's arrival is just too

24 coincidental to be credible.

25          The government also argues that the temporal

1  proximity of the calls between Mr. Sylla and Mr. Souare

2  to the shipment from Ghana, in addition to the number and

3  sequence of calls between Mr. Sylla, Mr. Souare and a

4  phone call that Mr. Sylla made with an African calling

5  card, all suggest that Mr. Sylla knowingly participated

6  in the importation of the March 21st ivory shipment into

7  the United States.

8          Defense counsel on the other hand, argues that

9  the evidence presented by the government is insufficient

10  to link Mr. Sylla to the March 21st, '06 shipment and

11  notes that it's the government's burden to prove by a

12  preponderance of evidence that he is connected to that

13  shipment.

14          Specifically, Mr. Margulis-Ohnuma points out

15  that Mr. Peraja corroborated Mr. Sylla's testimony, that

16  Sylla helps other African consignees who don't speak

17  English with shipping arrangements.  And we did have some

18  dispute about that today -- about that statement that

19  Mr. Peraja rather said that, not Mr. Sylla in particular,

20  but other folks involved in African art do sometimes

21  assist one another with shipping related matters.

22          Mr. Ohnuma also points out that Mr. Souare told

23  law enforcement that the shipment did not belong to

24  Mr. Sylla and that Mr. Sylla testified that the $1,600

25  that he paid was for an unrelated debt.  Mr. Margulis-

1  Ohnuma also points out that Mr. Sylla has no family

2  living in and has never visited Ghana and the shipments

3  -- which was the shipment's place of origin.

4         Because Mr. Sylla's explanation of his

5  connection to the shipment is corroborated by the

6  testimony of Mr. Peraja and by most of the statements

7  that Mr. Souare made to law enforcement, I will accept

8  Mr. Sylla's explanation, notwithstanding the very curious

9  coincidences that permeate this transaction linking

10 Mr. Sylla in some way with the phone calls and the money

11 for the delivery.

12        Accordingly, I do find that Mr. Sylla will not

13 be held accountable for the market value of the ivory

14 contained in the March 21, 2006 shipment.

15        Now, next, turning to the ivory imported by

16 Mr. Yacouba.  Cooperating witness, Mfopa Yacouba provided

17 very detailed deposition testimony on March 10th and

18 March 11, 2009, linking Mr. Sylla to a total of $68,300

19 worth of illegal importation purchase or sale of ivory.

20        Specifically, Mr. Yacouba testified that in

21 January 2007, he met with Mr. Mfomboutmoun and Mr. Sylla

22 and that Mr. Mfomboutmoun and Mr. Sylla showed him

23 photographs of ivory carvings and art catalogues and

24 asked him to go to the Ivory Coast to procure pieces of

25 ivory and have them carved to resemble the pieces that

Proceedings

1   appeared in the art catalogues.

2          Mr. Yacouba testified that Mr. Mfomboutmoun and

3   Mr. Sylla told him that he should arrange to have the

4   color of the ivory darkened to brown and to have clay or

5   some other substance applied to the pieces to avoid

6   detection by Customs officials.  Mr. Yacouba testified

7   that he did, in fact, bring ten ivory pieces into the

8   United States via JFK Airport on March 29, 2007 and that

9   Mr. Mfomboutmoun and Mr. Sylla met him in a hotel in New

10  York City and paid him $15,000 over the course of two

11  days for those pieces of ivory.  Mr. Yacouba testified

12  that Mr. Mfomboutmoun and Mr. Sylla told him that they

13  would buy more ivory from him in the future because they

14  had customers who would buy it.

15         Mr. Yacouba testified that he returned to the

16  United States again on September 7, 2007 with fifteen

17  ivory pieces and that Mr. Mfomboutmoun and Mr. Sylla met

18  him again in the same New York City hotel and paid him

19  $20,000 in cash for these pieces.

20         Now I note that Mr. Ohnuma has objected based

21  among other things, on the hotel records not showing that

22  Mr. Yacouba stayed at the Newton Hotel, which was the

23  site that he testified to as the meetings that he had

24  with Mr. Yacouba -- I mean, Mr. Mfomboutmoun and Mr.

25  Sylla but I do also recall that there was evidence in the

record that from time to time when the Newton Hotel had

overflow, they would send travelers to other hotels and

there was also a recognition that and evidence in the

record that from time to time, one would not stay at a

hotel under one's real name or use fictitious names in

the trade -- in the ivory trade, both in shipping and

importation.

During the September 7, 2007 meeting,

Mr. Yacouba testified that the three men discussed making

a third smuggling trip where Mr. Yacouba would travel to

the Ivory Coast and meet with Mr. Sylla's cousin to bring

back ivory pieces that Mr. Sylla had there.

Mr. Yacouba testified that Mr. Sylla showed him

pictures of the ivory that he was to bring back and told

him that he would pay $5,000 for the pieces -- I'm sorry,

that Mr. Sylla told him that he would pay $5,000 for the

pieces and in addition, Mr. Sylla paid him $1,500 for the

trip from Cameroon to the Ivory Coast.

Mr. Yacouba testified that Mr. Sylla later sent

the same photographs of the ivory that he was to bring

back to Mr. Yacouba after he returned to Africa.  When

Mr. Yacouba arrived in the Ivory Coast in November 2007,

he testified that he called Mr. Mfomboutmoun and Mr.

Sylla and they put him in touch with Mr. Sylla's cousin.

Mr. Yacouba testified that he took sixteen ivory

pieces for Mr. Sylla from Mr. Sylla's cousin and that he

bought five pieces of ivory at his own expense.  He also

testified that Mr. Sylla's cousin gave him two letters

and a cassette for Mr. Sylla which were discussed with

Mr. Yacouba and in evidence at the deposition.

Mr. Yacouba testified that when attempting to

leave the Ivory Coast for Cameroon, he was stopped by

Customs officials and was told that he must pay money if

he wanted to leave the country with the ivory.

Mr. Yacouba testified that he then called

Mr. Mfomboutmoun and Mr. Sylla to tell them about the

situation and Mr. Yacouba further testified that when he

spoke with Mr. Mfomboutmoun and Mr. Sylla, he did so two

or three times between November 2007 and January 2008.

And during a December 2007 phone call, he told

them that he had bought thirteen additional ivory pieces

in addition to the five ivory pieces that he had

purchased and that the price for those eighteen pieces

that he bought would be $30,000.  And that Mr. Yacouba

intended to sell those to Mr. Sylla and Mr. Mfomboutmoun

when he returned to the United States.

Mr. Yacouba arrived in the United States in

January 2008 and was arrested.  The ivory pieces were

seized from him and then later valued by Mr. Oliver to be

worth $31,800.  When in MDC custody, Mr. Yacouba made

1  phone calls to Mr. Mfomboutmoun without -- before

2  Mr. Yacouba had any knowledge that the call was being

3  recorded.  Those phone calls corroborated the

4  relationship between Mr. Yacouba and Mr. Mfomboutmoun and

5  Mr. Sylla.

6          Moreover, based on transcripts, Mr. Yacouba's

7  wife consensually recorded a telephone conversation with

8  Mr. Sylla which implicates Mr. Sylla in the illegal ivory

9  importation scheme with Mr. Mfomboutmoun and Mr. Yacouba.

10          Mr. Sylla did concede at the hearing and his

11  affidavit and in his submissions, that he met with Mr.

12  Yacouba through Mr. Mfomboutmoun and that he paid Mr.

13  Yacouba $6,000 for three pieces of illegally smuggled

14  ivory in September of 2007 which he then resold to his

15  clients.

16          He admits that through Mr. Mfomboutmoun, he put

17  Mr. Yacouba in touch with his nephew or cousin -- it's

18  used interchangeably in his submissions -- who lives --

19          MR. MARGULIS-OHNUMA:  Your Honor, that would be

20  my error.  It's nephew.

21          THE COURT:  Nephew, okay.

22          MR. MARGULIS-OHNUMA:  I was confused about

23  cousin at some point.

24          THE COURT:  All right.  Okay.  Well, anyway, he

25  does admit that he put Mr. Mfomboutmoun in touch with his

Proceedings

1  nephew who lives on the Ivory Coast.  However, Mr. Sylla

2  testified that he decided not to have Mr. Yacouba import

3  what he calls  his nephew's ivory because Mr. Sylla

4  feared that because Mr. Yacouba was not coming directly

5  back to the United States, the ivory would be ceased by

6  Customs officials in Africa and that Mr. Sylla would be

7  held responsible for the ivory that would be ceased that

8  was taken or given by his nephew.

9          Mr. Sylla admits in his affidavit that if

10  Mr. Yacouba had been coming directly to the United

11  States, he would have asked Mr. Yacouba to smuggle the

12  ivory from his nephew for him.  Mr. Sylla maintains,

13  however, that he ultimately did not ask Mr. Yacouba to

14  bring the ivory into the United States and that the ivory

15  pieces belonged to his nephew, not him.

16          Mr. Sylla denies all other transactions that

17  Mr. Yacouba testified about and denies that he recruited

18  Mr. Yacouba, instructed him on how and where to buy ivory

19  or that he sent him to the Ivory Coast to bring back his

20  ivory.

21          Defense counsel argues that the Court should not

22  rely on Mr. Yacouba's testimony because Mr. Yacouba was a

23  cooperating witness with a motive to lie in hopes of

24  reducing his sixteen month sentence.

25          In support of this proposition, defense counsel

Proceedings

1  points out that although Mr. Yacouba mentioned

2  Mr. Mfomboutmoun, at the time of his arrest, he only

3  implicated Mr. Sylla after he was sentenced and sought to

4  cooperate.

5          Mr. Sylla also suggests that it is improbably

6  that Mr. Yacouba, an international businessman, would

7  have directed Mr. Sylla, who defense counsel describes as

8  an impoverished and illiterate refugee and it is equally

9  improbable that Mr. Sylla would have access to the amount

10 of cash that Mr. Yacouba testified Mr. Sylla paid to him.

11         Defense counsel ultimately argues that

12 Mr. Sylla's testimony is more credible than Mr.

13 Yacouba's.  Mr. Yacouba argues that Mr. Yacouba testimony

14 is credible and is corroborated by his phone records,

15 travel records, Mr. Mfomboutmoun's proffer statements,

16 Mr. Sylla's bank records and Mr. Sylla himself.

17         Now, based on all of the evidence in the record

18 before me, including my viewing of Mr. Yacouba's

19 deposition testimony, I do find that his testimony was

20 credible and I find that based on the details of

21 Mr. Yacouba's testimony, and that on the corroborating

22 evidence of those details, that Mr. Sylla in conjunction

23 with Mr. Mfomboutmoun, worked with Mr. Yacouba to smuggle

24 ivory into the United States in March and September of

25 2007 and in January of 2008.  And that Mr. Sylla paid

1  additional monies to Mr. Yacouba in the amount of $1,500

2  to retrieve ivory for him in the Ivory Coast.

3       Furthermore, I find that Mr. Oliver's valuation

4  of ivory that Mr. Yacouba smuggled into the United States

5  in January 2008 to be a reliable valuation.  Despite the

6  fact that I previously did find Mr. Oliver qualified to

7  appraise African art, defense counsel nonetheless

8  continues to argue that Mr. Oliver is not qualified to do

9  so.  Defense counsel alternatively argues that if

10  Mr. Oliver is qualified, his appraisals are unreliable

11  because, for example, Mr. Oliver appraised ivory covered

12  by mud or resin.  He could only provide data of a few

13  comparable sales, that he based his appraisal on retail

14  market instead of wholesale market value and that -- and

15  on the offer price and not on the actual sales price.

16       I've considered Mr. Ohnuma's arguments but I

17  find that the $31,800 value that Mr. Oliver appraised for

18  the ivory pieces seized at the time of Mr. Yacouba's

19  arrest to be reliable for the following reasons:

20       First, Mr. Oliver testified at the Fatico

21  hearing that he assesses the value of particular pieces

22  of ivory by considering its carry or its beauty or its

23  patina or color, the finesse and detail of the carving

24  and its size.  And that he is familiar with the origin of

25  ivory statues and the concealment methods used by ivory

Proceedings

1  smugglers.

2       Mr. Oliver testified that he was able to

3  personally inspect each of the ivory pieces that

4  Mr. Yacouba brought to the United States in January 2008

5  and that he was able to hold the pieces and view the

6  ivory's color and patina when possible and that he noted

7  many of the pieces revealed corroborating evidence of the

8  dirt or binding mixture that Mr. Yacouba testified that

9  he was instructed to have applied to disguise the pieces

10  to either hide the fact that they were ivory and to look

11  more like wood or clay.

12       Although Mr. Oliver admitted that evaluating

13  ivory covered in resin provided some impediments to his

14  appraisal, Mr. Oliver testified that he could still

15  reliably evaluate the ivory pieces based on their

16  appearance through the resin and their size.

17       Moreover, I agree with Judge Gershon's

18  observation in sentencing Mr. Mfopa Yacouba, that the

19  difficulty in determining their fair market value, which

20  valuation may include an assessment of the condition and

21  the artistic quality of the ivory, ignores the important

22  purpose of the enforcement statutes which is to protect

23  from destruction and slaughter the elephants,

24  individually and as an endangered species and that those

25  tusks are taken only after the elephant is killed.

Proceedings

1      The defendant should not enjoy the benefit of

2 the deliberate concealment and staining used by ivory

3 smugglers to evade detection by law enforcement in

4 assessing a reliable valuation.

5      Thus, defendant's argument that the values

6 assigned to the ivory are unreliable due to the

7 deliberate concealment of the ivory under a resin matrix

8 by the ivory smugglers should not redound to the benefit

9 of the defendant.

10      Furthermore, Mr. Oliver explained that his

11 appraisals are based on what he knows the ivory will be

12 worth after they are cleaned and mounted and offered for

13 sale in the retail market.  It is clear from the record

14 that a legitimate retail market is the exact market that

15 Mr. Sylla was targeting by procuring pieces carved to

16 look like ivory pieces sold in the catalogues and art

17 galleries and auction houses and that he used this market

18 to set his prices.

19      Further, there's no evidence that there's any

20 impediment to cleaning the resin off the ivory that would

21 prevent it from being sold in a retail market.

22      Further, defense counsel's argument that

23 Mr. Oliver offers very little comparable sales data, some

24 of which includes the price that ivory is offered for

25 sale does not make Mr. Oliver's appraisals unreliable.

Proceedings

1  As discussed previously, the sentencing guidelines direct

2  the Court to make a reasonable estimate using any

3  reliable information and Mr. Oliver presented reliable

4  estimates based upon the reality that there are very few

5  historical sales of legitimate pieces of ivory, let alone

6  historical sales of smuggled ivory.

7          Finally, the Court declines to apply the twenty

8  percent discount to Mr. Oliver's appraisals urged by

9  defense counsel for the reasons that I just stated.  I

10 note that the ten percent discount that I applied to

11 Mr. Oliver's appraisals in Mr. Diane's and Mr.

12 Doumbouya's sentencings, is not applicable here because

13 in the case of Mr. Diane and Mr. Doumbouya, Mr. Oliver

14 was only able to appraise the ivory based on photographs

15 whereas here, he was able to personally inspect the ivory

16 that was imported in January 2008.

17         Also, I think there was some concern raised by

18 Mr. Ohnuma that the appraisal value included the wood

19 carvings, the non-ivory carvings in that shipment and

20 looking back at Mr. Oliver's appraisal of that shipment,

21 he specifically broke apart and appraised separately,

22 objects made of ivory and objects made of wood.  And the

23 Court's calculations and evaluations that Mr. Oliver gave

24 to the ivory pieces were only from ivory.  So, Mr. Sylla

25 is not being charged for wood carvings.

Proceedings

1    Accordingly, I find that Mr. Sylla is

2  accountable for a total value of $68,300 worth of ivory

3  that he imported, purchased and sold with Mr. Yacouba.

4  This is based on the addition of $10,000 paid to

5  Mr. Yacouba in March 2007, plus $20,000 paid to

6  Mr. Yacouba in September 2007, plus $1,500 paid to Mr.

7  Yacouba to retrieve Mr. Sylla's ivory from the Ivory

8  Coast, plus $31,800 of the thirty-six pieces seized --

9  I'm sorry, these are -- there was some discrepancy

10  regarding tops of pieces but the bottom line is the total

11  value and each of the pieces detailed in Mr. Oliver's

12  March 25th appraisal amounted to $31,800 and those were

13  the pieces seized and inspected by Mr. Oliver from

14  Mr. Yacouba's January '08 arrest and seizure.

15    In total, Mr. Sylla is accountable for $16,000

16  in domestic sales of ivory and that's calculated as $900

17  for the pieces of ivory sold to Clarice Sabree, $300 for

18  the sale of the ivory trumpet to Robert Banks, $3,000 for

19  the ivory value of the Benin leopard statue, $4,400 for

20  the sale of two ivory tusks on behalf of Otis Williams,

21  $3,000 for the sale of the ivory Benin leopard statue to

22  Mr. Williams, $4,000 -- I'm sorry, $4,400 for the sale of

23  two -- the two couple Baule ivory statue to Mr. Ibrahim

24  and I did not add the $2,000 sale to Howard Henderson in

25  an attempt to avoid double counting because I am assuming

Proceedings

1  that that $2,00 sale is included in the imported amounts

2  that Mr. Yacouba brought in.

3          MR. SINCLAIR:  Your Honor?

4          THE COURT:  I'm sorry?

5          MR. SINCLAIR:  I was just going through your

6  calculation.

7          THE COURT:  Okay.  I'm wrong?

8          MR. SINCLAIR:  No, no.  I don't know.

9          THE COURT:  No, no, that's okay.

10          MR. SINCLAIR:  I did not hear you including that

11  amount, the $3,000 for the leopard in his house.  You

12  included, I heard just now, one $3,000 for the $3,000

13  sale of the leopard to Williams.  I may have heard wrong.

14          THE COURT:  Oh, you know what?  Wait.  I did.  I

15  did.  I'm sorry.  $900 for the pieces of ivory sold to

16  Clarice Sabree, $300 for the sale of the ivory trumpet to

17  Robert Banks, $3,000 for the market value of the ivory

18  leopard in his house -- I'm sorry, I should have said

19  that -- made that clearer and then another $3,000 for the

20  sale of a similar ivory Benin leopard to Mr. Williams,

21  $4,400 for the sale of two ivory tusks for Mr. Otis

22  Williams and $4,400 for the sale of the two couple Baule

23  ivory statues to Mr. Ibrahim.  And then not counting the

24  $2,000 sale to Mr. Henderson.  Does that add up?

25          MR. SINCLAIR:  That's what I understood from

Proceedings

1  what the Court's findings have been so far; yes.

2       THE COURT:  Okay.  All right.  I think the math

3  is correct.  We double-checked it a couple of times.  So,

4  all right. Now --

5       MR. MARGULIS-OHNUMA:  Sorry.  So, that total

6  number of domestics comes to $16,000?

7       THE COURT:  Yes, $16,000 domestic, $68,300 for

8  the transactions involving Mr. Yacouba, total $84,300.

9       Now based on Mr. Sylla's financial profile and

10 notwithstanding the fact that he owns a home, I find

11 based on the PSR's information that Mr. Sylla cannot pay

12 a fine.

13      I've given respectful consideration to the

14 advisory guidelines and I compute Mr. Sylla's offense

15 level as follows bsed on my findings:

16      For a violatiuon of Title 16 USC Section

17 3372(a)(1), I've considered advsiory guideline 2q2.1(a)

18 and that provides for a base offense level of six.  A two

19 level increase is applied pursuant to advisory guideline

20 2q2.1(b)(1)(A) because the offense was committed for

21 pecuniary gain.

22      Given what I have just found to be the market

23 value of ivory attributable to Mr. Sylla for a total of

24 $8,000 -- I'm sorry, $84,300, eight points are added.  I

25 make no adjustments for any human victims or obstruction

Proceedings

1  of justice.

2         Now there is a dispute about the role of the

3  offense.  Both the probation department and the

4  government seek a two level enhancement under advisory

5  guideline 3b1.1(c) for defendant's role as an organizer,

6  leader, manager or supervisor.  The government argues

7  that such an enhancement is warranted because

8  Mr. Sylla provided Mr. Yacouba with directions on how to

9  import ivory into the United States and what types of

10 ivory to smuggle into the United States.  And funded his

11 trip to the Ivory Coast to retrieve ivory.

12        Second, that Mr. Sylla directed a man named Alfa

13 Jenna to act as a courier for him by having Mr. Jenna

14 sell ivory to Mr. Henderson and bring a check from

15 Mr. Henderson to Mr. Sylla with a pay to the order line

16 blank and subsequently filled in with Mr. Sylla's name.

17        Third, that Mr. Sylla directed co-defendant

18 Mfomboutma.

19        Now in opposition, Mr. Sylla argues that it is

20 not believable that Mr. Sylla managed someone of

21 Mr. Yacouba's stature and negotiating a check for

22 Mr. Jenna is insufficient to support a guideline

23 enhancement.

24        I note here that the PSR did not recommend and I

25 did not award a two level enhancement for Mr.

Proceedings

1  Mfomboutmoun who is involved in all of the transactions

2  with Mr. Sylla involving Mr. Yacouba.

3        Given the similarity with which Mr. Yacouba

4  described his interactions, always together with

5  Mr. Sylla and Mr. Mfomboutmoun, and the lack of evidence

6  that Mr. Sylla led, organized, managed or supervised

7  Mr. Mfomboutmoun, or even Mr. Yacouba, I find that

8  awarding Mr. Sylla a role enhancement here would lead to

9  a sentencing disparity.

10       Further, I find that there is not preponderant

11  evidence as to the nature of the relationship between

12  Mr. Sylla and Mr. Jenna or the circumstances that led to

13  Mr. Jenna to and pick up a check for Mr. Sylla to warrant

14  the instant role enhancement.  There are a number of

15  explanations that could account for that situation.

16       Mr. Sylla pleaded guilty and notified the

17  government of his intention to do so in a timely manner,

18  sparing the government the burden of preparing for trial.

19  As was his right, though, he did ask the government to

20  prove by a preponderance the involvement of Mr. Sylla in

21  the various transactions and the value of those

22  transactions.

23       Nonetheless, Mr. Sylla will receive a two level

24  decrease plus the additional one level decrease that the

25  government has agreed to.  So, a total of three points

Proceedings

1  off.

2       He also receives a one point deduction for the

3  global disposition which was available to three of the

4  defendants including Mr. Sylla.

5       Thus, we have a total offense level of twelve.

6  I do not find any aggravating factors.

7       MR. SINCLAIR:  Your Honor?

8       THE COURT:  Yes.

9       MR. SINCLAIR:  If I may be heard?

10      THE COURT:  Yes, sir.

11      MR. SINCLAIR:  In light of the Court's finding

12  with respect to the Yacouba transactions, effectively the

13  Court has found that the defendant perjured himself in

14  the course of the Fatico hearing by denying any other

15  involvement with the Yacouba transactions is contrary to

16  what the Court's findings are and frankly, what the

17  evidence established at trial.  Therefore, the government

18  under these circumstances moves the Court to add a two

19  point enhancement for obstruction of justice as is

20  contemplated by the guidelines.

21      MR. MARGULIS-OHNUMA:  I am going to object to

22  that, your Honor.  He was --

23      THE COURT:  You know, I'm not making a finding

24  that Mr. Sylla perjured himself.  What I'm saying is that

25  I'm trying to weigh a preponderance and there is an

Proceedings

1 explanation that Mr. Sylla offered at trial. I

2 understand that he denies having smuggled ivory with

3 Mr. Yacouba.

4 I did find Mr. Yacouba to be credible and I did

5 find that the disparities or inconsistencies that

6 Mr. Sylla's counsel argued for with respect to that

7 testimony were not really of any significance or

8 explanable. For example, I think that there was some

9 focus on Mr. Yacouba's cross-examination where he wasn't

10 sure what ivory masks belonged to him and what belonged

11 to Mr. Sylla. But I believed in reading the full

12 transcript, Mr. Yacouba was able to explain that, that

13 they were packaged and in Mr. Yacouba's mind, some was

14 from Mr. Sylla's, some was stuff that he intended to sell

15 on his own and that those packages were -- they were

16 similar in appearance and they were -- the packages were

17 opened and that they were sort of put together and a year

18 and a half after the seizure, Mr. Yacouba was unable to

19 specifically say which particular mask was his and which

20 was Mr. Sylla's. I did not think that that was a

21 material base -- a material inconsistency or one that

22 would warrant a finding that Mr. Yacouba was not

23 credible.

24 But I am not finding that Mr. Sylla deliberately

25 lied. He has an explanation and based on the

Proceedings

1 preponderance and all the other credible information and

2 evidence before me, I found in favor of the government on

3 some of those disputed issues.

4          MR. SINCLAIR:  Respectfully, it is a matter of

5 he denied any additional contact with Yacouba which flies

6 in the face of the proven facts and, you know, as the

7 government has been arguing all along, and in light of

8 the Court's findings today, to deny that he interacted

9 with Yacouba, for purposes of the transactions, and to

10 find that he did not lie on the stand is factually

11 incompatible, your Honor, and --

12          THE COURT:  Well, I think perjury is a crime and

13 I think what you're asking me to find is that he perjured

14 himself.

15          MR. SINCLAIR:  No, for instance, the obstruction

16 of justice enhancement is often times used if statements

17 are made inconsistent with the probation department in

18 the course of creating the PSR and that is more akin to

19 what the government is seeking for the Court to find

20 here.

21          With respect to the Court's fact finding mission

22 in establishing what the guidelines are, the defendant

23 presented a story that was false in light of the evidence

24 and now in light of the Court's findings, it's

25 necessarily false.

Proceedings

1          MR. MARGULIS-OHNUMA:  Your Honor?

2          MR. SINCLAIR:  And so therefore, under these

3    circumstances, an obstruction of justice enhancement

4    should be found here.

5          MR. MARGULIS-OHNUMA:  Your Honor, if I may?

6    It's -- I mean, I think counsel's suggesting that it's

7    necessary -- that because there's an inconsistently one

8    is true and the other is necessarily false and that's

9    just not so.  I mean, first of all, it's only by a

10   preponderance that you credited Yacouba's testimony.

11   It's not beyond a reasonable doubt.  And even in that

12   case, repugnant verdicts are allowed to stand in many

13   cases, contradictory verdicts are allowed to stand when

14   it's beyond a reasonable doubt.  In this case, it's only

15   by a preponderance.

16          And it's -- I mean I have no choice but to

17   accept your finding on that but it doesn't mean that it's

18   so strong that it would prove perjury or prove a false

19   statement to a preponderance by Mr. Sylla.

20          MR. SINCLAIR:  Your Honor, the standard for all

21   of the findings under the guidelines are by a

22   preponderance --

23          MR. MARGULIS-OHNUMA:  That's what I just said.

24          MR. SINCLAIR:  -- to the extent -- and to the

25   extent that the Court needs to find sufficient facts to

Proceedings

1   find that there was an obstruction of justice, that too

2   would be by a preponderence.  Necessarily, given that you

3   found -- the Court found that there's an inconsistency in

4   this story, and the defendant took the stand and you

5   found more than enough evidence to find that his story

6   was inconsistent, thereby establishing the finding, the

7   Court necessarily found that there's more -- that his

8   story is inconsistent and that he has presented false

9   information to the Court in the course of the fact

10  finding mission.

11          That is -- and I don't have the guidelines in

12  front of me.  I see that the Court's reviewing what the

13  guidelines say about this but I believe that it's within

14  the ambit of the two point enhancement for obstruction of

15  justice under them.

16          THE COURT:  All right.  Just for the record, the

17  advisory guideline 3C1.1 regarding obstructing or

18  impeding the administration of justice provides, "If (A)

19  the defendant willfully obstructed or impeded, or

20  attempted to obstruct or impede, the administration of

21  justice with respect to the investigation, prosecution,

22  or sentencing of the instant offense of conviction, and

23  (B) the obstructive conduct related to (i) the

24  defendant's offense of conviction and any relevant

25  conduct; or (ii) a closely related offense, increase the

1  offense level by 2 levels."

2       Right.  Now, I note again, you know, as we all

3  know these are advisory and I just -- I think what we're

4  trying to get to ultimately is a sentence that will be

5  appropriate, you know?  That will be sufficient but not

6  greater than necessary.  And it is a difficult case and I

7  understand that there was a lot of effort by both parts,

8  which I am very grateful for, in presenting evidence and

9  trying to assist the Court in coming to the right

10 decision regarding what that sentence should be.

11      And I understand what the guidelines provide.

12 Nonetheless, they are advisory and I am giving -- I'm

13 going to calculate, even if I were to add that extra two

14 point enhancement for obstruction, ultimately I would

15 have the authority as we know, to give a sentence that is

16 more or less severe, as long as I am within the range.

17      And I think that Mr. Sylla's personal situation

18 does present a somewhat unique situation, not -- I'm not

19 excusing it at all and I'm not diminishing the

20 seriousness of it.  But I think that 3553(a) does give me

21 some latitude to consider other factors that will guide

22 me toward an appropriate sentence in this case.

23      So, I certainly do understand the government's

24 view that there was an affidavit that prompted the

25 hearing and it was a request for a hearing and that had

1  substantial time and effort by all parties in presenting

2  evidence at that hearing and substantial work by

3  everybody including the Fish and Wildlife agents and the

4  experts that were retained.  And I know that all the

5  defense lawyers worked very hard to present evidence in

6  that case.

7          It does seem to me that if I were to follow this

8  guideline, it would require a two point enhancement for

9  obstruction.  Given my findings, which I stand by, given

10  my observation of all of the witnesses, including

11  Mr. Yacouba, but I will be going on from there to

12  consider the sentence under the statute which I am

13  required to do, as well.  So, if we do add the two

14  points, we are at a fourteen.

15          THE CLERK:  So, you're going to grant it?

16          THE COURT:  Yes, I'm going to grant -- I'm

17  granting the obstruction enhancement.

18          Now, the presentence report indicates that

19  Mr. Sylla has no prior criminal convictions other than

20  the instant offense.  So, his criminal history category

21  is one under the advisory sentencing tables.

22          There are no open counts in the superseding

23  information.  And the indictment --

24          MR. SINCLAIR:  Your Honor, there are two open

25  counts in the underlying indictment and the government

Proceedings

1  moves Counts 1 and 2 of the underlying indictment be

2  moved to dismiss.

3          THE COURT:  All right.  We will dismiss Counts 1

4  and 2 of the indictment, underlying superseding

5  indictment.

6          MR. SINCLAIR:  And that indictment is now

7  dismissed in its entirety.

8          THE COURT:  Okay.  Thank you.  Thanks for your

9  guidance on that.

10          All right.  I've next had to consider the

11  sentencing options both under the advisory guidelines and

12  the criminal code.  So, under the statute, the maximum

13  term of imprisonment for a violation of Title 16 USC

14  Section 3372(a)(1) is five years.  And that's pursuant to

15  Section 3373(d)(1)(B).

16          Under the advisory guidelines, with the offense

17  level of fourteen, and a criminal history category of

18  one, we come to a range of fifteen to twenty-one months.

19          Okay.  Bear with us.  We're just going to make

20  sure we're not using -- we're going to take just a couple

21  of minutes.

22          (Off the record)

23          THE COURT:  We're back on the record and my

24  clerk is going to provide the guidelines that were

25  effective in November 2008 and before.  And if you look

Proceedings

1  on the back page, with an adjusted offense level of

2  fourteen and criminal history category of one, it results

3  in a range of fifteen to twenty-one months, which is the

4  current guideline, as well.  And in addition, it is still

5  a Zone B offense.  So, nothing has changed substantively

6  regarding the range.

7           MR. MARGULIS-OHNUMA:  Your Honor, I was just

8  checking the fraud table that you -- I thought you had

9  mentioned it changed.  Is that --

10          THE COURT:  No, it was my mistake.

11          MR. MARGULIS-OHNUMA:  I'm just double-checking.

12          THE COURT:  Excuse me.  I thought you were --

13  you had referenced a 2010 date and we were using the

14  2008 --

15          MR. MARGULIS-OHNUMA:  Right.

16          THE COURT:  -- which applies prior to that date.

17          MR. MARGULIS-OHNUMA:  Okay.  And I see the plus

18  eight supported by your finding of the $84,000 amount.

19  So, that's -- I'm in agreement with that.

20          THE COURT:  All right.  In addition, the -- to

21  the advisory guidelines which provide for a range of

22  sentence between fifteen to twenty-one months, I next

23  turn to supervised release which under the criminal code

24  3583(a) and (b)(2) provides that if a term of

25  imprisonment is imposed, supervised release shall not be

1   more than three years and the advisory guideline provides

2   for supervised release between two to three years, if a

3   term of imprisonment is imposed.

4           Under the criminal code, Title 18 USC Section

5   3561(a), and (c)(1), Mr. Sylla may be sentenced to

6   probation for not less than one or more than five years.

7   However, under the advisory guidelines because the

8   minimum term is greater than six months, the defendant is

9   not eligible for probation.

10          The fines under Title 18 USC Section 3571(b)(3),

11  is $250,000 and under the advisory guidelines it's

12  between $4,000 and $40,000.  However, as I previously

13  noted, it does not appear that Mr. Sylla is able to pay a

14  fine based on his financial circumstances.

15          I must impose and do impose a mandatory special

16  assessment and in addition, there was a final order of

17  forfeiture entered in January 12, 2011.  Mr. Sylla is

18  ordered -- was ordered and is ordered as part of this

19  sentence to forfeit any property in which he has an

20  interest and which was derived from the proceeds of the

21  instant offense.  There were pieces of ivory that were

22  listed there and I believe there was other property

23  including the rough cut diamonds, I believe, was there.

24          MR. SINCLAIR:  That's correct, your Honor.

25          THE COURT:  All right.  But no automobile, as I

Proceedings

1  recall.

2        MR. SINCLAIR:  That is correct.

3        THE COURT:  All right.  Now, Mr. Sylla, I wish

4  to advise you that do you have the right to appeal your

5  sentence, subject to any waiver of your appellate rights.

6        Did he --

7        MR. MARGULIS-OHNUMA:  There is a waiver, your

8  Honor.

9        THE COURT:  Yes, he did.  There was a plea --

10        MR. SINCLAIR:  There is an appeallate waiver and

11  we've not yet addressed it.

12        THE COURT:  There was a plea agreement in which

13  he did make a waiver.  However, it is not my place to

14  determine the enforceability of that waiver.  That's an

15  issue for the appellate court.

16        You must file an appeal within fourteen days of

17  judgment being entered and if you cannot afford to pay

18  the cost of an appeal, you may apply for leave to do so

19  without payment of a filing fee.  And in addition, the

20  clerk will prepare a notice of appeal if you request the

21  clerk to do so.

22        And I trust that Mr. Ohnuma-Margulis would, if

23  asked, represent Mr. Sylla on the appeal, if he chooses

24  to exercise his right to appeal.

25        MR. MARGULIS-OHNUMA:  Yes, your Honor.

Proceedings

1          THE COURT:  All right.  Now do we have any

2   issues regarding return of property or has that all been

3   taken care of?

4          MR. SINCLAIR:  I don't believe there are any

5   outstanding issues.

6          MR. MARGULIS-OHNUMA:  Yes, your Honor.  The

7   government's in possession of Mr. Sylla's passport, I

8   think or the --

9          MR. SINCLAIR:  Well, the Court is.

10          MR. MARGULIS-OHNUMA:  Yes.

11          THE COURT:  Yes, the Court will retain control

12   until after any supervised release term is terminated or

13   concluded.

14          MR. MARGULIS-OHNUMA:  Well, in terms of property

15   that was seized, it was -- we forfeit any interest in it,

16   so no.

17          THE COURT:  All right.  Are there any other

18   matters that I should consider before we move forward?

19          MR. SINCLAIR:  Nothing further from the

20   government, your Honor.

21          THE COURT:  All right.

22          MR. MARGULIS-OHNUMA:  Not from the defense, your

23   Honor.

24          THE COURT:  Now, as we know, I must also

25   consider the 3553(a) factors under the criminal code,

Proceedings

1  first with respect to the nature and circumstances of the

2  offense and the history and characteristics of the

3  defendant.  I find that the nature of Mr. Sylla's

4  offense, that is selling ivory that he knows to be

5  imported illegally, that is ivory from the endangered

6  African elephant, for financial gain is a very serious

7  offense because it encourages the death of elephants, an

8  endangered species, the poaching which results in harm to

9  law enforcement and it heightens the risk of an

10 endangered species.

11         In addition, as we've discussed earlier, there

12 are adverse human impacts by the loss of an endangered

13 species, especially the African elephant.

14         I have considered Mr. Sylla's family history and

15 circusmtances and find them to be very compelling and

16 very sympathetic.  Mr. Sylla was born January 9, 1976 in

17 Liberia.  The only child born to his young parents,

18 Mohammed Sylla and Awa (ph.) Sylla.  Mr. Sylla has four

19 half-siblings and he was raised under very difficult

20 economic circumstances where there was often not enough

21 food for the family.

22         In addition, in 1989 when Mr. Sylla was only

23 thirteen years old, his family had to flee for their

24 lives to escape persecution and murder in Liberia.  They

25 lived in a refugee camp in Guinea and it was very

1  difficult for the family to find work or to find

2  sufficient food to sustain themselves.

3         Mr. Sylla's parents ended up separating and Mr.

4  Sylla then lived with his father and paternal

5  grandmother.  In 1991, Mr. Sylla briefly traveled to

6  Sierra Leone in the hope of obtaining work and sending

7  money home to his family.  However, he was forced to

8  return to Guinea due to political unrest.  And he also

9  found that it was very difficult to pay the debt that he

10  owed for his travel expenses to Sierra Leone.

11         In 1992, Mr. Sylla's father left the family --

12  left Mr. Sylla and emigrated to the United States in

13  order to escape the conditions in Guinea and in 1998, Mr.

14  Sylla followed his father to the United States on a

15  temporary work visa that he was able to procure as a

16  refugee from Liberia.

17         Mr. Sylla resided since his arrival in Trenton,

18  New Jersey and lived near his father.  He maintains a

19  close relationship with his father and lives close by.

20         Mr. Sylla was unable to be included on his

21  father's asylum application but applied for asylum

22  himself in 2004 as a Liberian refugee of Mandingo

23  descent.  In 2007, he also filed a request for a deferred

24  enforced departure which provides certain Liberians with

25  temporary protected status in the United States.

Proceedings

1          Mr. Sylla keeps in close contact with his

2     mother, grandmother and half sisters in Guinea and sends

3     between $50 to $200 a month to them which is enough to

4     feed them for one month.  According to defense counsel's

5     submissions, Mr. Sylla and his father who works as a

6     delivery person are very close and together they send an

7     additional $50 to $200 a month through their extended

8     family in the United States to more than thirty extended

9     family members in Guinea. They hold monthly family

10    meetings to discuss ways that they can help their

11    relatives.

12          Mr. Sylla is not married but he does have a six

13    year old daughter with Whatta Bamba (ph.).  Ms. Bamba,

14    their daughter and Ms. Bamba's daughter from another

15    relationship all reside in Mr. Sylla's home in Trenton,

16    New Jersey, even though Mr. Sylla and Ms. Bamba no longer

17    share a romantic relationship.  Mr. Sylla is consistently

18    described by his family and friends and Ms. Bamba as a

19    wonderful father who has an extremely close relationship

20    with his daughter and who plays an active role in her

21    life.  The letters submitted on his behalf detail the

22    difficulty that Mr. Sylla's daughter has had coping with

23    his arrest and initial detention.

24          Mr. Sylla also cares for and supports an eleven

25    year old son who lives in Guinea and he does attempt to

Proceedings

1  maintain contact.  Mr. Sylla sends between $50 and $200 a

2  month to his son and his son's mother and grandmother.

3        Mr. Sylla attended primary school in Liberia for

4  four years and attended two months of secondary school in

5  Guinea.  Mr. Sylla is currently attending adult literacy

6  classes once a week, although it's reported that he has

7  become depressed and has difficulty concentrating at

8  those classes.

9        Mr. Sylla owns and operates a hair braiding

10 salon in Trenton, New Jersey and has two employees, one

11 of whom is Ms. Bamba.  The business earns between $600

12 and $1,200 a month.  Mr. Sylla had also been employed --

13 self-employed as an African art dealer since 2003. In

14 this capacity, Mr. Sylla sold hand carved wood and bronze

15 carvings which he usually bought from wholesale dealers

16 and sold to galleries and private clients.  Because of

17 the travel restrictions placed on him in connection with

18 this offense, he has been unable to make money as an art

19 dealer.

20       Prior to being an art dealer, Mr. Sylla worked

21 as a handyman and a stock person with a Dollar Store and

22 Walmart and before coming to the United States, he worked

23 as a housekeeper, car washer and in diamond mines under

24 very harsh conditions.

25       Mr. Sylla does not suffer from any mental or

Proceedings

1  emotional health issues and is in good physical health

2  and he has no history of drug use or alcohol consumption.

3          The PSR notes that he has compliant with all

4  pretrial release conditions.

5          All of the letters submitted on Mr. Sylla's

6  behalf describe him as a hard-working and generous

7  person, an exceptional father who is trying to better

8  himself, so that he can continue to provide for his

9  family.  The letters describe the difficulties of living

10  in Africa and explain the financial support that

11  Mr. Sylla provides, allows his relatives the basic

12  necessities of food. The letters also ask the Court to

13  give him a second chance.

14          Now under 3553(a)(2), the sentence that I impose

15  must reflect the seriousness of the offense, promote

16  respect for the law and provide just punishment, afford

17  adequate deterrence to criminal contact, protect the

18  public from further crimes of the defendant and provide

19  defendant with needed educational or vocational training,

20  medical care or other correctional treatment in the most

21  effective manner.

22          As previously discussed, the selling of ivory

23  from endangered African elephants is a serious crime

24  because of the necessity of slaughtering those endangered

25  animals.  The people who participate in the illegal ivory

Proceedings

1    trade are incentivized by the slaughter of elephants and

2    a profit to be made by trafficking in illegal ivory and

3    they must be deterred.

4            Mr. Sylla's attorney emphasizes that Mr. Sylla

5    has alreayd been deterred by the three months he spent in

6    detention, both in BOP custody and immigration custody,

7    as well as the possibility of deportation, imminent

8    separation from his daughter and his father and the loss

9    of the life that he has built for himself here in the

10   United States.

11           As the letters from Mr. Sylla's father and Ms.

12   Bamba poignantly expressed, Mr. Sylla's immediate family

13   in the United States and Guinea are financially dependent

14   upo him.  Notwithstanding his very sympathetic family

15   circumstances, I am concerned that Mr. Sylla has engaged

16   extensively in the illegal trafficking of ivory from the

17   endangered African elephant.

18           Now I note that Mr. Sylla has requested a

19   departure from the guidelines here and we discussed

20   previously the factors that Mr. Ohnuma has asserted.

21           Under 3553(a)(3) and (4), I have also considered

22   the kinds of sentences available and the sentencing

23   ranges established under the applicable -- I'm sorry, the

24   advisory guidelines for the applicable category of

25   defendant.  I've considered 3553(a)(5)'s policy

Proceedings

1  statements and the need to avoid unwarranted sentencing

2  disparities pursuant to 3553(a)(6), among defendants with

3  similar records who have been found guilty of similar

4  conduct.

5      Mr. Sylla has six co-defendants in this case.

6  I've considered the conduct of each of Mr. Sylla's co-

7  defendants, as well as the sentences of other defendants

8  who have violated the Lacey Act by the sale of illegally

9  imported African elephant ivory.

10     I find that Mr. Sylla is more culpable than the

11  low to mid-level operatives in the ivory smuggling trade

12  and sales that I have previously sentenced such as Mr.

13  Diane, who I sentenced to one month in custody, three

14  months of home confinement and a $1,200 fine.  And Mr.

15  Sidime, who I sentenced to one month in custody and five

16  months of home confinement.  And Mr. Kone, who I

17  sentenced to one year of probation and a $1,200 fine.

18     All of these defendants imported, sold and

19  transported significantly less ivory than Mr. Sylla over

20  a shorter period of time.  Instead, I find that Mr. Sylla

21  is more similarly situated to Mr. Doumbouya who I

22  sentenced to fourteen months in custody and to Mr.

23  Mfomboutmoun, who I sentenced to ten months and twenty-

24  seven days in custody, both of whom smuggled similar

25  quantities of ivory over a similar period of time as

Proceedings

1 Mr. Sylla.

2          After giving respectful consideration to the

3 advisory sentencing guidelines, I will impose a sentence

4 that falls below the advisory guideline range and is

5 sufficient but not greater than necessary for punishment

6 and deterrence and in doing so again, I take into

7 consideration the very unique and difficult circumstances

8 under which Mr. Sylla was raised.  And again, I do not

9 diminish in the least the seriousness of the offense or

10 the magnitude of the offense.

11          I'm authorized and do find all of the facts

12 appropriate for the sentence as follows:

13          I sentence Mr. Sylla to a sentence of ten months

14 in custody with credit for the time served in BOP custody

15 only; that is one month and twelve days. He does not

16 receive credit under the law for the immigration custody.

17          I sentence him to three years of supervised

18 release with a condition that Mr. Sylla serve sixty hours

19 of community service for each year of supervised release,

20 preferably with the Wildlife Conservation organization.

21 Mr. --

22          MR. SINCLAIR:  Your Honor,  I apologize for

23 interrupting.  Was it sixty or sixteen?

24          THE COURT:  6-0, sixty hours of community

25 service for each of the three years of supervised

Proceedings

1   release.  So, 180 hours of community service, again

2   preferably with a Wildlife organization because I do

3   think it's important for Mr. Sylla to understand the need

4   for wildlife conservation.

5          I also sentence him -- I also impose a condition

6   that he shall not possess any firearm, ammunition or

7   destructive device, that he must comply with forfeiture

8   as ordered by the Court.

9          If he is deported, Mr. Sylla may not re-enter

10  the United States illegally and he need not serve his

11  supervised release term in the United States.

12         Mr. Sylla shall submit his person, residence,

13  place of business, any vehicles or other premises under

14  his control to a search by probation on the basis that

15  the probation officer has a reasonable belief that

16  contraband or evidence of a violation of the conditions

17  of release may be found.  The search must be conducted in

18  a reasonable manner and at a reasonable time.

19         The defendant shall inform any other residents

20  that the premises may be subject to search pursuant to

21  this condition.  Mr. Sylla will not be ordered to pay a

22  fine.  He must pay a $100 special assessment without

23  interest and he must criminal forfeit the items set forth

24  in the final order of forfeiture and in his plea

25  agreement.  The final order of forfeiture is incorporated

Proceedings

1    into this judgment.

2            I would like to set a surrender date for

3    Mr. Sylla.

4            MR. MARGULIS-OHNUMA:  He has no desire to

5    prolong the proceeding.  I think it's about six or eight

6    weeks to designate him.  We would also request a

7    designation to Fort Dix, which is closest to his home, I

8    think.  Although it's a low, not a camp, it would

9    facilitate visits with his family which is very important

10   to him.

11           THE COURT:  Well, I'm going to ask BOP to

12   consider placing him at Fort Dix or another facility in

13   this area that will facilitate family visits, all right?

14           MR. MARGULIS-OHNUMA:  Yes.

15           THE COURT:  I don't have the ability to tell

16   them exactly where because I don't know what their

17   situation is.

18           MR. MARGULIS-OHNUMA:  Thanks.

19           MR. SINCLAIR:  Your Honor, when describing the

20   vicinity, I think that the defendant wants to be in the

21   vicinity of Trenton, not Brooklyn.

22           MR. MARGULIS-OHNUMA:  Yes, Trenton.

23           THE COURT:  Oh.

24           MR. MARGULIS-OHNUMA:  Right.

25           THE COURT:  Okay. In the vicinity of Trenton,

Proceedings

1 New Jersey.

2        MR. MARGULIS-OHNUMA:  Right.  I would have asked
3 for Otisville if he were in New York.

4        THE COURT:  Yes, okay.  All right.  So when you
5 say as soon as possible, what would like to do?

6        MR. MARGULIS-OHNUMA:  So, I mean I --

7        THE COURT:  Should I have him surrender
8 tomorrow?

9        MR. MARGULIS-OHNUMA:  No, because then he won't
10 be designated.

11        THE COURT:  Okay.

12        MR. MARGULIS-OHNUMA:  So --

13        THE COURT:  Six to eight weeks --

14        MR. MARGULIS-OHNUMA:  Six to eight; yeah.

15        THE COURT:  -- after designation?

16        MR. MARGULIS-OHNUMA:  No, after -- as soon as
17 possible after designation which I think takes six or
18 eight weeks.

19        THE COURT:  Oh.

20        MR. MARGULIS-OHNUMA:  But the government might
21 have more information on that.

22        MR. SINCLAIR:  So, maybe six weeks from today.

23

24        MR. MARGULIS-OHNUMA:  Right, maybe eight weeks
25 from today to be safe.

Proceedings

1          THE COURT:  All right.

2          MR. MARGULIS-OHNUMA:  Because I don't want him

3     to be shuttled around --

4          THE COURT:  I understand.

5          MR. MARGULIS-OHNUMA:  -- if he's not designated.

6

7          THE COURT:  All right.  Today is March 2nd.

8     That would bring us to April 13th.

9          (Pause)

10         MR. MARGULIS-OHNUMA:  Yes, your Honor, it's

11    April 13th, is that what you said?

12         THE COURT:  Let me just double-check.  Six weeks

13    is April 13th.

14         MR. MARGULIS-OHNUMA:  Right.

15         THE COURT:  Six weeks isApril 13th.  Do you want

16    eight weeks?

17         MR. MARGULIS-OHNUMA:  I need -- I think eight

18    weeks is safer, just to give them a chance to designate

19    him.

20         THE COURT:  Do you want April 27th?  Surrender

21    on April 27th.

22         MR. MARGULIS-OHNUMA:  Thank you, your Honor.

23         THE COURT:  All right.  To the facility

24    designated by the BOP.  And that would be by 12 noon.

25         MR. MARGULIS-OHNUMA:  Yes, your Honor.

Proceedings

1          THE COURT:  And I will continue the conditions

2   of release absent any objection or reason why I

3   shouldn't.

4          MR. SINCLAIR:  No objection.

5          THE COURT:  All right.  Thank you.

6          MR. MARGULIS-OHNUMA:  Thank you, Judge.

7          THE COURT:  Okay.  We're adjourned.

8          MR. SINCLAIR:  Thank you, your Honor.

9                   (Matter concluded)

10                       -o0o-

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T E

I, LINDA FERRARA, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **nd** day of **April**, 2014.

*Linda Ferrara*

Linda Ferrara

CET**D 656

Transcriptions Plus II, Inc.